**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| **UNITED STATES OF AMERICA** | ) | | |
| | ) | | |
| **v.** | ) | No. | **1:21-cr-28 (APM)** |
| | ) | | |
| **KENNETH HARRELSON,** | ) | | |
| | ) | | |
| **Defendant.** | ) | | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S
<u>MOTION FOR RECONSIDERATION OF CONDITIONS OF RELEASE</u>**

Defendant Kenneth Harrelson should remain detained pending trial. Like his co-defendant Kelly Meggs (as "Gator 1"), Defendant Harrelson (as "Gator 6") was one of the leaders of the group of Oath Keepers who organized and plotted with coconspirators to stop the certification of the Electoral College vote, prepared to use violence if necessary, and stormed the Capitol. Afterwards, he attempted to delete incriminating evidence and falsely distance himself from the Oath Keepers, and then he perjured himself at his detention hearing.

For these reasons, the Court should maintain the order that the defendant be detained pending trial and deny the defendant's motion (ECF 143).

I.    <u>Background</u>

Video recorded on January 6, 2021, captured the defendant among a "stack" of more than a dozen individuals dressed in camouflaged para-military gear moving in a deliberate and organized manner toward the Capitol building. An additional recording shows the stack moments later embedded near the front of a violent mob that is attempting to break open the doors of the Capitol building. The video depicts the doors later opening and the subsequent flow of people into the building, to include the defendant and members of the stack. Selfies and surveillance video taken inside of the Capitol Rotunda further evince Defendant Harrelson's and his coconspirators' presence inside.

Co-defendant Jessica Watkins characterized their insurgent effort to breach the Capitol building as "forcing entry into the Capitol building" and said that it was "[f]orced.  Like Rugby." On the afternoon and evening of January 6, co-defendant Graydon Young wrote on Facebook that "[w]e stormed and got inside."  Co-defendant Kelly Meggs wrote in a Signal chat, "Ok who gives a damn who went in there…. We are now the enemy of the State."  An hour later, Kelly Meggs wrote to the same Signal chat: "We aren't quitting!!  We are reloading!!"

Based on his actions described above, on March 10, 2021, Defendant Harrelson was arrested on a complaint charging him with conspiracy, in violation of 18 U.S.C. § 371 (a felony); destruction of government property, in violation of 18 U.S.C. § 1361 (a felony); obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2) (a felony); entering a restricted building without lawful authority, in violation of 18 U.S.C. § 1752(a) (a misdemeanor).  Defendant Harrelson made his initial appearance in the Middle District of Florida the following day and was detained pending a hearing pursuant to 18 U.S.C. § 3142(f).

On March 12, 2021, a federal grand jury in Washington, D.C., indicted Defendant Harrelson (along with nine co-defendants) on the same four counts from the complaint.[1]

On March 15, 2021, Magistrate Judge Embry J. Kidd of the Middle District of Florida conducted a detention hearing and ordered that Defendant Harrelson be detained pending trial. (ECF 7; Case 6:21-mj-01221-EJK (M.D. Fla.).)

Defendant Harrelson testified at the detention hearing.[2]  He admitted that he shot his neighbor's dog in August 2004, was arrested for drug possession in 2003, and was arrested for

---

[1] On March 31, 2021, the grand jury handed up a third superseding indictment, adding defendants 11 and 12 but leaving the charges as to Defendant Harrelson unchanged.

[2] A copy of the transcript is attached as Exhibit 1.

battery in 2001.  (3/15/21 Tr. at 24.)  He denied taking any photos or videos while inside the Capitol

on January 6, 2021:

```
24  Q.   Did you take photos and videos when you were inside the
25  Capitol on your telephone?
```

                                                                                            26

```
 1  A.   No.
 2  Q.   You did not?
 3  A.   Well, there's -- it didn't -- nothing was recorded.
 4  Q.   Did you take photographs?
 5  A.   No.
 6  Q.   Did you see the picture of yourself inside the Capitol
 7  holding the phone up?
 8  A.   Yes, ma'am.
 9  Q.   And it's your testimony that nothing recorded on your
10  phone.
11  A.    It was -- it didn't record for some reason.  There was
12  issues with the phone.
```

(3/15/21 Tr. at 25-26).

        Judge Kidd found that the presumption of detention in Section 3142(e) applied, and that

evaluating the factors under Section 3142(g) led to the conclusion that Defendant Harrelson would

be a danger to the community if released.  (*Id.* at 51.)  Judge Kidd found that the evidence was

strong, that Defendant Harrelson has strong community ties, that the arrest for battery is "really concerning" but did not result in a conviction, that there is no indication of failing to appear for court, and that there is some indication of drug and alcohol abuse. (*Id.* at 49-50.) Judge Kidd also found that the charges against Defendant Harrelson – for which the grand jury has found probable cause – show that Defendant Harrelson has "an absolute disregard for the validity of official proceedings that are being held by the United States government. So that, to me, is very troublesome." (*Id.* at 51.)

On April 6, 2021, Defendant Harrelson filed the instant motion. (ECF 143.)

## II.  <u>Legal Standard</u>

### a.   **Detention Hearing**

Defendant Harrelson is apparently moving for "revocation or amendment" of Magistrate Judge Kidd's detention order under Section 3145(b). As the defendant indicates in his motion, the court's review is *de novo*. (ECF 143 at 2); *see also United States v. Munchel*, No. 21-3010, 2021 WL 1149196, at *5 & n.3 (D.C. Cir. Mar. 26, 2021) (noting that Chief Judge Howell conducted a *de novo* review of a release order under Section 3145(a), and that district courts have "broad discretion" to review magistrate judges' detention decisions) (citation omitted).

