```
 1                  UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
 2                        ORLANDO DIVISION

 3   UNITED STATES OF AMERICA,      Orlando, Florida

 4            Plaintiff,            Case No. 6:21-mj-1221-EJK

 5   -vs-                           March 15, 2021

 6   KENNETH HARRELSON,             1:01 p.m.

 7            Defendant.            Courtroom 4C
     _____

 8

 9           DIGITALLY RECORDED DETENTION HEARING
            BEFORE THE HONORABLE EMBRY J. KIDD
10              UNITED STATES MAGISTRATE JUDGE

11
                       A P P E A R A N C E S
12

13   GOVERNMENT COUNSEL:

14        Karen Gable, Esquire
          U.S. Attorney's Office
15        400 West Washington Street, Suite 3100
          Orlando, FL  32801
16

17   DEFENSE COUNSEL:

18        Kenneth Barlow, Jr., Esquire
          Law Office of Corey Cohen, P.A.
19        605 D. Robinson Street, Suite 330
          Orlando, FL  32801
20

21   OFFICIAL COURT REPORTER:

22        Shelli Kozachenko, RPR, CRR, CRC
          221 North Hogan Street, #185
23        Jacksonville, FL  32202
          Telephone:  (904) 301-6842
24
             (Proceedings recorded by electronic sound recording;
25                            transcript produced by computer.)
```

1                    T A B L E   O F   C O N T E N T S

2

3  <u>DEFENSE WITNESSES:</u>                                    <u>Page No.</u>

4    ANGEL HARRELSON

5        DIRECT EXAMINATION BY MR. BARLOW..........         7

6        CROSS-EXAMINATION BY MS. GABLE............        15

7        REDIRECT EXAMINATION BY MR. BARLOW........        17

8

9    KENNETH HARRELSON

10       DIRECT EXAMINATION BY MR. BARLOW..........        18

11       CROSS-EXAMINATION BY MS. GABLE............        23

12       REDIRECT EXAMINATION BY MR. BARLOW........        28

13

14

15

16

17

18

19

20

21

22

23

24

25

|     |                                                                  |
|-----|------------------------------------------------------------------|
| 1   | P R O C E E D I N G S                                            |
| 2   | March 15, 2021                                        1:01 p.m.  |
| 3   | - - -                                                            |
| 4   | COURT SECURITY OFFICER:  All rise.  United States                |
| 5   | District Court in and for the Middle District of Florida is now  |
| 6   | in session, the Honorable Embry J. Kidd, United States           |
| 7   | Magistrate Judge, presiding.                                     |
| 8   | Please be seated.                                                |
| 9   | COURTROOM DEPUTY:  Case No. 6:21-mj-1221, United                 |
| 10  | States of America versus Kenneth Harrelson.                      |
| 11  | Counsel, please state your appearance for the record.           |
| 12  | MS. GABLE:  Good afternoon, Your Honor.  Karen Gable             |
| 13  | on behalf of the United States.  I'm appearing with Special      |
| 14  | Agent Kelsey Harris of the FBI.                                  |
| 15  | THE COURT:  Good afternoon.                                      |
| 16  | MR. BARLOW:  Good afternoon, Judge.  Ken Barlow of               |
| 17  | Law Office of Corey Cohen for Mr. Harrelson, who is seated to    |
| 18  | my right.                                                        |
| 19  | THE COURT:  Good afternoon.                                      |
| 20  | Mr. Harrelson, we were originally scheduled to have a            |
| 21  | preliminary hearing and a detention hearing in your case today.  |
| 22  | However, I've been informed that a grand jury from the District  |
| 23  | of Columbia has returned a second superseding indictment         |
| 24  | charging you and nine others with various federal crimes.        |
| 25  | Ms. Gable, can you advise us of the charges against              |

1    Mr. Harrelson, as well as potential penalties?

2              MS. GABLE:  Yes, Your Honor.

3              Pursuant to the indictment, a grand jury has charged

4    the defendant with 18, United States Code, Section 371,

5    conspiracy.  For that offense the defendant faces a maximum

6    term of imprisonment of five years.

7              He has also been charged with a violation of 18,

8    United States Code, Sections 1512(c)(2) and aiding and abetting

9    obstruction of an official proceeding.  For that offense the

10   defendant faces a statutory maximum term of 20 years in prison.

11             He is also charged with a violation of 18, United

12   States Code, Sections 1361 and 2, which is aiding and abetting

13   in the destruction of government property.  For that offense

14   the defendant faces a mandatory -- or a statutory -- a maximum

15   statutory term of imprisonment of ten years.

16             He is also charged with a violation of 18, United

17   States Code, Section 1752(a)(1), which is unlawfully entering

18   and remaining in a restricted building or grounds.  For that

19   offense, if he is convicted, he faces a maximum term of

20   imprisonment of one year.

21             THE COURT:  Thank you.

22             Mr. Harrelson, have you received a copy of the

23   indictment?

24             THE DEFENDANT:  Yes, Your Honor.

25             MR. BARLOW:  Judge, I have received it.  However,

1  Mr. Harrelson's just received a copy here from me in open

2  court.  He has not had a chance to read it.

3            THE COURT:  Well --

4            MR. BARLOW:  I attempted -- Judge, I attempted to

5  meet with him before the proceeding today, but based upon the

6  amount of time it was taking to get me into the secure

7  interview area and my desire not to be late, I had to abandon

8  that attempt and come on up.

9            THE COURT:  All right.  Well, Ms. Gable has just

10  summarized the charges against you, as well as the potential

11  penalties.

12            We can allow time for you to review this second

13  superseding indictment if you wish, or we can proceed.  But

14  because the grand jury has found that there's probable cause to

15  believe that you've committed these offense -- offenses, you're

16  no longer entitled to a judicial determination of probable

17  cause by way of a preliminary hearing, so we will not be having

18  a preliminary hearing today.

19            Is the United States still seeking Mr. Harrelson's

20  detention?

21            MS. GABLE:  We are, Your Honor.

22            THE COURT:  And does the presumption still apply?

23            MS. GABLE:  Yes, it does.

24            THE COURT:  All right, Mr. Harrelson.  So the United

25  States is still seeking your detention, so we will still have a

1    detention hearing today.

2          But, Mr. Barlow, would you like a few minutes to

3    review the indictment with Mr. Harrelson?

4          MR. BARLOW:  Yes, please.

5          THE COURT:  All right.  So we'll recess for 15

6    minutes.  I will come back on the record at 1:20 p.m.

7          MR. BARLOW:  Thank you, sir.

8          COURT SECURITY OFFICER:  All rise.

9       (Recess from 1:04 p.m. until 1:20 p.m.)

10         COURT SECURITY OFFICER:  All rise.  This Honorable

11   Court is back in session.

12         Please be seated.

13         THE COURT:  All right, Mr. Barlow.  We're back on the

14   record.

15         Did you have an opportunity to review the second

16   superseding indictment with your client?

17         MR. BARLOW:  Yes, Your Honor.  Thank you.

18         THE COURT:  All right.  And, Mr. Harrelson, do you

19   understand the charges against you, as well as the potential

20   penalties?

21         THE DEFENDANT:  Yes, Your Honor.

22         THE COURT:  All right.  So as for the detention

23   hearing, Mr. Barlow, how would you like to proceed?