Upon holding a detention hearing, the Court "shall order" a defendant detained if it "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). Here, there are no conditions that could assure the latter; in other words, releasing the defendant would present a "danger to the community." *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019).

"When the Government proves by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community," the Supreme Court has

explained, "a court may disable the arrestee from executing that threat." *United States v. Salerno*, 481 U.S. 739, 751 (1987).  Notably, "the threat need not be of physical violence, and may extend to 'non-physical harms such as corrupting a union.'" *Munchel*, 2021 WL 1149196, at *7 (quoting *United States v. King*, 849 F.2d 485, 487 n.2 (11th Cir. 1988)).  "In assessing whether pretrial detention is warranted for dangerousness, the district court considers four statutory factors: (1) 'the nature and circumstances of the offense charged,' (2) 'the weight of the evidence against the person,' (3) 'the history and characteristics of the person,' and (4) 'the nature and seriousness of the danger to any person or the community that would be posed by the persons' release.'" *Id.* at *4 (quoting 18 U.S.C. § 3142(g)).

At a detention hearing, the government may present evidence by way of a proffer.  *United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996).

### b.    Application of Presumption and Factors To Be Considered

Defendant Harrelson is wrong to contend that the presumption of detention in Section 3142(e) does not apply.

Under Section 3142(e)(3)(C), the presumption arises if the offense – here, felony destruction of property under Section 1361 – is "listed in [S]ection 2332b(g)(5)(B)" and carries "a maximum term of imprisonment of 10 years or more."  Nothing more.  Section 3142(e)(3)(C) does *not* reference Section 2332b(g)(5)(A), and thus to obtain the presumption the government has no obligation to show that the "offense was calculated to influence or affect the conduct of government by intimidation or coercion."[3]

---

[3] However, to show that the offense is a "[f]ederal crime of terrorism" to be considered as part of the "nature and circumstances of the offense" under Section 3142(g)(1), the government must meet both of Section 2332b(g)(5)'s prongs: (A) purpose of offense and (B) enumeration of offense.  The conduct of Defendant Harrelson and his coconspirators – invading and temporarily taking over the national legislature while it was convening, pursuant to federal law, to formally count the ballots for the presidential election – was clearly "calculated to influence or affect the conduct of

Regardless, the government submits that, here, it has shown that the offense of felony destruction of property with which Defendant Harrelson has been indicted is a federal crime of terrorism that carries a maximum term of imprisonment of 10 years or more and that was calculated to influence or affect the conduct of government by intimidation or coercion.  In other words, the offense of felony destruction of property *both* gives rise to the presumption of detention under Section 3142(e)(3)(C) *and* constitutes a federal crime of terrorism as part of the nature and circumstances of the offense to be considered under Section 3142(g)(1).

Here, the government is not relying on the strength of the evidence as to the Section 1361 violation to support Defendant Harrelson's detention.  In fact, once the grand jury has found probable cause that Defendant Harrelson violated Section 1361 (felony) – and here, it has – then under the guidance of *United States v. Singleton*, 182 F.3d 7, 12 (D.C. Cir. 1999), the government has satisfied its burden under Section 3142(f)[4] to trigger a detention analysis under Section 3142(g).

III.   **Argument**

Defendant Harrelson cannot rebut the presumption of detention under Section 3142(e)(3)(C).  And the factors to be considered under Section 3142(g) support Defendant Harrelson's continued detention.

   a.      **Preparation: Defendant Harrelson's Actions Prior to Storming the Capitol**

Defendant Harrelson was a leader of this group of Oath Keepers who came to Washington, D.C., prepared to do violence, and then stormed the Capitol.

---

government by intimidation or coercion" under Section 2332b(g)(5)(A).  And because the offense is enumerated in Section 2332b(g)(5)(B), the definition of "[f]ederal crime of terrorism" has been satisfied.

[4] The same rationale would apply to the detention analysis under Section 3142(e)(3)(C).

### i.   Training and Access to High-Powered Firearms

In the fall of 2020, Defendant Harrelson, wearing Oath Keepers garb, and along with co-defendants Kelly and Connie Meggs, and others, participated in a "gunfight oriented training" with an AR-platform firearm.  (*See* ECF 106.)  Indeed, on March 10, 2021, the FBI located an AR-15-style rifle inside a gun safe at Defendant Harrelson's house:



### ii.   Leadership Role

#### 1.   GoToMeeting

Between September 30, 2020, and January 3, 2021, Defendant Harrelson, using the names "gator 6," "hotel 26,"[5] or "kenneth harrelson," attended or organized approximately 30 meetings on Go To Meeting that appear to be related to the Oath Keepers:

---

[5] The government identified Defendant Harrelson as "gator 6" and "hotel 26" in part from his IP address and in part from communications recovered from his phone, in which he refers to himself as "Gator 6" and also tells others that his email address contains the words "hoteltwosix,"

| 1 | session_subject | session_typ | session_dat | session_duratic | participant_name | participant_typ | participant_ip | participant_city | participant_state |
|---|---|---|---|---|---|---|---|---|---|
| 13 | dc planning call | scheduled | 2021-01-03 | 54.48 | gator 6 | organizer | 184.90.105.158 | titusville | florida |
| 163 | friday free for all | scheduled | 2020-12-19 | 67.18 | gator 6 | organizer | 184.90.105.158 | titusville | florida |
| 190 | monday night florida chapter call | scheduled | 2020-12-22 | 66 | gator 6 | organizer | 107.77.216.118 | miami | florida |
| 226 | monday night call | scheduled | 2020-12-22 | 103.27 | gator 6 | organizer | 184.90.105.158 | titusville | florida |
| 245 | monday night call | scheduled | 2020-12-22 | 103.27 | gator 6 | attendee | 184.90.105.158 | titusville | florida |
| 295 | dc discussion and cpt teams | scheduled | 2020-12-23 | 33.78 | gator 6 | organizer | 184.90.105.158 | titusville | florida |
| 317 | warrior wednesday with gator 6 | scheduled | 2020-12-17 | 50.47 | gator 6 | organizer | 184.90.105.158 | titusville | florida |
| 340 | florida dc op planning chat | scheduled | 2020-12-31 | 31.93 | gator 6 | organizer | 184.90.105.158 | titusville | florida |
| 357 | oath keepers friday night free for all | scheduled | 2020-12-05 | 56.62 | gator 6 | organizer | 184.90.105.158 | titusville | florida |
| 404 | ok florida | recurring | 2020-12-15 | 66.3 | hotel 26 | attendee | 184.90.105.158 | titusville | florida |
| 448 | miami review and positions | scheduled | 2020-12-12 | 34.2 | gator 6 | organizer | 184.90.105.158 | titusville | florida |
| 464 | ok florida | recurring | 2020-12-08 | 73.28 | gator 6 | attendee | 184.90.105.158 | titusville | florida |
| 512 | oath keepers dc call | recurring | 2020-11-14 | 57.23 | hotel-26 | attendee | 184.90.105.158 | titusville | florida |
| 575 | fitness and health | scheduled | 2020-12-10 | 36.78 | gator 6 | organizer | 184.90.105.158 | titusville | florida |
| 599 | warrior wednesday with gator 6 | scheduled | 2020-12-03 | 41.47 | gator 6 | organizer | 184.90.105.158 | titusville | florida |
| 703 | ok florida | recurring | 2020-12-01 | 79.85 | gator 6 | attendee | 184.90.105.158 | titusville | florida |
| 725 | oath keepers national call - members only | recurring | 2020-11-07 | 112.25 | hotel-26 | attendee | 184.90.105.158 | titusville | florida |
| 781 | ok florida | recurring | 2020-11-17 | 102.62 | hotel-26 | attendee | 184.90.105.158 | titusville | florida |
| 831 | oath keepers national call - members only | recurring | 2020-11-08 | 105.3 | hotel-26 | attendee | 184.90.105.158 | titusville | florida |
| 845 | new meeting | scheduled | 2020-11-21 | 20.62 | gator 6 | organizer | 184.90.105.158 | titusville | florida |
| 944 | ok national call - post dc | scheduled | 2020-11-19 | 134.18 | hotel-26 | attendee | 184.90.105.158 | titusville | florida |
| 987 | ok florida | recurring | 2020-11-03 | 81.65 | kenneth harrelson | attendee | 184.90.105.158 | titusville | florida |
| 1008 | ok florida | recurring | 2020-11-24 | 87.17 | gator 6 | attendee | 184.90.105.158 | titusville | florida |
| 1064 | oath keepers national call - members only | recurring | 2020-11-06 | 73.72 | kenneth harrelson | attendee | 184.90.105.158 | titusville | florida |
| 1100 | ok florida | recurring | 2020-12-29 | 51.83 | kenneth harrelson | attendee | 184.90.105.158 | titusville | florida |
| 1214 | oath keepers national call - members only | recurring | 2020-11-12 | 86.95 | hotel-26 | attendee | 184.90.105.158 | titusville | florida |
| 1279 | ok florida | recurring | 2020-10-13 | 75.55 | kenneth harrelson | attendee | 184.90.105.158 | titusville | florida |
| 1327 | ok florida | recurring | 2020-10-20 | 81.35 | kenneth harrelson | attendee | 184.90.105.158 | titusville | florida |
| 1393 | oath keepers national call - members only | recurring | 2020-11-10 | 125.8 | hotel-26 | attendee | 184.90.105.158 | titusville | florida |
| 1604 | ok florida | recurring | 2020-10-06 | 62.52 | kenneth harrelson | attendee | 184.90.105.158 | titusville | florida |
| 1648 | ok georgia | recurring | 2020-09-30 | 85.1 | kenneth harrelson | attendee | 184.90.105.158 | titusville | florida |
| 1649 |  |  |  |  |  |  |  |  |  |

Tellingly, prior to the presidential election on November 3, 2020, Defendant Harrelson often logged in using his own name (and twice with the name "hotel 26"), and always participated as an "attendee." But following the election, he never logged in under his own name, he most frequently used the moniker "gator 6" (but occasionally "hotel 26"), and starting in December 2020, was far more frequently an "organizer" rather than an "attendee." Notably, for the meeting titled "dc planning call" on January 3, Defendant Harrelson (as "gator 6") was one of the three "organizers"; a second organizer was co-defendant Kelly Meggs (as "gator 1").