24         MR. BARLOW:  Judge, I would start by calling Angel

25   Harrelson as a witness.

1          THE COURT:  All right, ma'am.  Please step forward
2    and be sworn.
3          MR. BARLOW:  Judge, may I inquire from counsel table,
4    or do you want me at the podium?
5          THE COURT:  It will be easier from the lectern.
6          MR. BARLOW:  All right.
7          COURTROOM DEPUTY:  Please raise your right hand to be
8    sworn.
9          Do you solemnly swear or affirm that the testimony
10   you give in this case is the truth, the whole truth, and
11   nothing but the truth?
12         THE WITNESS:  Yes.
13         COURTROOM DEPUTY:  Please be seated.
14         MR. BARLOW:  I did not notice any of the COVID
15   protocols I've seen in the other courtroom.  That's why I was
16   wondering.
17         THE COURT:  Well --
18         COURTROOM DEPUTY:  Could you please state your name
19   for the record.
20         THE WITNESS:  Angel Harrelson.
21         ANGEL HARRELSON, DEFENDANT'S WITNESS, SWORN
22                     DIRECT EXAMINATION
23   BY MR. BARLOW:
24   Q.   Ma'am, would you please spell your first and last name for
25   the record.

1   A.   A-n-g-e-l, H-a-r-r-e-l-s-o-n.

2   Q.   And do you know the accused in this instance, Kenneth

3   Harrelson?

4   A.   Yes.

5   Q.   How do you know him?

6   A.   He's my husband.

7   Q.   How long have you been married?

8   A.   11 years.

9   Q.   And do you share children with him?

10  A.   Yes.

11  Q.   How many?

12  A.   Two.

13  Q.   What are their names?

14  A.   Nathan and Amy Harrelson.

15  Q.   What are their ages?

16  A.   14 and 17.

17  Q.   And do you and Mr. Harrelson reside in the same residence?

18  A.   Yes, sir.

19  Q.   Where is that located?

20  A.   2885 St. Marks Drive, Titusville, Florida.

21  Q.   And if Mr. Harrelson were released on some type of a bond,

22  is that where he would reside?

23  A.   Yes, sir.

24  Q.   Are there any firearms in that home?

25  A.   No, sir.  They're gone.

1    Q.    There were?  There were some?

2    A.    They're AirSoft.

3    Q.    Yeah.  And everything's been removed?

4    A.    Yes.

5    Q.    Is there a handgun anywhere in that house?

6    A.    No, gone.

7    Q.    Is there a rifle anywhere in that house?

8    A.    No.

9    Q.    Shotgun?

10   A.    No.

11   Q.    All right.  What other weapons, if any, did you remove

12   from the house?

13   A.    My pistol.

14   Q.    All right.  So there are no weapons anywhere within the

15   house?

16   A.    No.

17   Q.    How about large hunting knives or things of that nature?

18   A.    No.

19   Q.    You removed those as well?

20   A.    Yes.

21   Q.    Kitchen knives?

22   A.    No.  I need those.

23   Q.    You have kitchen knives, then.

24   A.    I have kitchen knives.

25   Q.    All right.  Do you know whether or not Kenneth Harrelson

1    has a passport?

2    A.   No, he doesn't.

3    Q.   And you're sure of that?

4    A.   Yes, sir.

5    Q.   All right.  In the time that you have known him, have you

6    and he ever traveled outside the continental United States --

7    A.   No, sir.

8    Q.   -- the lower 48?

9    A.   No.

10   Q.   Do you or he have any relatives outside of the United

11   States?

12   A.   No.

13   Q.   Any friends?

14   A.   No.

15   Q.   No place to go outside the United States?

16   A.   No.

17   Q.   Do you know where Mr. Harrelson's family is located?

18   A.   Yes.

19   Q.   And where is that?

20   A.   Well, one of them's at my house right now.

21   Q.   All right.

22   A.   And in Georgia.  That's it.

23   Q.   Whereabouts in Georgia?

24   A.   St. Marys.

25   Q.   All right.  Just over the line, then.

1    A.    Yes.

2    Q.    All right.  That's near, what, Kings Bay?

3    A.    Yes.

4    Q.    Are you aware of your husband, Mr. Harrelson's current

5    medical condition?

6    A.    Yes.

7    Q.    Does he take medication?

8    A.    Yes.

9    Q.    And since he has been incarcerated, has his regimen of

10   treatment been interrupted?

11   A.    Yes.

12   Q.    Is this contrary to a doctor's instructions?

13   A.    I'm sorry?

14   Q.    The interruption.

15   A.    It interrupted it.

16   Q.    Have you made any attempt to provide these medications --

17   A.    Yes.

18   Q.    -- to the U.S. Marshals Service?

19   A.    Yes.

20   Q.    All right.  And the U.S. Marshals let you into the

21   building so you could make arrangements to turn those over,

22   correct?

23   A.    Yes.

24   Q.    At the end of the day were you able to give those

25   medications to be provided to your husband?

1    A.    No.

2    Q.    Why is that?

3    A.    Because I was told the county wouldn't accept outside

4    medication.

5    Q.    The county being what -- which county?

6    A.    Seminole County Jail.

7    Q.    All right.  And that is where Mr. Harrelson's being housed

8    currently?

9    A.    Yes, sir.

10   Q.    Do you know if stopping this medication is detrimental to

11   your husband's health?

12   A.    Yes.

13   Q.    And is it?

14   A.    Yes.

15   Q.    If the Court were to grant a monetary bond, would you be

16   able to raise funds with family and friends to post that bond?

17   A.    Yes.

18   Q.    If the Court were to allow bond, would you ensure that

19   Mr. Harrelson appeared at any court date?

20   A.    Yes.

21   Q.    If it appeared that he was not going to appear at any

22   court date, would you cooperate with federal and local law

23   enforcement to make sure that he did, in fact, appear?

24   A.    Yes.

25   Q.    In regards to this particular proceeding, has his

1    continued incarceration had a negative impact on your minor

2    children?

3    A.    Yes.

4    Q.    Can you describe that for the Court, please.

5    A.    They're afraid to go to school.  They've already been

6    asked about his -- their father.

7    Q.    In the time that you have known your husband, have you

8    ever known him to be a violent person?

9    A.    No.

10   Q.    Have you ever known him to be involved in a fistfight or a

11   fight or anything of that nature?

12   A.    No.

13   Q.    Do you know whether or not he served in the military?

14   A.    Yes.

15   Q.    And was he discharged honorably or dishonorably?

16   A.    Honorably.

17   Q.    And does he receive any type of payment from the

18   government in regards to his service?

19   A.    Veteran, VA disability.

20   Q.    All right.  And his disability is what?

21   A.    A hundred percent.

22   Q.    Do you know whether or not he has high blood pressure?

23   A.    Yes.

24   Q.    Does he?

25   A.    Yes.

1  Q.    The medication that he receives that you were not able to

2  get to him because of Seminole County Jail's policy, does that

3  affect his blood pressure?

4  A.    Yes.

5  Q.    It helps to regulate it?

6  A.    If his hormones are unstable right now, they -- his blood

7  pressure's going to be unstable.

8  Q.    If, as a condition of release, the Court were to order

9  Mr. Harrelson to attend any type of medical or psychological

10  treatment, would you participate and/or support that?

11  A.    If he does, yes.

12  Q.    Do you know whether or not Mr. Harrelson's disability from

13  the VA includes a diagnosis of PTSD?

14  A.    Yes.

15  Q.    Okay.  Has the VA determined that that needed treatment?

16  A.    No.

17  Q.    They just said that it was there?

18  A.    Yes.

19  Q.    Has the VA prescribed any particular set of treatment for

20  any of his disabilities?