## 2. Signal

Several members of the conspiracy – as well as other members and affiliates of the Oath Keepers – participated in at least two Signal chats, titled "DC OP: Jan 6 21" (hereinafter, "National Signal Chat") and "OK FL DC OP Jan 6" (hereinafter, "Florida Signal Chat"). The chats show that the participants were planning and anticipating to use force on January 6. Notably, Defendant Harrelson was a member of both chats (as "Gator 6"), as were co-defendants Jessica Watkins and Kelly Meggs (as "OK Gator 1").

In the Florida Signal Chat, co-defendant Kelly Meggs told others that Defendant Harrelson would be "run[ning] the ground team" and coordinating and managing the others state teams:

| | | | | |
|---|---|---|---|---|
| 53 | OK Gator 1 | 1/4/2021 | 10:41:00 AM | Jessica you have 4 working the detail from Ohio. REDACTED you have 6 confirmed for detail from SC. If correct that gives us 27 man team I like it!! Perfect mi with 4-5 medics in the group. I'll keep working on overall contact between Natl/congress team and stop the steal team for scheduling etc...Gator 6 runs the ground team. REDACTED and REDACTED will assist him especially when we are moving! |
| 54 | OK Gator 1 | 1/4/2021 | 10:42:00 AM | Other state leaders can be in direct contact with GATOR 6 and then you handle your team as he needs. |

Per the explicit instructions from Kelly Meggs, Defendant Harrelson would be "assisted" by others, but would both be in charge and would tell the other state team leaders how to "handle" their own teams.

The only two people with "admin" privileges (who added other users) on the Florida Signal Chat appear to be Defendant Harrelson and co-defendant Kelly Meggs, again suggesting Defendant Harrelson's leadership role.

### iii.  Quick Reaction Force (QRF) and Stashing Firearms

The evidence suggests that Defendant Harrelson was both aware of the presence of an armed Quick Reaction Force and likely contributed weapons to it.  This evidence is drawn primarily from the communications in the Florida Signal Chat, Defendant Harrelson's cell site location information (CSLI), hotel surveillance video, and information about Person Three.

Person Three (who was a member of the National Signal Chat) stayed at the Comfort Inn Ballston, as confirmed by surveillance video there and the fact that Person Three paid for one of the rooms at the hotel.[6]  As recounted in the third superseding indictment, on December 30, 2020, co-defendant Caldwell wrote to co-defendant Watkins: "Talked to [Person Three]…. [H]e is trying

---

[6] As recounted in the third superseding indictment, Kelly Meggs paid for two other rooms at the Comfort Inn that had been reserved in Person Three's name.  (ECF 127 at ¶ 45.)

to book a room at Comfort Inn Ballston/Arlington because of its close-in location and easy access to downtown because he feels 1) he's too broken down to be on the ground all day and 2) he is committed to being the quick reaction force an[d] bringing the tools if something goes to hell." (ECF 127 at ¶ 45.)

On January 4, in the Florida Signal Chat, co-defendant Watkins asked the group, "Where can we drop off weapons to the QRF team?  I'd like to have the weapons secured prior to the Op tomorrow."

On the morning on January 5, in the Florida Signal Chat, Defendant Harrelson asked the group for the location of the "QRF hotel," and co-defendant Kelly Meggs responded by asking for a direct message[7]:

| 134 | GATOR 6 | 1/5/2021 | 8:02:00 AM | We get that QRF hotel address yet? |
| 135 | OK Gator 1 | 1/5/2021 | 8:07:00 AM | Dm |

Defendant Harrelson's CSLI shows that on January 4, he drove from Florida to North Carolina (where he stayed the night on or near the property of Person Five, a known leader of the North Carolina Oath Keepers), and that he left North Carolina early on the morning of January 5 to drive to the Washington, D.C., area.  About three hours after sending the above message, Defendant Harrelson arrived in the area of the Comfort Inn Ballston, where he remained for about an hour before driving into Washington, D.C.  It is reasonable to believe that during this hour, Defendant Harrelson was dropping off his weapons with Person Three and the QRF.

---

[7] Note that that Defendant Harrelson and co-defendant Kelly Meggs treated the location of the QRF with some level of additional secrecy, insisting on a "direct message" for its address rather than putting the address in the Florida Signal Chat (which was itself an encrypted app requiring an invitation to join).  Moreover, while the government was able to extract data from the cell phones of both Defendant Harrelson and co-defendant Kelly Meggs, the government has not located the "direct message" between the two men, suggesting that both deleted it.

Defendant Harrelson's CSLI shows that after he left the area of the Comfort Inn Ballston at around 12:30 p.m., he spent the remainder of January 5, all day on January 6, and the early morning of January 7 in downtown Washington, D.C.  Given that co-defendant Kelly Meggs and other known Oath Keepers paid for multiple rooms at the Hilton Garden Inn in Washington, D.C., and that Defendant Harrelson's CSLI places him in that area overnight of January 5 and 6, it is reasonable to believe that Defendant Harrelson similarly stayed at the Hilton Garden Inn while he was in the Washington, D.C., area.