21  A.    Not that I know of.  He's been through the treatments,

22  through the surgeries.

23  Q.    And if released on bond, you will make every effort to

24  ensure that he appears at every court proceeding, regardless of

25  where it be, in Washington, D.C., or here?

1    A.    Yes, sir.

2              MR. BARLOW:  Nothing further at this time, Judge.

3              THE COURT:  Cross-examination?

4                          CROSS-EXAMINATION

5    BY MS. GABLE:

6    Q.    Good morning, ma'am -- or good afternoon, ma'am.

7              Did you know that the defendant participated in the

8    riots at the Capitol on January 6th of 2021?

9    A.    It's -- he wasn't there for the riot.

10   Q.    My question is, did you know that he participated in the

11   riots on January 6th?

12   A.    On the riot, no.

13   Q.    Did you know that he was inside the Capitol?

14   A.    Not until I talked to him.

15   Q.    And was that when he was in Washington, D.C.?  Is that

16   when he talked to you about that?

17   A.    I talked to him, yes.

18   Q.    And did you -- did you see any pictures or video on his

19   telephone that he recorded when he was inside the Capitol?

20   A.    No.

21   Q.    And did you report that activity to law enforcement?

22   A.    No.

23   Q.    Okay.  Regarding the defendant's violent character, are

24   you aware that in November of 2012 his sister called the police

25   because he threatened to shoot her and her kids?

1   A.    That's not his sister.

2   Q.    Excuse me?

3   A.    It wasn't his sister.

4   Q.    So are you aware that someone did call the police

5   because --

6   A.    That is not his sister.

7   Q.    -- he threatened to shoot --

8   A.    And, yes, I'm aware of that, and that didn't happen.

9   Q.    And are you aware that in 2004 he shot his neighbor's dog?

10  A.    No.

11  Q.    And that he admitted to shooting him and not just -- that

12  his intent was to scare the dog, not shoot him?

13  A.    No.

14  Q.    Are you aware that in 2001 he was arrested for battery?

15  A.    Yes, I'm aware of that, but all that was expunged.

16  Q.    You talked about weapons in your home.

17  A.    Uh-huh.

18  Q.    Did you --

19  A.    And all of them have been removed.

20  Q.    -- have an assault rifle in your home?

21  A.    No.

22  Q.    And did you have a pistol in your home?

23  A.    They're no longer there.  I got rid of them.

24  Q.    And -- so the assault rifle, you did have that in your

25  home?

1    A.    It's not an assault rifle.  As far as I know, that was an

2    AirSoft, and I got rid of them.

3    Q.    Okay.

4    A.    I even got rid of my -- my son's AirSoft pistol.

5    Q.    The defendant is not currently working; is that correct?

6    A.    Correct.

7    Q.    And you currently work, correct?

8    A.    Not anymore.  I lost my job that day.

9    Q.    And, ma'am, again, did you see any videos or photos of the

10   defendant --

11   A.    No.

12   Q.    -- inside the Capitol on his telephone?

13   A.    No.  Only on YouTube videos.

14          MS. GABLE:  Thank you, ma'am.  No further questions.

15          THE COURT:  Any redirect?

16          MR. BARLOW:  Yes.  Thank you.

17                    REDIRECT EXAMINATION

18   BY MR. BARLOW:

19   Q.    Ms. Harrelson, when you make reference to AirSoft items,

20   are you talking about items that look like real firearms but

21   are nonlethal and shoot rubber projectiles?

22   A.    Little plastic pellets.

23          MR. BARLOW:  Thank you, Judge.  That's all.

24          THE COURT:  All right, ma'am.  You may step down.

25          THE WITNESS:  Thank you.

1          THE COURT:  Do you have any additional witnesses?

2          MR. BARLOW:  Yes, Judge.

3          Defense would call Mr. Kenneth Harrelson.

4          THE COURT:  All right, Mr. Harrelson.  Step forward

5   to the stand and raise your right hand, as best you can, to be

6   sworn.

7          COURTROOM DEPUTY:  Do you solemnly swear or affirm

8   that the testimony you give in this case is the truth, the

9   whole truth, and nothing but the truth?

10         THE DEFENDANT:  Yes.

11         COURTROOM DEPUTY:  You may be seated.

12         KENNETH HARRELSON, DEFENDANT'S WITNESS, SWORN

13                    DIRECT EXAMINATION

14  BY MR. BARLOW:

15  Q.   Please state your name and spell your first and last name

16  for the record.

17  A.   Kenneth Harrelson, K-e-n-n-e-t-h, H-a-r-r-e-l-s-o-n.

18  Q.   All right.  Mr. Harrelson, you have seen today, this

19  afternoon, the four-count indictment charging you in this

20  proceeding; is that correct?

21  A.   Yes.

22  Q.   If the judge were to release you on bond, will you appear,

23  whether it be here or in Washington, D.C., or such other place

24  as designated, as ordered by the Court?

25  A.   Yes.

```
1    Q.   Do you have any access or knowledge of any weapons other
2    than those that your wife has testified have been removed from
3    your home?
4    A.   No.
5    Q.   Where are you -- when you're not here in court with us,
6    where are you being housed?
7    A.   Currently in a quarantine unit in Seminole County.
8    Q.   Seminole County Jail?
9    A.   Yes, sir.
10   Q.   And that would be the John E. Polk Correctional Facility?
11   A.   Yes, sir.
12   Q.   When you are in that facility, are they depriving you of
13   your legal correspondence and items from this court?
14        MS. GABLE:  Your Honor, excuse me.  Objection,
15   relevance.
16        THE COURT:  Mr. Barlow?
17        MR. BARLOW:  The relevance has to do with preparation
18   of defense, preparation for this hearing, and preparation of
19   any future calls now that he's been charged.
20        THE COURT:  All right.  Go ahead.
21        THE DEFENDANT:  I have not had any correspondence.
22   BY MR. BARLOW:
23   Q.   All right.  What about the papers you brought back from
24   court?  Did they take those from you?
25   A.   Yes, they did.
```

1    Q.    Do you have any expectations of what will happen with your

2    copy of the indictment when you return?

3    A.    I imagine they'll be taken like the others were.

4    Q.    Do you have any medical conditions at the current time?

5    A.    I have hypertension, PTSD.  Currently I have two back

6    surgeries and a shoulder surgery.  I have several herniated

7    discs in my spine.

8    Q.    And are you being treated for any of those matters in the

9    Seminole County Jail?

10   A.    Just checking blood pressure twice a day.

11   Q.    All right.  And why are they checking your blood pressure

12   twice a day?

13   A.    Because I told them that I had hypertension, and they said

14   they wanted to monitor it.

15   Q.    Prior to your arrest were you under the care of a doctor?

16   A.    Yes.

17   Q.    And did that doctor prescribe various injectable

18   medications to you?

19   A.    Yes, he did.

20   Q.    And how often were you supposed to take these medications?

21   A.    Twice a week.

22   Q.    And in regards to those medications, were you told and

23   instructed not to discontinue those medications without his

24   instruction?