On the morning of January 7, in response to Defendant Harrelson asking about the location of his "shit," another member the Florida Signal Chat asked if he had left it at the Comfort Inn:

| 504 | GATOR 6 | 1/7/2021 | 8:55:00 AM | So we're just leaving DC and I would like to know where my shits at since it seems everyone's gone already |
| 505 | REDACTED | 1/7/2021 | 8:55:00 AM | We are headed out now |
| 506 | REDACTED | 1/7/2021 | 8:56:00 AM | [Responding to GATOR 6] Did u leave it at Comfort Inn in that room? |

Defendant Harrelson's CSLI shows that he was in the area of the Comfort Inn about twenty minutes later, from 9:08 am through 9:48 am, before starting his drive southward.  Indeed, surveillance video from the Comfort Inn shows what appears to be Defendant Harrelson rolling what appears to be at least one rifle case down a hallway and towards the elevator:



11

In other words, it is reasonable that Defendant Harrelson dropped his weapons off with the QRF at the Comfort Inn Ballston on January 5, and then retrieved those weapons on the morning of January 7 as he left the Washington, D.C., area.  Defendant Harrelson's reference to needing to locate his "shit" on the morning on January 7 is most naturally read as a reference to his weapons, given that his clothing and other personal effects would have been with him at the Hilton Garden Inn (where he appears to have spent the nights of January 5 and 6).  Especially in light of the fact that co-defendant Kelly Meggs had previously advised that "Dc is no guns," (ECF 127 at ¶ 39), the most logical inference is that Defendant Harrelson left the guns with his comrades just over the border in Virginia in anticipation of an opportunity to use them later in the nation's capital.

### b.   Obstructing the Certification:  Defendant Harrelson's Actions on January 6

In the National Signal Chat, in which Defendant Harrelson was also a member, on January 6, at approximately 1:38 p.m., Person One wrote to the group, "All I see is Trump doing is complaining.  I see no intent by him to do anything.  So the patriots are taking it into their own hands.  They've had enough."  At 2:14 p.m., an individual leading the coordination of the security details run by the Oath Keepers on January 5-6 stated in the National Signal Chat, "The have taken ground at the capital[.]  We need to regroup any members who are not on mission."  Person One then reposts that message and instructs the group: "Come to South Side of Capitol on steps" and then sends a photograph showing the southeast side of the Capitol.  At 2:41 p.m., Person One posted another photograph in the National Signal Chat showing the southeast side of the Capitol with the caption, "South side of US Capitol.  Patriots pounding on doors[.]"  At around the same time, Defendant Harrelson – with several of his coconspirators – was breaching the Capitol itself.

Defendant Harrelson arrived at the Capitol by 2:00 p.m. on January 6: At that time, he

recorded a video (IMG_1396)[8] outside the Capitol.  At around 5 seconds, a man is heard stating, "They're storming the fucking Capitol building."  At around 23 seconds, a man is heard stating, "I think we should go."  When the video pans to the east side steps of the Capitol, it is clear that the rioters have not yet ascended the steps (and that the Capitol Police have been able to hold the line).

Defendant Harrelson likely recorded another video and then deleted it, because the next video is IMG_1398.  In IMG_1398, recorded at 2:21 p.m., Defendant Harrelson is on the top of the steps on the east side of the Capitol.  The video shows that the steps and veranda have been overrun (over the prior 20 minutes) with rioters.

At around the same time (2:20 p.m.), the U.S. Capitol Police locked down the Senate chamber to protect Vice President Pence, the senators, and staffers from the rioters that had begun to storm the Capitol and from the mob that was enveloping the building.  At around 2:30 p.m., law enforcement began to evacuate Vice President Pence and senators from the Senate chamber.  Over the prior ten minutes, Defendant Harrelson had assumed a position with an optimal vantage point: Defendant Harrelson stood on the top of the steps on the east side of the Capitol, facing away from the Capitol (and towards the growing crowd).  Defendant Harrelson then signaled to and waved at the stack of Oath Keepers to join him at the top of the steps.

A New York Times article "Tracking the Oath Keepers Who Attacked the Capitol"[9] shows Defendant Harrelson (red arrow) facing the military-style "stack" formation of individuals moving up through the crowd towards the door of the Capitol:

---

[8] Three pertinent video files from Defendant Harrelson's phone – IMG_1396, IMG_1398, and IMG_1399 – are described below and are being provided to the Court on a disc as Exhibit 2.
[9] https://www.nytimes.com/interactive/2021/01/29/us/oath-keepers-capitol-riot.html.



And video footage from AP News[10] shows Defendant Harrelson (red circle) interacting

with these stack members as they move towards his position of prominence:



---

[10]  See  https://apnews.com/article/ex-military-cops-us-capitol-riot-a1cb17201dfddc98291edead5
badc257/gallery/0ecd1781c66d437f92c61b3f4848a74e (at slide 10).

Towards the top of the stops, Defendant Harrelson joined the co-conspirators in the "stack" formation, with hands on each other's backs or flak jackets, some with obvious Oath Keeper insignias visible on their clothing.  The group, as captured on video, moved further up through the crowd onto the veranda, towards the doors of the Capitol.[11]

These individuals, who are wearing helmets, reinforced vests, and clothing with Oath Keeper logos and insignia, can be seen moving in an organized and practiced fashion and forcing their way to the front of the crowd gathered around a set of doors:



A close-up view of the badges on the vest of one of these individuals seen just under the Oath Keepers emblem on his shirt, displays the Oath Keepers motto, "Not On Our Watch."  The badge also says, "I don't believe in anything.  I'm just here for the violence."



---

[11] The video is available at the following link, at slide 10: https://apnews.com/article/ex-military-cops-us-capitol-riot-a1cb17201dfddc98291edead5badc257.

Defendant Harrelson started recording an almost-three-minute-long video (IMG_1399) at 2:39 p.m., as he and his coconspirators actually forcibly breached the Capitol.[12]  The blaring alarms should have made it be obvious to Defendant Harrelson that the Capitol was under attack and the rioters were not welcome to enter.