25   A.    Yes.

1  Q.   Since you have been incarcerated, have you been permitted
2  or allowed to have this medication?
3  A.   No.
4  Q.   Has this failure to allow you to be medicated affected
5  your hypertension?
6  A.   I believe so, yes.
7  Q.   What have you experienced in regards to your hypertension
8  since being incarcerated?
9  A.   I've had some --
10          MS. GABLE:   Again, Your Honor, I'm going to object on
11  the basis of relevancy.
12          THE COURT:   I will -- I will allow some leeway.
13          Go ahead.
14          THE DEFENDANT:   In speaking with my wife, we've
15  noticed some confusion.   I had issues filling out paperwork,
16  not remembering her mother's name, my mother's name, ages.   I
17  had issues recalling my sister's name.
18  BY MR. BARLOW:
19  Q.   Did you discuss this with the medical staff at the
20  Seminole County Jail?
21  A.   I had not at the time of processing, no.
22  Q.   Since that time have you?
23  A.   No.   They've just been in to check blood pressure, and
24  that's it.
25  Q.   Okay.   Do you know what your blood pressure was the last

1  time they checked it?

2  A.   It was around 169 over 100.

3  Q.   And for you that is high?

4  A.   Yes.

5  Q.   In regards to your diagnosed mental illness or PTSD

6  diagnosis from the VA, have they at any time directed you to

7  treatment for that?

8  A.   No, they have not.

9  Q.   Do you have any particular work skills?

10  A.   I'm a certified welder on both aerospace, structural.  I'm

11  qualifi- -- certified in precious metal welds, Inconel,

12  stainless steel, aluminum, so forth.

13  Q.   Prior to your arrest were you able to find part-time

14  employment?

15  A.   On and off, yes.  The pandemic has kind of hampered that a

16  little bit, but it's -- comes and goes.

17  Q.   And if you are released from custody, would you attempt to

18  procure part-time employment?

19  A.   Yes.

20  Q.   Do you possess a passport?

21  A.   No, I do not.

22  Q.   Have you ever been outside of the continental United

23  States?

24  A.   No, I have not.

25  Q.   Do you have any family members, friends, or other contacts

1    outside of the United States?

2    A.    No.

3    Q.    Where is your family located?

4    A.    Other than here, in Southeast Georgia.

5    Q.    All right.  Do you have any family members in Texas?

6    A.    Yes, I do.

7    Q.    Who?

8    A.    My aunt and uncle.

9    Q.    All right.  The rest are all in Southeast Georgia?

10   A.    Yes.

11   Q.    Where in Southeast Georgia?

12   A.    Camden County, Kings Bay, St. Marys.

13   Q.    All right.

14              MR. BARLOW:  Thank you, Judge.  That's all I have.

15              THE COURT:  All right.  Cross-examination?

16                        CROSS-EXAMINATION

17   BY MS. GABLE:

18   Q.    Mr. Harrelson, the medication that you keep referring to

19   during your testimony, it's testosterone, correct?

20   A.    Yes.

21   Q.    And there's no other medication besides that that you're

22   referring to, correct?

23   A.    The HCG and the estrogen blockers.

24   Q.    Okay.  So these are hormones, correct?

25   A.    Say again?

1    Q.    These are hormones?

2    A.    Yes.  I have hormone issues because of the pain management

3    I was put through through the VA for four years on 180 10

4    milligram Lortabs a month.  It destroyed my endocrine system,

5    and I have the testosterone of an 80-year-old man, which

6    affects my blood pressure, my sleeping habits, and a few other

7    things.

8    Q.    And, Mr. Harrelson, it's true that in August of 2004, you

9    shot your neighbor's dog, correct?

10   A.    Yes, but there's --

11   Q.    Mr. Harrelson, yes or no?

12   A.    Yes.

13   Q.    And, sir, it's true that in January of 2003 you were

14   arrested for drug possession, correct?

15   A.    Yes.

16   Q.    And in 2001 you were arrested for battery?

17   A.    Yes.

18   Q.    Then while in the Army, you were cited for using

19   marijuana, correct?

20   A.    No, drinking.

21   Q.    And also for failure to follow orders, correct?

22   A.    Not (unintelligible), no.

23   Q.    And you also used marijuana as recently as three weeks

24   ago?

25   A.    Yes.

1    Q.   And you don't have a prescription for marijuana, correct?

2    A.   No, ma'am, I do not.

3    Q.   And so you're currently not working right now, correct?

4    A.   No, ma'am.

5    Q.   When you unlawfully entered the Capitol on January 6th of

6    2021, did you talk to your wife?

7            MR. BARLOW:  Objection, Judge.  Outside the scope.

8    Also assumes facts not in evidence.

9            THE COURT:  Ms. Gable?

10           MS. GABLE:  Your Honor, he's been placed under direct

11   examination.  His wife testified, as a third-party custodian,

12   that he did contact her when he was up in Washington, D.C.  I'm

13   asking him simply to confirm that.

14           THE COURT:  I'll allow it.

15   BY MS. GABLE:

16   Q.   You can answer the question.

17   A.   Can you repeat the question, please?

18   Q.   Yes.  When you were up in Washington, D.C., and you

19   unlawfully entered the Capitol on January 6th of 2021, did you

20   notify your wife?

21   A.   No.

22   Q.   Did you talk to her that night?

23   A.   Yes.

24   Q.   Did you take photos and videos when you were inside the

25   Capitol on your telephone?

```
 1   A.   No.

 2   Q.   You did not?

 3   A.   Well, there's -- it didn't -- nothing was recorded.

 4   Q.   Did you take photographs?

 5   A.   No.

 6   Q.   Did you see the picture of yourself inside the Capitol

 7   holding the phone up?

 8   A.   Yes, ma'am.

 9   Q.   And it's your testimony that nothing recorded on your

10   phone.

11   A.   It was -- it didn't record for some reason.  There was

12   issues with the phone.

13   Q.   And do you know Kelly Meggs?

14   A.   Yes.

15   Q.   And Connie Meggs?

16   A.   Yes.

17            MR. BARLOW:  Objection, Judge.  Outside the scope.

18            THE COURT:  Ms. Gable?

19            MS. GABLE:  Your Honor, he's been placed under oath

20   to testify regarding this detention hearing.  One of the issues

21   that the Court needs to consider is the nature and the

22   circumstances of the offense.

23            THE COURT:  Do you have a response?

24            MR. BARLOW:  Yes, Judge.  That does not include

25   trying to build their case against him, you know, what would
```

1  amount to a discovery deposition.

2         My client does have a Fifth Amendment right not to

3  answer questions about his involvement in the alleged offense.

4  He has contested his innocence.  He's pled not guilty at this

5  point.

6         And the cross-examination should be limited only to

7  those matters gone directly into during direct, which are in

8  regards to his medical condition, his ability to flee the

9  country, i.e., doesn't have a passport, the fact that he has no

10 contacts outside the country, things that are relative to bond,

11 not relative to the government's case in chief, which will

12 proceed in the District Court in the District of Columbia.

13        THE COURT:  Well, Mr. Harrelson is certainly entitled

14 to his Fifth Amendment rights.  However, he did take the stand

15 today with regard to the detention issue, and whether anything

16 that's said on the stand will be subsequently admissible at

17 trial, I assume you'll take that up with the judge at that time

18 with regard to this detention hearing.

19        But in addition to risk of flight, I do have to

20 consider also danger to the community, as well as the other

21 statutory factors in Section 3142.

22        So I will allow the United States a bit of leeway to

23 make some inquiry into those matters.

24 BY MS. GABLE:

25 Q.   Do you know Graydon Young?

1    A.    I -- not exactly, no.

2    Q.    Were you with him on January 6th, 2021, inside the

3    Capitol?

4    A.    I'm not sure.

5    Q.    And did he have his arm on you and his hand on your

6    shoulder as you were illegally inside the Capitol?