At around 2:40 p.m., as captured by surveillance video, Defendant Harrelson, as part of the stack, and with seven of his current co-defendants, rushed through the Capitol doors and past a police officer trying to keep the crowd at bay:



A photojournalist captured Defendant Harrelson (red oval) storming from the just-breached east doors into the Rotunda, at the front of a pack of several of his coconspirators[13]:

---

[12] As described in the section below about Defendant Harrelson's obstructive conduct, he later shared this video via text message.

[13]   See   http://www.kentnishimura.com/january-6-2021-siege-trump-supporters-storming--us-capitol-attack.



In the video from Defendant Harrelson's phone (IMG_1399), starting at around 1:21 on the counter, the crowd loudly chants, "Treason!  Treason!"  At the 1:45 mark, a person – it's unclear if it's Defendant Harrelson or someone standing near him – yells, "This is our fucking house!"  At the 2:00 mark, tear gas was deployed by the police to repel the rioters.  Defendant Harrelson did not leave the Capitol.  At the 2:15 mark, Defendant Harrelson interacts with co-defendant Watkins and another member the stack, at the mouth of a hallway leading north towards the Senate.  He then moves back into the Rotunda.  At the 2:27 mark, a person – again, it's unclear if it's Defendant Harrelson or someone standing near him – states, "We took the fucking Capitol." At the 2:47 mark, just before Defendant Harrelson stops recording, he links up with other members of the stack.  Defendant Harrelson's video stops at around 2:42 p.m., yet he does not exit the Capitol for another 15 minutes.

Surveillance and public source video shows that, with some of his coconspirators, once inside the Capitol, Defendant Harrelson first attempted to go north, towards the Senate.  Some of the coconspirators were part of a group of rioters who pushed down a hallway connecting the Rotunda to the Senate chamber.  Thankfully, a group of police officers in riot gear was able to

17

push the rioters back into the Rotunda (and away from the Senate chamber) by deploying a chemical irritant.  Defendant Harrelson, with other members of the conspiracy, including notably co-defendant Kelly Meggs, then moved south, back across the Rotunda, in the direction of the House of Representatives.

The coconspirators' movements and statements are relevant to their intent, and their dangerousness.  While trying to go north towards the Senate, the rioters chanted phrases such as "Fuck McConnell."[14]  After apparently being sprayed with a chemical irritant, one man who is wearing Oath Keepers gear (and who appears to have been part of the stack) waves other rioters towards the line of police and yells "the fight's not over!"[15]  Then, when Defendant Harrelson moved south in the direction of the House chamber, it is reasonable to infer that he and his coconspirators may have been going to look for Speaker Nancy Pelosi.  Indeed, on the evening of January 6, co-defendant Caldwell (who remained outside the Capitol but apparently was in communication with coconspirators inside) wrote: "Proud boys scuffled with cops and drove them inside to hide.  Breached the doors.  One guy made it all the way to the house floor, another to Pelosi's office.  A good time."  And co-defendant Kelly Meggs,[16] with whom Defendant Harrelson appears to have been travelling while inside the Capitol, had the following exchange with another person on the night of January 6 on Signal about having sought out Speaker Pelosi:

---

[14] See https://www.liveleak.com/view?t=9ZobJ_1610107203.

[15] See the broadcast of the French news show *Quotidien*, at around the 5:02 mark on the clip available at https://www.tf1.fr/embedplayer/13760032/?startAt=0.

[16] In the extraction from his cell phone, co-defendant Kelly Meggs's name appears as "Kelly Dad." Also, the time zone is UTC, which in January was five hours ahead of Eastern Time.



Defendant Harrelson remained inside the Capitol for about 17 minutes in total, until finally leaving with several of his coconspirators at around 2:57 p.m.  Near the doors, prior to leaving, Defendant Harrelson had what appears to be verbal exchange with a Capitol Police officer in riot gear, with Defendant Harrelson initially facing the officer and then the officer raising his riot shield and placing it between himself and Defendant Harrelson:



While Defendant Harrelson eventually left the Capitol, he did not leave the area.  At around 4:00 p.m., a large group – including Defendant Harrelson and co-defendants Kelly Meggs, Connie Meggs, Graydon Young, and Laura Steele, other members of the stack, and other individuals

wearing "Oath Keepers" clothing and insignia who stormed the Capitol – gathered around Person One and stood around waiting for at least ten minutes in that location.

      **c.**      **Future Dangerousness:  Defendant Harrelson's Actions After the Attack**

Evidence collected from Defendant Harrelson's iPhone and premises demonstrate his risk of future dangerousness.  Specifically, Defendant Harrelson has gone to great lengths to evade law enforcement detection – including deleting potentially inculpatory information and distancing himself from the Oath Keepers organization.  Evidence recovered from his premises also strongly suggests Defendant Harrelson was prepared, if necessary, to evade detection even further, as he had a "go bag" (a bag designed for quick escape) filled with a flip phone, gun, ammunition, and survival books.  Taken together, this evidence counsels in favor of detention and undermines any assurances that he would comply with conditions of release necessary to assure the safety of the community.

      **i.**   **Access to Firearms and a "Go Bag"**

On March 15, 2021, the FBI located three firearms inside Defendant Harrelson's house. An AR-15-style rifle[17] and a revolver were inside the large gun safe, and a semi-automatic handgun with two magazines was inside what appears to have been a "go bag."