7    A.    I don't know.

8    Q.    And, Mr. Harrelson, did you travel to Washington, D.C.,

9    with the express purpose of participating in that rally?

10   A.    No.

11   Q.    And did you travel to Washington, D.C., for the express

12   purpose of participating in the riot?

13   A.    No.

14   Q.    Did you plan with other members of the Oath Keepers to go

15   to D.C. to attend the rally?

16   A.    No.

17   Q.    Do you know -- are you a member of the Oath Keepers?

18   A.    I was, yes.

19         MS. GABLE:  I have no further questions, Your Honor.

20   Thank you.

21         THE COURT:  Any redirect?

22                    REDIRECT EXAMINATION

23   BY MR. BARLOW:

24   Q.    Mr. Harrelson, you were asked about an incident with

25   your -- about a neighbor's dog?

1   A.    Yes.

2   Q.    Do you wish to explain what happened in that instance?

3   A.    Yes, I do.

4   Q.    Proceed.

5   A.    On that afternoon I heard -- my ex-wife had left to go get

6   groceries.  I heard a substantial amount of noise in the yard.

7   I came out and the neighbor's dog was chasing my ex-wife around

8   the yard, attempting to bite her.

9         So I went inside and got my handgun and came back

10  out, and I cracked a shot off at it.  I didn't hit the dog, but

11  it scared it over to the yard.

12        And then we went over -- the neighbors called the

13  law.  The law came to the house.  We explained to them what

14  happened.  And the law said that, you know, not to crack rounds

15  off because people were out, and it -- you know, if it happened

16  again, to call animal control and the sheriff's department, and

17  they would handle it.

18  Q.    Did you receive any criminal conviction from that

19  instance?

20  A.    No.

21  Q.    Have you received any criminal convictions?

22  A.    No, sir.

23  Q.    During your time incarcerated, you were contacted by an

24  individual by the name of Juan Cabrera from the U.S. pretrial

25  services department?

```
 1   A.    Yes.

 2   Q.    And you spoke with him and disclosed these matters?

 3   A.    Yes.

 4   Q.    Thank you.

 5              MR. BARLOW:  Nothing further, Judge.

 6              THE COURT:  All right, Mr. Harrelson.  You can take

 7   your seat.

 8              Do you have any additional witnesses?

 9              MR. BARLOW:  No, Judge.

10              THE COURT:  All right.  Any evidence by way of

11   proffer?

12              MR. BARLOW:  No, Your Honor.

13              THE COURT:  Okay.  All right.  Ms. Gable?

14              MS. GABLE:  Your Honor, we would only proffer from

15   the criminal complaint affidavit and the indictment, which we

16   can do by way of argument to the Court.

17              THE COURT:  Okay.  Why don't you go ahead.

18              MS. GABLE:  The government?

19              THE COURT:  Yes.

20              MS. GABLE:  Your Honor, as the Court is aware, under

21   18, United States Code, 3142(e)(3)(C), a presumption of

22   detention exists in this case.  It is the government's position

23   that the defendant has not rebutted the presumption that he is

24   both a danger to the community and a flight risk.

25              Turning to the nature and circumstances of the
```

1    offense charged, Your Honor, the Court shall consider the
2    nature of the offense here.
3         The defendant is charged with both a crime of
4    violence and a federal crime of terrorism under Section
5    2332b(g)(5) in the sense that he is charged with an offense
6    that was calculated to influence or affect the conduct of
7    government by intimidation or coercion or to retaliate against
8    government conduct.
9         And he has been charged with an enumerated offense
10   under 2332b(g)(5)(B), which is destruction of government
11   property.  So the Court is to consider that he has been charged
12   with both a crime of violence and a federal crime of terrorism.
13        Turning to the weight of the evidence against the
14   person, Your Honor, we would suggest to the Court that the
15   weight of the evidence against the defendant is quite strong.
16        As set forth in the criminal complaint affidavit and
17   the indictment, the defendant is a member of the Oath Keepers,
18   which is a right-wing militia organization.
19        From at least as early as November 3rd of 2020
20   through January 6th of 2021, the defendant, along with his
21   codefendants, planned to use violence to breach the Capitol and
22   obstruct congressional proceedings to certify the vote of the
23   electoral college of the 2020 United States presidential
24   election.
25        During the period of the conspiracy, the defendant

1    participated and/or hosted meetings of the Oath Keepers on

2    GoToMeeting.  On January 3rd of 2021, he, along with Kelly

3    Meggs, hosted a meeting titled "D.C. Planning Call."  18

4    participants were on the line during this call.

5         The government has linked the defendant to these

6    meetings by his name, cell phone, his e-mail, and his IP

7    address.

8         According to messages obtained from social media

9    accounts, these conspirators planned to storm the Capitol and

10   coordinated with a group of co-conspirators who agreed to serve

11   as a quick reaction force to monitor the attack at the Capitol

12   from a distance and be prepared to travel to the Capitol in the

13   event they were called upon, possibly while armed.

14        One of the conspirators, Mr. Caldwell, also provided

15   maps informing this quick reaction force, or QRF, team how to

16   most effectively reach the Capitol from their staging area.

17        On January 6th of 2021, the defendant's

18   co-conspirators stormed the Capitol -- the defendant and his

19   co-conspirators stormed the Capitol.  The video and photo

20   evidence provided in the complaint affidavit shows the

21   defendant congregating outside the Capitol with some of his

22   co-conspirators, to wit, Mr. Young, Ms. Meggs, and Mr. Steele

23   [verbatim].

24        Then the video evidence shows some of the

25   conspirators aggressively moving through the crowd and toward

1   the entrance of the Capitol in a military stack formation with

2   their hands on the shoulders of the individuals in front of

3   them.  They were dressed in paramilitary gear, with one of

4   those participants wearing a sign that said "I don't believe in

5   anything.  I'm just here for the violence."

6          Furthermore, they were outfitted in clothing that had

7   the Oath Keepers logos and insignia on it.

8          As the stack of Oath Keepers moved through the crowd,

9   the defendant was seen in front of them, interacting with them.

10  Video from inside the Capitol then shows the stack of Oath

11  Keepers and other members of the crowd shortly after they

12  breached the Capitol and damaged the doors to the Capitol.

13         In the video Mr. Harrelson is in front of the group

14  of the Oath Keepers, and it appears that he forcibly entered

15  before them.

16         When they pushed through that door, Your Honor, they

17  pushed -- they passed at least -- or pushed through at least

18  one law enforcement officer who was trying to stop the crowd

19  from breaching the Capitol.

20         The Capitol doors that the Oath Keepers and

21  Mr. Harrelson -- through which they breached were significantly

22  damaged.  Multiple panes of glass were smashed, and a door

23  handle was missing or broken off.

24         The stack of Oath Keepers, Your Honor, then

25  congregated inside the north section of the rotunda, as seen

1    from surveillance footage.  The defendant is among that group.

2    The video shows his co-conspirator Graydon Young, in Oath

3    Keeper attire, with his hand on the defendant's shoulder, as

4    the defendant records the event with his phone.

5            During the attack, based on communications from a

6    Zello channel called "Stop the Steal," which the conspirators

7    had planned to use and communicate with before they breached

8    the Capitol -- the FBI has recovered some of those

9    communications.

10           And in those communications, one of the

11   co-conspirators, Ms. Watkins, communicates, "We have a good

12   group.  We have 30 or 40 of us.  We are sticking together and

13   sticking to the plan."