The gun safe, shown below, also contained seven survival guides, including one on "eluding pursuers and evading capture":



---

[17] A photo of the rifle is above, in Section III.a.i.



Defendant Harrelson's "go bag," in addition to the handgun (with a light attachment) and two magazines, contained a "burner" cell phone (i.e., a flip phone that was not Defendant Harrelson's usual iPhone), an iPad, a holster, and three books[18]:



---

[18] The titles of the books are *The Book of Five Rings*; *The Bushcraft Field Guide to Trapping, Gathering, and Cooking in the Wild*; and *Technological Slavery*: *The Collected Writing of Theodore J. Kaczynski, a.k.a. "The Unabomber*."

These materials are consistent with someone seeking to evade detection.

### ii. Deleting Messages

Defendant Harrelson's iPhone shows that he deleted almost all of his text messages and Signal messages through late February 2021. This obstructive conduct suggests additional inculpatory evidence existed – which Defendant Harrelson took steps to remove.

His deletion of the messages through which he sent video of the breach (IMG_1399) is particularly acute. Records show that he sent the video of the breach via text message on the evening of January 6 (at 6:14 p.m.) and on January 7 (3:24 p.m.):



Neither of those text messages are present in Defendant Harrelson's phone, suggesting that he deleted them. The text message sent on January 6 at 6:14 p.m. was sent, at minimum, to co-defendant Kelly Meggs. The government was able to confirm that fact by reviewing records from Meggs's cellphone, which show this same video (with a creation date of January 6 at 6:11 p.m.) residing on Meggs's phone:



But the message through which this video was sent from Defendant Harrelson to co-defendant Kelly Meggs is missing from both men's phones, suggesting that they both deleted it.

Moreover, Defendant Harrelson re-saved the video twice on his phone on January 12, both times in a "trimmed" smaller file size. This means that, at minimum, Defendant Harrelson accessed the video on January 12, and likely also sent the video (in this smaller trimmed format) to others. Again, there is no record of any messages whatsoever on Defendant Harrelson's phone during this time frame, suggesting he deleted these messages along the remainder of his incriminating messages.

### iii.  Affiliation with the Oath Keepers

The evidence also suggests Defendant Harrelson was worried his affiliation with the Oath Keepers would be detected and subsequently took steps to distance himself from the organization. These efforts, however, appear intended to obfuscate his affiliation when in fact he has remained in contact with the leadership of the Oath Keepers. In the National Signal Chat, on the night of January 6, Defendant Harrelson deleted multiple messages he had previously sent (and that the government has not yet recovered) and then wrote: "Didn't realize I was in a unsecured chat with

a bunch of shit bags.  And blue falcons."[19]  Defendant Harrelson made his comments after the following exchange in the National Signal Chat from earlier in the evening on January 6, suggesting that Defendant Harrelson was worried that at least one other member of the group was going to turn on him:

| Person One | Look, I WAS THERE.  I WAS RIGHT OUSIDE.  Patriots stormed in.  Not Antifa.  And I don't blame them.  They were justifiably pissed off. |
| --- | --- |
| Kelly Meggs | Ok who gives a damn who went in there. If it's Obama himself it doesn't matter[.]  What matters is where we are now and decisions that have to be mad. We are now the enemy of the State |
| Person Eleven | As I figured.  This organization is a huge fuckin joke.  You [Name of Person One] are the dumbass I heard you were.  Good luck getting rich off those Dumb ass PSD donations you fuck stick. |

On January 20, 2021 – inauguration day – Defendant Harrelson sent an email to co-defendant Kelly Meggs purporting to resign from the Oath Keepers itself, as well as from being the "POC" for "EFL" (likely the "point of contact for east Florida"):



_____

[19] A "blue falcon" is likely military jargon for a backstabbing comrade.

24

Two hours later, he sent a similar "resignation" message, apparently attempting to distance himself from the "national" organization whose beliefs allegedly did not align with his own and whose members had "malicious intent":



But this attempt at distance appears to have been a farce.  In early March 2021, Defendant Harrelson exchanged phone calls with Person One – the leader of the Oath Keepers – and then he

sent a message through Signal on March 6 directly to Person One, apologizing for not having done

a better job of monitoring the job Kelly Meggs was doing[20]:



Person One sent Defendant Harrelson a long message about reforming the organization,

and asked Defendant Harrelson to transmit it to others.  Defendant Harrelson both "hearted" the

message and agreed to pass it on:

---

[20] Kelly Meggs had been arrested a few weeks earlier, on February 17.  In the Signal messages
embedded herein, Defendant Harrelson's comments are on the righthand side, in blue.





Defendant Harrelson then discussed setting up a "face to face" meeting with another person affiliated with the Oath Keepers, and also referenced an allegation about the Proud Boys leader being an "FBI informant."[21]   The import of Defendant Harrelson's statement appears to be that one should be careful around this individual, based on his supposed assistance to the FBI.

On March 7, Defendant Harrelson and Person One exchanged Signal messages about filings made in this very case:



---

[21] Kelly Meggs had told others that Meggs had been in contact with the same leader of the Proud Boys in the weeks leading up to January 6.  (*See* Gov't Opp. to Meggs's Motion for Release, ECF 98 at 10.)