14           Then an unknown male states, "You are executing

15   citizen's arrest.  Arrest this assembly.  We have probable

16   cause for acts of treason, election fraud."

17           Watkins then replies, "We are in the mezzanine.  We

18   are in the dome right now.  We are rocking it."

19           And then the individual on the channel responds:

20   "Get it, Jess.  Do your f'ing thing.  This is what --

21   everything we f'ing trained for."

22           One of the co-conspirators, Caldwell, also received a

23   Facebook message which stated, quote, "All members are in the

24   tunnels under Capitol.  Seal them in.  Turn on gas."

25           When Caldwell posted inside, he received messages

1   such as, "Tom, take that b-i-t-c-h over.  All of the

2   legislators are down in the tunnels three floors down.  Do like

3   we had to do when I was in the corps.  Start tearing out

4   floors.  Go from top to bottom and go through back house

5   chamber doors facing north, left down the hallway, down steps,"

6   indicating that other members were watching the TV and were

7   communicating with individuals inside and providing them

8   positions of the legislators inside the Capitol.

9          Mr. Young posted later that evening, "We stormed and

10  got inside."

11         In the course of these riots, Your Honor, 139 law

12  enforcement officers were assaulted, and the Capitol suffered

13  millions of dollars in damage.

14         The weight of the evidence against this defendant is

15  strong.  There is video evidence.  There is photographic

16  evidence of this defendant.  He participated in planning

17  meetings.  And the e-mail evidence, his phone evidence, the IP

18  address evidence, all of that evidence is very weighty and

19  shows that this defendant not only -- participated in this

20  conspiracy to obstruct government or to obstruct Congress.

21         And essentially, Your Honor, this -- the offense was

22  so serious, it was really one that was designed to challenge

23  over 244 years of our constitutional democracy.

24         Turning to the history and characteristics of the

25  person, the defendant admittedly has a mental health -- has

1  mental health issues.  He has PTSD, for which he is not
2  receiving treatment.

3          He has substance abuse issues, according to the
4  pretrial services investigation report, to include marijuana
5  and alcohol, which he has been dealing with, apparently, since
6  his early 20s.

7          It is also concerning that at age 31, while in the
8  Army, he was charged with wrongful use of marijuana and failing
9  to obey a general order.  And I would just note, Your Honor,
10 given the nature of the offense charged here, the defendant has
11 not shown a respect for the law or a likelihood to follow court
12 orders.

13         Finally, Your Honor, turning to the nature and
14 seriousness of the danger to any person or the community that
15 would be posed by his release, the defendant has simply not
16 rebutted the presumption of danger, Your Honor.

17         This defendant is not like the others that have come
18 before this Court.  As Judge Lammens said when detaining the
19 defendants -- codefendants Kelly Meggs and Connie Meggs, Judge
20 Lammens wrote:  "This case isn't just about breaking the law.
21 We see those cases every day.  This case is different.  It is
22 more.  It is about challenging the very existence of the law.
23 It is about a challenge to the very institution responsible
24 for" -- "responsible for making the law while it was in the
25 process of carrying out its lawful duty.  These members of

1  Congress were carrying out a duty that their oath required them

2  to fulfill.

3          "When the Court considers the seriousness of the

4  charges and the weight of the evidence, there is only one

5  conclusion.  The defendant is a danger to the community and

6  must be detained."

7          Likewise, Your Honor, in this case, this case just

8  involves a concerted activity by these -- the defendant and his

9  codefendants to obstruct congressional proceedings.  There was

10 planning before, during, and after the events had occurred.

11         And as a result, the members of Congress were

12 evacuated from their respective chambers.  The disruption

13 resulted in assault of more than a hundred law enforcement

14 officers, millions of dollars of damage to the Capitol, and

15 death to several individuals.

16         For those reasons, Your Honor, we would ask the Court

17 to detain the defendant.

18         In addition, Your Honor, regarding the defendant's

19 proposed custodian, she -- the defendant's wife admitted that

20 she (unintelligible) some information regarding the defendant's

21 participation in these events, and as such, she is not a

22 suitable custodian, Your Honor.

23         It is possible that she will be a witness in this

24 case, given her knowledge of the events, but more importantly,

25 she didn't report what occurred to law enforcement.  And so she

1    is not a suitable custodian.

2            So we would ask the Court to detain this defendant.

3            Thank you.

4            THE COURT:  All right.  Mr. Barlow?

5            MR. BARLOW:  Yes, Judge.

6            I presume that the Court has a copy both of the

7    indictment as well as the criminal complaint in this matter?

8            THE COURT:  I do.

9            MR. BARLOW:  And I find the government's argument

10   somewhat interesting in that if you look at the criminal

11   indictment, the conduct discussed by my esteemed opponent is

12   attributable to codefendants Caldwell, Crowl, Watkins, Parker,

13   Bennie Parker, Young, Steele, Meggs, both Connie and Kelly.

14           Mr. Harrelson doesn't appear in this indictment till

15   paragraph 56.  And it does charge participation in a

16   ComeToMeeting [verbatim] video or ComeToMeeting electronic

17   meeting, on, I believe, January the 3rd.  So I would concede

18   that that charge exists.

19           But what we're talking about, showing up in combat

20   gear and things of that nature, the evidence that's been

21   provided to the Court by the government kind of contradicts

22   that.

23           The photographic evidence of Mr. Harrelson allegedly

24   at the Capitol Building, shows him in civilian clothing, no

25   combat gear, shows him not in any stack going into the Capitol

1    Building.

2            And as it happens, I've had the occasion to go to the

3    Capitol Building.  Those doors don't open inward; they open

4    outward.  There's no evidence that's been put before this Court

5    that Mr. Harrelson touched a door, touched a barricade, touched

6    a person, moved a fence.

7            They have established, I believe, that he was

8    present.  They have established that he knows Kelly Meggs, but

9    knowing a co-conspirator does not necessarily make one a

10   co-conspirator.

11           At the foundation of our country, there were lots of

12   people that knew John Adams.  There were lots of people that

13   knew Thomas Jefferson.  There were lots of people who knew our

14   founding fathers.  That did not mean that they participated in

15   any attempt to overthrow the British government.

16           Likewise, the allegations asserted against my client

17   here today are allegations only.  They lack any proof.  Quite

18   frankly, when we look at the indictment, Mr. Harrelson starts

19   to appear -- I think 56 is the first one.  He appears again in

20   71 through 75, dealing with obstruction of an official

21   proceeding.

22           In Count Three at page 82 [verbatim], he appears

23   alleging damage of government property, but there's no specific

24   government property that he's alleged to have touched, harmed,

25   or anything, so I'm not exactly sure what they're talking about

1    in that regard.

2         There's the allegation -- there's no doubt there was

3    damage done to the Capitol Building, but nothing that the

4    government has offered here today is indicative that this man

5    did any of that, other than the fact he was present.

6         They also say that he entered and remained in a

7    restricted building or grounds.  Judge, there may be some basis

8    in that.  They have a picture of a person that they believe is

9    Mr. Harrelson, that they say is Mr. Harrelson -- again, not in

10   combat gear, not part of any stack -- standing next to some

11   people that quite -- very -- that are, without a doubt.

12        And in one of the photographs that they've made

13   allusion to, one of the persons in combat gear has reached out

14   in the direction -- well, at page 15 of the criminal complaint,

15   in paragraph 41, there is a picture of an individual that the

16   government suggests is Mr. Harrelson with his phone in the

17   air -- Mr. Harrelson said it didn't capture anything -- with a

18   person in combat gear with a beard and mustache that appears to

19   be white or gray behind him that they say is touching him on

20   the shoulder.