And the following day, Person One and Defendant Harrelson exchanged Signal messages that show Defendant Harrelson's true power within the organization.  When Person One started a chat on Rocket Chat, it was Defendant Harrelson who received a notification[22]:



At least as of November 2020, oathkeepersnational[.]org hosted a Rocket Chat server that housed chat threads apparently advocating violence and attacks on the media.[23]

---

[22] Notably, Defendant Harrelson references receiving an email, but that email was not located on his iPhone, suggesting that it went to one of his two known secure, encrypted ProtonMail accounts. Rocket Chat provides this description of its software: "Rocket.Chat is a free and open source team chat collaboration platform that allows users to communicate securely in real-time on web, desktop or mobile and to customize their interface with a range of plugins, themes and integrations with other key software.  Anyone in the world can download and run a Rocket.Chat server at any time." *See* https://docs.rocket.chat/legal/guidelines-for-law-enforcement.

[23] See https://unicornriot.ninja/2020/its-time-to-start-killing-the-news-media-live-on-air-oath-keepers-private-chats-show-increased-desire-for-post-election-violence.

Defendant Harrelson's administrative control of an Oath Keepers chat as of just last month – after he purported to "resign" from the organization and tried to disassociate himself from the actions of national leadership – demonstrates that he is a continued threat to the community.

Moreover, Defendant Harrelson had additional Signal communications with another Oath Keeper member in March 2021 regarding supposed government surveillance on Defendant Harrelson's house, the need to be careful about electronic monitoring, the need for "face to face meetings," and hoping that the "Deep State feels this pain!":









iv. **Lying at the Detention Hearing**

As indicated above, Defendant Harrelson took the stand at his detention hearing in Orlando on March 15, 2021, and testified under oath that he did not take any videos while inside the Capitol. (3/15/21 Tr. at 25-26.) That was a lie. He not only took a video, but also sent it via message to multiple people on January 6, 7, and 12.

Moreover, Defendant Harrelson sponsored his wife's testimony at the same detention hearing, and she testified that there was never an assault rifle in the house. (3/15/21 Tr. at 16-17.) The FBI's documentation of a real AR-15-style rifle – not the "AirSoft" rifle that Defendant Harrelson's wife referenced – belies this statement.

Perjuring oneself at a detention hearing is an appropriate consideration under Section 3142(g)(3), which focuses on the defendant's characteristics, including specifically a defendant's "record concerning appearance at court proceedings." If a court should consider a defendant's *appearance* at court proceedings, the court can surely consider a defendant's *conduct* at those proceedings. *See, e.g.*, *United States v. Feldman*, No. 11-20279-CR, 2016 WL 8505085, at *2 (S.D. Fla. Aug. 1, 2016) (holding that a defendant's perjury during a court proceeding "demonstrated his total lack of trustworthiness" and "ma[de] him a flight risk" under Section 3142(f)(2)); *United States v. Djoko*, No. CR19-0146-JCC, 2019 WL 4849537, at *4 (W.D. Wash. Oct. 1, 2019) (holding that a defendant's "apparent willingness to destroy evidence and lie to authorities creates a serious risk that he may attempt to obstruct justice in some other way"). Indeed, in *United States v. Robertson*, 608 F. Supp. 2d 89, 92 (D.D.C. 2009), the court held that the defendants should be detained because their release "would pose an unreasonable risk of obstruction of justice," based on their prior obstructive conduct.

Here, Defendant Harrelson's obstructive conduct – evidenced both through planning and entering the Capitol, and then lying under oath to the magistrate – makes him unlikely to follow

any combination of conditions designed to ensure his appearance or the community's safety.  "It is ultimately the responsibility of this Court to ensure the integrity of its own judicial proceedings." *Id.*  Indeed, since the January 6 attack on the Capitol, Person One has ordered Oath Keepers to continue to engage in undetected communications and to disobey laws and orders enforced by an administration deemed illegitimate.  Defendant Harrelson's continued participation in the Oath Keepers, despite claims to the contrary, and willingness to commit obstruction and perjure himself show that he is an adherent of this approach.

Appellate courts have routinely upheld the obstruction enhancement under U.S.S.G. § 3C1.1 for lying to a magistrate judge during a detention hearing in an effort to escape detention.  *See, e.g.*, *United States v. Harkness*, 305 F. App'x 578, 585-86 (11th Cir. 2008); *United States v. Harrison*, 42 F.3d 427, 431 (7th Cir. 1994); *United States v. Mafanya*, 24 F.3d 412, 415 (2d Cir. 1994).  If making false statements to a judicial officer during a detention hearing is serious enough to warrant an enhancement under the Guidelines, it is surely also serious enough weigh in favor of a defendant's detention itself.

Defendant Harrelson's preparation for a potentially armed escape, his multipronged efforts to evade detection, and his perjury refute any assures the Court may have that Defendant Harrelson would comply with its release conditions.

IV.   **CONCLUSION**

For all these reasons, the government submits that Defendant Harrelson has not rebutted the presumption under Section 3142(e)(3)(C) that he be detained pretrial, as there are no conditions that will reasonably assure the safety of the community.  Defendant Harrelson's motion should therefore be denied.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY

By:
_____
Jeffrey S. Nestler
Assistant United States Attorney
D.C. Bar No. 978296
Ahmed M. Baset
Troy A. Edwards, Jr.
Jeffrey S. Nestler
Kathryn Rakoczy
Assistant United States Attorneys
U.S. Attorney's Office for the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530


*/s/ Alexandra Hughes*
_____
Alexandra Hughes
Justin Sher
Trial Attorneys
National Security Division
United States Department of Justice
950 Pennsylvania Avenue
NW Washington, D.C. 20004