21        And this is a black and white picture.  It's hard to

22   say if he is or not.  But even if he is, that does not mean

23   that he's part of any grand conspiracy.

24        Under the First Amendment of the United States

25   Constitution, an individual in this country has the right of

1   redress, of protest, and being present at a protest where

2   someone else commits a criminal act does not, in and of itself,

3   make one a co-conspirator.

4           Presence alone is not enough, and the government has

5   put forth nothing before this Court but allegations and not any

6   presumptive proof other than their claims.  We've not heard

7   from the FBI agent who's investigated this cause, who is

8   present.  We've heard nothing but the charging document, which

9   is nothing but claims not substantiated by proof.

10          Additionally, we've had testimony from both the

11  defendant and his wife, and he does not have a passport.  His

12  family lives either in south -- Southeast Georgia, in the area

13  of St. Marys, Georgia, or here in Florida.

14          He has ties to the community.  He does have a

15  diagnosed mental disorder for PTSD that the -- is apparently

16  not sufficiently worrisome to the VA that they require -- or

17  give him any treatment for it.

18          But more importantly, as he's being held currently at

19  the Seminole County Jail, it's endangering his health.  He's

20  not been allowed to have his medication.  Now, granted, the

21  U.S. Marshals Service was willing to accept the medications and

22  make the attempt, but the holding facility has denied action.

23          I would submit that this Court is empowered to

24  consider the effect on the defendant's health in considering

25  whether or not bond is appropriate.

1          I would also suggest that if the Court is not

2    inclined to grant bond, that the Court perhaps order the

3    Seminole County Jail to accept his medication so that he can

4    have it.

5          The undisputed and uncontroverted testimony at this

6    point is that because of medications the VA gave him in the

7    past, his endocrine system is shot, and he has to have these

8    medications to control his blood pressure.

9          If he doesn't have his blood pressure controlled,

10   there's a danger of stroke, and I would submit to the Court

11   that one of the preliminary signifying symptoms of that is

12   negatively impacted memory.

13         This is important because it also impacts upon his

14   ability to cooperate with counsel in regards to the preparation

15   of a defense or, if he were to participate with the government,

16   his ability to assist them in their prosecution of others as

17   well.

18         So it's important that his medical issues be taken

19   care of, and they can more easily be taken care of while out on

20   bond.

21         It's also important to note, Judge, that when

22   pretrial services met with Mr. Harrelson, they were aware of

23   the facts as alleged by the government.

24         And yet their recommendation, based upon his physical

25   health, his mental health, the nature of the charges, his risk

1    of potential -- identified risks of nonappearance, which are

2    essentially the same things argued by the government, their

3    recommendation is that Mr. Harrelson be released on an

4    unsecured bond in an amount to be determined by the Court, with

5    conditions that he report to pretrial services as directed; he

6    not possess firearms, destructive devices, or ammunition; he

7    refrain from use or unlawful possession of any narcotic drug or

8    any controlled substance defined in 21 U.S.C. 802 unless

9    prescribed by a licensed medical practitioner; that he refrain

10   from the excessive use of alcohol; he submit to abuse --

11   substance abuse testing as directed by pretrial services; and

12   submit to mental health evaluation and treatment as directed by

13   pretrial services, with costs to be borne by the defendant as

14   determined by pretrial services.

15          Now, that was March 11th, 2021, and that's government

16   pretrial services.  So at least one branch of the federal

17   government believes that Mr. Harrelson can remain at large

18   without being an inherent danger to the community or to others

19   or to other property, whether it be public or private.

20          Mr. Harrelson has said -- stated under oath that he

21   will participate, and he will appear.  It is our position that

22   the government has not put forth sufficient factual evidence to

23   establish that a presumption should apply.

24          They have certainly alleged it, but you haven't

25   received any evidence from the government at all other than the

1  accusations.

2          And for that reason it is the defense position that

3  setting bond, as suggested by pretrial services, is appropriate

4  and that the concerns of the government can be adequately

5  covered for or eliminated by the terms and conditions of

6  release by the Court.

7          They could include things such as home confinement,

8  GPS monitoring, the substance abuse, and those type things that

9  pretrial services is suggesting.

10          So with all due respect to the government's

11  arguments, we are asking the Court to find that the defense has

12  overcome the presumption sought by the government and set bond

13  in a reasonable amount, with the conditions that are suggested

14  by pretrial services and any others that the Court finds

15  appropriate.

16          Mr. Harrelson will appear as ordered, whether it be

17  in this district or in the District of Columbia, as ordered.

18          Thank you, Judge.

19          THE COURT:  Thank you, Mr. Barlow.

20          Are you contesting that the presumption does apply

21  based on the nature of the charges, or is your argument to me

22  that it just -- the circumstances are not such that would

23  warrant an application of the presumption?

24          MR. BARLOW:  Judge, I do not believe that the

25  circumstances are as such as the presumption should apply.  I

1   would not dispute that if -- as to the other codefendants,

2   based upon what's in the paperwork that's been provided to me.

3          But when I read this indictment, it looks as

4   Mr. Harrelson might have been added as an afterthought.

5          THE COURT:  Well, I understand your argument there,

6   but minus just a very technical argument, do you disagree that

7   statutorily the presumption applies based on the nature of

8   the -- based on the charges that are set forth in the second

9   superseding indictment?  Because if there's a dispute over

10  that, then we might need to address that.

11         MR. BARLOW:  I believe, in tender to the Court, that

12  an argument can realistically be made by the government.  I

13  note that there was argument in regards to, you know, terrorism

14  and terroristic type things, but I haven't seen any disclosures

15  to that effect.

16         None of the charges, per se, allege any terroristic

17  conduct by Mr. Harrelson, other than being present, and there

18  is the conspiracy count that talks about the one GoToMeeting.

19         But when we look at the -- at the big picture, we've

20  got all these machinations by the other codefendants from which

21  Mr. Harrelson is noticeably absent from, except that one

22  GoToMeeting.

23         THE COURT:  Well, I understand your argument as to

24  the sufficiency of the evidence.  Just as to the application of

25  the statutory presumption -- you know, there are a lot of

1  factors for me to consider, but I just need to know -- make

2  sure we're on the same page at the outset, that the presumption

3  does apply.

4          MR. BARLOW:  Judge, I have no statutory authority to

5  give you that suggests that it doesn't.

6          THE COURT:  Okay.  I understand.

7          MR. BARLOW:  But I don't agree that it applies, but I

8  can't cite to any --

9          THE COURT:  Okay.

10          MR. BARLOW:  -- controlling or compelling argument.

11          THE COURT:  All right.  Thank you, Mr. Barlow.

12          All right.  Mr. Harrelson, as the attorneys have been

13  discussing, my consideration is governed by statute, Title 18

14  of the United States Code, Section 3142.

15          Because you have been charged -- and recognizing that

16  you're innocent until proven guilty, but nevertheless, there is

17  a charging instrument from the grand jury setting forth charges

18  of 18, U.S.C., Section 1512(c)(2), which I believe is the one

19  that triggers the presumption because it is one of the offenses

20  listed in Section 2332b(g)(5)(B) of Title 18, that a

21  presumption of your detention should apply.

22          There are two aspects of it.  One is risk of flight.

23  The statute says subject to rebuttal by the person, it shall be

24  presumed that no condition or combination of conditions will

25  reasonably assure the appearance of the person as required.

1    That's risk of flight.  But then there's also the safety of the
2    community.

3          I do believe that you've met your burden for
4    production as to risk of flight.  I don't think there's really
5    any argument that you're a serious risk of flight.  You have
6    ties to the community.  You don't possess a passport.  You
7    haven't traveled outside the United States.

8          But that's only one aspect of it.  The other aspect
9    is danger to the community.

10          I think -- I've not heard very much, at least in
11   terms of production from the defense, that addresses danger to
12   the community other than the sufficiency of the evidence for
13   the charges.

14          Nevertheless, I will assume that you've met your
15   burden of production as to danger to the community and still
16   consider the factors set forth in 18, U.S.C., Section 3142(g),
17   the first of which is the nature and circumstances of the
18   offense charged, including whether it is a crime of violence.

19          I think the United States makes a good argument that
20   this should be considered a crime of violence, but it is
21   certainly a -- a federal crime of terrorism, so there are two
22   factors that go against you there.

23          Second, the weight of the evidence against you,
24   understanding that this still has to go to a jury trial, so a
25   jury will ultimately make the determination as to whether

1    there's sufficient evidence to find you guilty beyond a

2    reasonable doubt.

3          But as to my consideration, I do have to consider

4    that there does appear to be photographic and video evidence of

5    you at the Capitol.  The United States apparently has evidence

6    of your conspiring with others by way of these meetings that

7    occurred through the app, some of which you apparently helped

8    organize and some of which perhaps you did not but were

9    nevertheless affiliated with the Oath Keepers and their actions

10   with regard to the Capitol on that day.

11         So in terms of the conspiracy charge, to me, that

12   seems fairly strong.

13         As to the other charges, obstruction of an official

14   proceeding and aiding and abetting, based on the information

15   set forth in the complaint and in the indictment, it certainly

16   seems like that was the purpose of what occurred on the Capitol

17   that day, so that evidence -- and to the extent that you were

18   involved in the planning of that and the participation of that,

19   the evidence of that count seems fairly strong.

20         Destruction of government property, the complaint

21   sets forth several items and portions of the Capitol that were

22   destroyed as a result of the actions that were taken that day.

23   As for whether you specifically destroyed any, that's something

24   that the government's going to have to prove.

25         Then the final count of which you're charged,

1  restricted building or ground, I don't think there's really any

2  contention there that you were in restricted building and

3  grounds, that is, posted, cordoned off, or otherwise restricted

4  area within the United States Capitol and its grounds, without

5  lawful authority to do so.

6          So overall, I find that the evidence against you is

7  fairly strong but, again, recognizing that you're certainly

8  entitled to presumption of innocence and a jury trial.  But at

9  this stage of the proceedings, based on the information before

10  me, the evidence does seem fairly convincing.

11          Your history and characteristics, I do note your

12  physical and mental condition, the -- that you were in the

13  military and that you suffer from PTSD -- although it's not

14  currently being treated, I do note the diagnosis -- your

15  physical condition with regard to the medication that has been

16  prescribed and that you need and that you haven't been

17  receiving.

18          Financial resources, you don't appear to have -- so

19  you're receiving disability benefits from the VA.  It does not

20  appear that you have significant means with which to flee.

21          Community ties, as I noted, were fairly strong.  You

22  have a wife and family here, as well as in South Georgia.

23          Your past conduct, the United States has pointed out

24  several instances in the past.  I don't give very much weight

25  to things like -- at least in terms of this context, to the dog

1    incident.  You've explained the circumstances of that.

2          The battery is really concerning, the other instances

3    of police being called.  But I do note that, as your attorney

4    pointed out, that the charges were ultimately dismissed, so you

5    don't have a criminal history to speak of.

6          A record concerning appearance in court proceedings,

7    I don't have any indication that you've ever failed to appear

8    at any court proceeding, so that is also in your favor.

9          Drug or alcohol abuse, I did note that in your past

10   there were some instances involving alcohol, as well as

11   marijuana, which, if you were to be released, you would not be

12   allowed to -- to use marijuana.

13         And then finally, the nature and seriousness of the

14   danger to any person of the community that would be posed by

15   your release, and that brings us back to the presumption, which

16   even if you meet your burden of production, it's nevertheless a

17   factor that I have to consider, as Congress has decided that

18   the nature of the charges that you're facing are such that the

19   Court should presume that you should be detained.

20         And I do take the description of the incidents that

21   the United States has proffered and that's contained in the

22   criminal complaint are certainly very concerning, certainly to

23   a Court, and the circumstances under which you'd be appearing

24   before the Court, which are, in themselves, official

25   proceedings.

1          And yet the criminal complaint describes conduct that

2   is -- that shows an absolute disregard for the validity of

3   official proceedings that are being held by the United States

4   government.  So that, to me, is very troublesome.

5          And I think that in light of the nature of the

6   violence that was -- that has been described by the United

7   States and as set forth in the complaint, in light of your

8   actions with regard to organizing some of these events

9   surrounding it, your affiliation with the organization the Oath

10  Keepers that was involved in perpetrating a lot of this

11  violence, and certainly organizing in a paramilitary style in

12  order to interfere with these official government proceedings,

13  that gives me great pause.

14         When I consider that, along with the statutory

15  presumption that you shall be detained based on the nature of

16  the charges, I do find that there are no conditions or

17  combination of conditions that will reasonably assure the

18  safety of the community if you were to be released.

19         So I will order that you be remanded to the custody

20  of the United States Marshal pending further proceedings.

21         You will be transferred to the District of Columbia,

22  where you will face charges in that jurisdiction.

23         Was there anything else to take care of today from

24  the United States?

25              MS. GABLE:  No, Your Honor.

```
1              THE COURT:  From the defense?

2              MR. BARLOW:  Yes, Judge.

3              In light of the fact that Mr. Harrelson is to be

4   continued detained, will the Court entertain an ore tenus

5   motion to order the Seminole County Jail to accept his

6   medication so that he can receive the treatment that he needs?

7              THE COURT:  I'm not going to order the jail to accept

8   the medication without more briefing.  I will request that the

9   United States Marshals look into it and -- and see what the

10  issue is with the jail.

11             I certainly agree that Mr. Harrelson should be

12  receiving his prescribed medication, but I understand that the

13  jail also has their own medical staff and that he is being seen

14  by that medical staff.

15             So I will request that the marshals look into it, but

16  if you believe that Mr. Harrelson continues not to receive the

17  medication that he needs, I'd encourage you to file a motion on

18  that, and we'll have a briefing on the issue.

19             MR. BARLOW:  Thank you, Judge.

20             THE COURT:  All right.  Is there anything else?

21             MR. BARLOW:  No, Your Honor.

22             THE COURT:  All right.  Thank you.  This hearing is

23  adjourned.

24             COURT SECURITY OFFICER:  All rise.

25        (The proceedings were concluded at 2:21 p.m.)
```

```
 1                CERTIFICATE OF OFFICIAL COURT REPORTER

 2

 3

 4   UNITED STATES DISTRICT COURT )

 5   MIDDLE DISTRICT OF FLORIDA    )

 6

 7             I, court approved transcriber, certify that the

 8   foregoing is a correct transcript from the official electronic

 9   sound recording of the proceedings in the above-entitled

10   matter.

11

12             DATED this 23rd day of March, 2021.

13

14                              s/Shelli Kozachenko_____
                                Shelli Kozachenko, RPR, CRR, CRC
15                              Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```