**UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 21-cr-28 (APM)** |
| | : | |
| **KENNETH HARRELSON** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

**MOTION TO DISMISS COUNTS 1, 2, 3, 4, & 12 OF THE**
**FOURTH SUPERSEDING INDICTMENT**

COMES NOW, the Defendant, Kenneth Harrelson, by and through counsel, Nina J.

Ginsberg and Jeffrey Zimmerman, and respectfully moves this Court to dismiss the Fourth

Superseding Indictment ("FSI" and "Indictment") (ECF 196), pursuant to Rule 12(b) of the

Federal Rules of Criminal Procedure, because it fails to state valid offenses and violates several

constitutional protections.

**MEMORANDUM OF LAW**

**Introduction And Summary Of Argument**

Mr. Harrelson is charged in five counts in the Fourth Superseding Indictment. ECF 196.

Count One alleges that, on January 6, 2021, Harrelson conspired with others "to corruptly

obstruct, influence, and impede an official proceeding, that is, the Certification of the Electoral

College vote, in violation of Title 18, United States Code, Section 1512(c)(2). ECF 196 at 7-29.

Count Two is a substantive count of obstruction of an official proceeding, and an allegation of

aiding and abetting, in violation of 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 2. ECF 196 at 29-20.

Count Three charges destruction of government property exceeding $1000, and aiding and

abetting, in violation of 18 U.S.C. § 1361(c)(2) and § 2.  ECF 196 at 30-31.  Count Four charges

entering and remaining in a restricted building and grounds, in violation of 18 U.S.C. §

1752(a)(1). ECF 196 at 31-32. Count Twelve alleges tampering with documents with the intent to impair its availability for use in an official proceeding, in violation of 18 U.S.C. § 1512(c)(1).

### Section 1512(c)(2).

The basis of the § 1512(c)(2) charge (Count Two), and the count charging a conspiracy to violate that statute (Count One), is that Harrelson and others aimed to "hinder the certification of the Electoral College vote" after the 2020 presidential election, which the FSI characterizes as an "official proceeding" under § 1512(c)(2). ECF 196 at ¶ 33. According to the Indictment, Harrelson did so in the belief that Congress should refuse to certify the vote upon a review of evidence that he contended showed voter fraud. But, as the FSI correctly alleges, the joint session of Congress on January 6 did not review evidence and find facts; it merely "formalized the result of the 2020 U.S. Presidential Election." *Id.* at ¶ 3. Thus, Congress was not exercising its implied power of investigation. Because Section 1512(c)(2) has never been applied to a "proceeding" that does not involve *a tribunal hearing evidence and finding facts*, the government misapplies the statute. Even if this construction was formally correct, §1512(c)(2) is void for vagueness as applied to Harrelson, requiring dismissal under the Due Process Clause of the Fifth Amendment, particularly in the context of Harrelson's political speech, assembly and petitioning of the government for a redress of grievances. *See* U.S. Const. amend I. Furthermore, even if the statute's notice were not unconstitutionally vague, the fact that the government's interpretation of § 1512(c)(2) is without precedent means that the rule of lenity, and the novel construction principle, require any ambiguity to be resolved in Harrelson's favor. Finally, insofar as the FSI's § 1512(c)(2) charges criminalize political speech and the nonviolent protest of acts of Congress per se, they violate the First Amendment, as applied to Harrelson.

**Section 1752.**

Since its enactment in 1970, Section 1752 has criminalized the unlawful entry into areas restricted for the protection of U.S. Secret Service ("USSS") protectees.  Statutory text, legislative history, and common sense all point to the conclusion that the agency that restricts such areas is the one that guards them, i.e., the USSS.  But here, the government contends that any federal or state entity may criminalize a person's movements under federal law.  The Indictment alleges that Harrelson violated § 1752 because the Capitol was visibly restricted by the U.S. Capitol Police ("USCP").  But the USCP do not guard the Secret Service protectees identified in § 1752; they protect members of Congress, who are neither guarded by the USSS nor covered by § 1752. The § 1752 counts should be dismissed for failure to state offenses. As applied to Harrelson, the government's interpretation of § 1752 is also void for vagueness, requiring dismissal under the Due Process Clause of the Fifth Amendment to the Constitution, particularly in the context of Harrelson's political speech, assembly and petitioning of the government for a redress of grievances. Even if the statute's notice were not unconstitutionally vague, the fact that the government's interpretation of a 50-year-old statute is without precedent means that the rule of lenity, and the novel construction principle, require any ambiguity to be resolved in Harrelson's favor.

**Section 1361.**

Boilerplate allegations in the Indictment that do not specify what property was damaged and by whom violate the presentment and notice functions of grand jury indictments under the Fifth and Sixth Amendments and Rule 7(c) of the Federal Rules of Criminal Procedure.

On all these grounds, independently and collectively, the Court should dismiss the FSI.

## Statutory History And Factual Background

**A.      Section 1512(c)(2)'s structure and legislative history**

Section 1512(c) provides: "Whoever corruptly—

>        (1)      alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

>        (2)      otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so . . . shall be fined . . . or imprisoned. . .

18 U.S.C. § 1512(c).

Section 1515 defines the term "official proceeding" as used in Section 1512(c) to mean:.

>        (A)      a proceeding before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury;

>        (B)      a proceeding before the Congress;

>        (C)      a proceeding before a Federal Government agency which is authorized by law; or

>        (D)      a proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce;

18 U.S.C. § 1515(a)(1).

Section 1515 also defines the term "corruptly"—but only for obstruction offenses

charged "in section 1505." § 1515(b). Before this definition was added, the D.C. Circuit had

determined that § 1505's adverb "corruptly" was unconstitutionally vague. *United States v.*

*Poindexter*, 951 F.2d 369 (D.C. Cir. 1991).  Congress subsequently amended § 1515 to provide,

>        *As used in section 1505*, the term "corruptly" means acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information.

18 U.S.C. § 1515(b) (emphasis added).

Section 1512(c)(2) was enacted as part of the Sarbanes-Oxley Act of 2002 ("SOX"). SOX was "[a]n Act to protect investors by improving the accuracy and reliability of corporate disclosures made pursuant to securities laws, and for other purposes." Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745.  As the previous U.S. Attorney General described it, SOX "was prompted by Enron's massive accounting fraud and revelations that the company's outside auditor, Arthur Andersen, had systematically destroyed potentially incriminating documents." Mem. of William P. Barr, dated June 8, 2018 ("Barr Mem"), p. 5, available at: https://bit.ly/2RYVZ47. Upon a review of the statute's legislative history, the former Attorney General concluded that the plain purpose of §1512(c)(2) was a "loophole closer meant to address the fact that the existing section 1512(b) covers document destruction only where a defendant has induced another person to do it and does not address document destruction carried out by a defendant directly." *Id.*

The legislative history supports the former Attorney General's interpretation of § 1512(c)(2)'s purpose. A Senate Judiciary Committee report described SOX's purpose as "provid[ing] for criminal prosecution and enhanced penalties of persons who defraud investors in publicly traded securities or alter or destroy evidence in certain Federal investigations." S. Rep. No. 107-146, at 2 (2002). The report states that the Corporate Fraud Accountability Act was designed to "clarify and close loopholes in the existing criminal laws relating to the destruction or fabrication of evidence and the preservation of financial and audit records." S. Rep. No. 107-146, at 14-15. Section 1512(c) did not exist as part of the original proposal. S. 2010, 107th Cong. (2002). Rather, Senator Trent Lott introduced it as an amendment in July 2002. 148 Cong. Rec. S6542 (daily ed. July 10, 200). The Senator explained the purpose of adding § 1512(c):

[This section] would enact stronger laws against *document shredding*. Current law prohibits obstruction of justice by a defendant acting alone, but only if a proceeding is pending and a subpoena has been issued for the evidence that has been destroyed or altered . . . [T]his section would allow the government to charge obstruction against individuals who acted alone, even if the tampering took place prior to the issuance of a grand jury subpoena. I think this is something we need to make clear so we do not have a repeat of what we saw with the Enron matter earlier this year.

*Id.* at S6545 (emphasis added).

Senator Orin Hatch explained that § 1512(c) would "close [] [the] loophole" created by the available obstruction statutes and hold criminally liable a person who, acting alone, destroys documents.  *Id.* As the former attorney general summarized this history, "The legislative history thus confirms that § 1512(c) was not intended as a sweeping provision supplanting wide swathes of obstruction law, but rather as a targeted gap-filler designed to strengthen prohibitions on the impairment of evidence." Barr Mem., p. 6.

Unlike § 1512(c), Section 1505 concerns obstruction of congressional proceedings "by threats or force." It provides criminal penalties for:

Whoever corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States, or the due and proper exercise of *the power of inquiry* under which *any inquiry or investigation* is being had by either House, or any committee of either House or any joint committee of the Congress—

18 U.S.C. § 1505 (emphasis added).

The italicized portions of that section show that Congress limited the obstruction-of-Congress offense to a specific kind of congressional "proceeding": those pursuant to Congress's "power of inquiry," which are "inquir[ies] or investigation[s]." § 1505. The legislative history of § 1505 shows that it was designed to prevent obstruction of only those proceedings held pursuant to Congress's investigative power.  *Poindexter*, 951 F.2d at 380-81.  Section 241, the

6

predecessor of § 1505, was passed in 1940 to bar witness tampering before Congress.

As the D.C. Circuit summarized the legislative history: "The Senate and House Reports and the floor debates concerning [§ 1505's predecessor] . . . state that the 'proposed legislation simply extends the protection now provided by law for witnesses in Court proceedings to witnesses in proceedings before either House of Congress or committees of either House (or joint committees).'" 951 F.2d at 381 (quoting .R. Rep. No. 1143, 76th Cong., 1st Sess. 1 (1939); S. Rep. No. 1135, 76th Cong., 1st Sess. 1 (1939)).

### B.    Section 1752 and the U.S. Secret Service

#### 1.    *The legislative history of § 1752*

Congress enacted 18 U.S.C. § 1752 as part of the Omnibus Crime Control Act of 1970. Public Law 91-644, Title V, Sec. 18, 84 Stat. 1891-92 (Jan. 2, 1971). At the time, the USSS was part of the Treasury Department.

Later Congress would amend Section 1752, but like its current iteration, the 1970 statute provided that it was "unlawful for any person . . . (1) willfully and knowingly to enter or remain in . . .(ii) any posted, cordoned off, or otherwise restricted area of a building or grounds where the President is or will be temporarily visiting. . ." 84 Stat. 1891-92. The statute made clear which entity "prescribed regulations" governing the "posted, cordoned off, or otherwise restricted areas where the President is or will be temporarily visiting": the Treasury Department, of which the USSS was then part. § 1752(d)(2); 84 Stat. 1892.

In 1969, Senators Roman Lee Hruska and James Eastland drafted S. 2896, which would later be codified at § 1752. The very purpose of the bill was to give the Secret Service the power to restrict areas for temporary visits by the President, a power which no other federal agency then possessed. S. Rep. No. 91-1252 (1970). The Senate Judiciary Committee report accompanying

S. 2896 made clear that in 1970, "[a]lthough the Secret Service [was] charged with protecting the person of the President . . . there [was], at the present time, no Federal statute which specifically authorize[d] *them to restrict entry to areas* where the President maintains temporary residences or offices." S. Rep. No. 91-1252, at 7 (emphasis added).

Similarly, during floor debate on the bill, senators explained that the key purpose of the legislation that would become § 1752 was to vest the Secret Service in particular with the authority to set restricted areas, cutting through the patchwork of existing State laws and local ordinances and *freeing the Secret Service from reliance on other government agencies*.

Explaining the need for S. 2896, Senator McClellan stated:

> Protecting the President . . . is a formidable task for the Secret Service, which is charged with safeguarding the personal life of the President.  As difficult as this task is, however, it is rendered even more difficult because the Secret Service's present powers are somewhat limited. Title 18, section 3056 of the United States Code authorizes the Secret Service to protect the life of the President, but does little more.  *Consequently, the Service must rely upon a patchwork of State laws and local ordinances and local officers to clear areas for security perimeters, to provide for free ingress and egress when the President is visiting, and to protect the President's private homes from trespassers*.

116 Cong. Rec. 35,651 (1970) (statement of Sen. McClellan) (emphasis added).

Similarly, Senator Hruska explained that S. 2896 was needed to empower the Secret Service to set restricted areas:

> It would be unconscionable not to recognize the obvious fact that the President's vulnerability is maximized when he is traveling or residing temporarily in another section of the country. It would be unconscionable not to recognize the obvious fact that *the Secret Service does not presently possess adequate Federal authority during these most vulnerable occasions.* This body cannot ignore the obvious responsibility and duty it has at this moment to *create the needed* protection and *authority*.

116 Cong. Rec. 35,653 (statement of Sen. Hruska) (emphasis added).

8

2.      *The current § 1752*

In its current version, Section 1752 criminalizes "knowingly enter[ing] or remain[ing] in any restricted building or grounds without lawful authority to do so." 18 U.S.C. § 1752(a)(1).

In turn, "restricted building or grounds" is statutorily defined.  In Section 1752,

(1) the term "restricted building or grounds" means any posted, cordoned off, or otherwise restricted area—

(A)     of the White House or its grounds, or the Vice President's official residence or its grounds;

(B)     of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or

(C)     of a building or grounds so restricted in conjunction with an event designated as a special event of national significance;

18 U.S.C. § 1752(c)(1).

The first two subparts of Section 1752(c) concern individuals protected by the USSS. In subpart (A) those individuals are the President (at the White House) and the Vice President (at his or her official residence). In subpart (B), the individual protected by the Secret Service is the President or "other person protected by the Secret Service."  Members of Congress are not protected by the Secret Service. 18 U.S.C. § 3056(a) (setting forth persons USSS is "authorized to protect").  Protection of Congressmen and Senators is the role of a separate federal agency, the United States Capitol Police. The U.S. Capitol Police do not provide for the protection of Secret Service protectees. *See* United States Capitol Police: Our Mission, available at: https://www.uscp.gov/; § 3056(a).

The final Section 1752(c) subpart concerns "a building or grounds so restricted in conjunction with an event designated as a special event of national significance." "Designation" in this subpart refers to a specific federal agency process. Major federal government or public events that are considered to be nationally significant may be designated by the President — or

his representative, the Secretary of the Department of Homeland Security ("DHS") — as National Special Security Events ("NSSE"). 18 U.S.C. § 3056(e)(1). Section 3056 designates the USSS as the lead federal agency responsible for coordinating, planning, exercising and implementing security for NSSEs. *Id.* (The joint session of Congress that met at the U.S. Capitol on January 6, 2021, to open, certify, and count the November 2020 presidential election votes was not designated an NSSE. National Special Security Events: Fact Sheet, Jan. 11, 2021, p. 1, Congressional Research Service, available at: https://fas.org/sgp/crs/homesec/R43522.pdf.) Accordingly, all three subparts of 18 U.S.C. § 1752(c)(1) concern decision-making authority or action by the Secret Service.

Section 3056 sets forth the "Powers, authorities, and duties of United States Secret Service." 18 U.S.C. § 3056. Subsection (d) criminalizes interfering with agents "engaged in the protective functions authorized by this section *or by section 1752 of this title*. . ." 18 U.S.C. § 3056(d) (emphasis added). Subsection (e) states, "When directed *by the President*, the United States Secret Service is authorized to participate, under *the direction of the Secretary of Homeland Security*, in the planning, coordination, and implementation of security operations at special events of national significance, *as determined by the President*." 18 U.S.C. § 3056(e)(1) (emphasis added). Finally, subsection (g) stresses the independence of the Secret Service's mission. "The United States Secret Service shall be maintained as a distinct entity within the Department of Homeland Security and shall not be merged with any other Department function. No personnel and operational elements of the United States Secret Service shall report to an individual other than the Director of the United States Secret Service, who shall report directly to the Secretary of Homeland Security without being required to report through any other official of the Department." 18 U.S.C. § 3056(g).

<u>**Argument**</u>

**I.        Standard for a Rule 12(b) motion to dismiss a criminal information**

Rule 7 of the Federal Rules of Criminal Procedure provides that "the indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged . . ." Fed. R. Crim. P. 7(c)(1). This rule performs three constitutionally required functions: (1) fulfilling the Sixth Amendment right to be informed of the nature and cause of the accusation; (2) preventing a person from being subject to double jeopardy, as required by the Fifth Amendment; and (3) protecting against prosecution for crimes based on evidence not presented to the grand jury, as required by the Fifth Amendment. *See*, *e.g.*, *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999).

Rule 12 provides that a defendant may move to dismiss the pleadings on the basis of a "defect in the indictment or information," including a "lack of specificity" and a "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(iii),(v).  In the Supreme Court's last decision to address the standard, it held that an indictment must "fairly inform[] a defendant of the charge against which he must defend" and "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." *Hamling v. United States*, 418 U.S. 87, 117-18 (1974).

**II.       The Section 1512(c) counts should be dismissed**

**A.        The indictment fails to state § 1512(c) offenses**

Counts One and Two, charging Harrelson with violating and conspiring to violate § 1512(c)(2), rest on the legal theory that he obstructed, impeded and interfered with the joint session of Congress on January 6, which the indictment characterizes as an "official proceeding" under that statute. Count Twelve charges tampering with documents to impair their integrity for

use in an "official proceeding," in violation of § 1512(c)(1).  ECF at 36-37. Because the joint session's Electoral College vote count did not exercise Congress's implied power of investigation in aid of legislation but instead "formalized the result of the 2020 U.S. Presidential election," ECF 196 at ¶ 3, the joint session did not constitute an "official proceeding" as that term has been construed in every reported §1512(c)(2) case on the subject.

It is settled law that proceedings held pursuant to Congress's legislative power under the Constitution exhibit legal characteristics different from those held under its implied and auxiliary power of investigation. *See*, *e.g.*, *Trump v. Mazars United States*, 940 F.3d 710, 719-23 (D.C. Cir. 2019) (outlining history of Congress's power to investigate in aid of legislation). In its earliest decision to draw a formal distinction between the legislative and investigative powers, the Supreme Court held that the House of Representatives had exceeded its investigatory authority by opening an inquiry into the bankruptcy proceedings of a firm in which the United States had invested money. *Kilbourn v. Thompson*, 103 U.S. 168 (1881). The Court held that Congress's sole route to a remedy in the bankruptcy proceeding was "by a resort to a court of justice" *id.* at 183, because the House's investigation "could result in no valid legislation." *Id.* at 195. Later, in *McGrain v. Daugherty*, the Court found that Congress properly issued a subpoena for bank records relevant to the Senate's investigation into the Department of Justice because "the subject to be investigated was . . . [p]lainly [a] subject . . . on which legislation could be had." 273 U.S. 136, 176 (1927).

Cases involving defendants' attempts to interfere with Congress's auxiliary investigative power have always included actions that prevent, or are designed to prevent, Congress from hearing evidence and making factual findings: refusals to answer congressional committees' requests, *United States v. Rumley*, 345 U.S. 41, 42 (1953); refusals to testify at congressional

hearings, *Barenblatt v. United States*, 360 U.S. 109 (1959); and obstructing proceedings by making false statements to a congressional inquiry, *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991). All of these cases have indisputably involved alleged inference with Congress's exercise of its investigative power.

That Congress intended to limit congressional obstruction prosecutions to acts interfering with its investigative power is seen in the text and structure of Chapter 73 of title 18, concerning "Obstruction of Justice." As noted above, although the Indictment charges Harrelson with a violation of § 1512(c)(2), it is § 1505 that criminalizes obstruction of congressional proceedings "by threats or force." 18 U.S.C. § 1505.  The government did not use that more appropriate statute here for a simple reason.  Section 1505 *explicitly* requires that the obstructed proceeding be an "inquiry or investigation . . . being had by either House, or any committee of either House or any joint committee of the Congress." § 1505.

Attempts by the government to charge defendants with violations of § 1512(c) outside the context of a judicial or quasi-judicial proceeding have uniformly failed. In *United States v. Ermoian*, 752 F.3d 1165 (9th Cir. 2013), for example, the government argued that an FBI investigation qualified as an "official proceeding" under § 1515.  The Ninth Circuit rejected that argument.  *See id.* at 752 F.3d at 1169-70.

The court of appeals determined that the specifically legal definition of "proceeding"— associated with formal appearances before a tribunal — was the right one for several reasons.

First, "the descriptor 'official' indicates a sense of formality normally associated with legal proceedings." *Id.* at 1170. Second, the word "proceeding" in § 1515(a)(1) is "surrounded with other words that contemplate a legal usage of the term, including 'judge or court,' 'federal grand jury' 'Congress,' and 'federal government agency.'" *Id*. Third, legal dictionaries define

"proceeding" as "'a word much used to express the *business done in courts.*'" *Id.* (quoting Black's Law Dictionary 1241 (8th ed. 2004)) (emphasis original). Fourth, the "use of the preposition 'before' suggests an appearance in front of [a body] sitting as a tribunal." *Id.* at 1171. Fifth, "Section 1512 refers to 'prevent[ing] the attendance or testimony of any person in an official proceeding'; 'prevent[ing] the production of a record, document, or other object, in an official proceeding'; and 'be[ing] absent from an official proceeding to which that person has been summoned by legal process.' 18 U.S.C. § 1512(a)(1)(A)-(B), (a)(2)(B)(iv). The use of the terms 'attendance,' 'testimony,' 'production,' and 'summon[]' when describing an official proceeding strongly implies that some formal hearing before a tribunal is contemplated." *Id.* at 1172.

Every single one of those factors applies to the phrase "a proceeding before the Congress." 18 U.S.C. § 1515(a)(1)(B).  As the Indictment itself alleges, there was no hearing before a tribunal on January 6, but rather a "formaliz[ation of] the result of the 2020 U.S. Presidential election." ECF 196 at ¶ 3. The joint session on January 6 was not an exercise of Congress's investigatory power. 167 Cong. Rec. H79, 105-06, 108, 111 (2021); 167 Cong. Rec. S16, 25, 32 (2021).

For all of these reasons, Counts One, Two and Twelve fail to state that Harrelson committed offenses under § 1512(c).  Therefore, they should be dismissed with prejudice.

### B.    If the government's interpretation of § 1512(c) is applied, it is unconstitutionally vague as to Kenneth Harrelson

A criminal statute is unconstitutionally vague if it "fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement." *United States v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017) (quoting *Johnson v. United States*, 576 U.S. 591, 595 (2015)); *see also Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.2d 1, 23 (D.C.

Cir. 2009) (noting that criminal statute must "'provide adequate notice to a person of ordinary intelligence that his contemplated conduct is illegal'") (quoting *Buckley v. Valeo*, 424 U.S. 1, 77 (1976)). "[T]he touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 67 (1997). "The void-for-vagueness doctrine . . . guarantees that ordinary people have 'fair notice' of the conduct a statute proscribes. And the doctrine guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries and judges." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (citing *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)). In addition, if the law at issue "interferes with the right of free speech or of association, a more stringent vagueness test [] appl[ies]." *Hoffman Estates v. Flipside*, *Hoffman Estates*, 455 U.S. 489, 500 (1982) (citing *Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972)).

Vagueness challenges are either facial or as-applied. "'[T]he distinction between facial and as-applied challenges . . . goes to the breadth of the remedy employed by the Court, not what must be pleaded by the complaint.'" *Edwards v. District of Columbia*, 755 F.3d 886, 1001 (D.C. Cir. 2014) (quoting *Citizens United v. FEC*, 558 U.S. 310, 331 (2010)).

If the government's novel interpretation of § 1512(c)(2) is applied here, it is unconstitutionally vague for the following reasons.

1.      *§ 1512(c) does not provide fair notice that "official proceedings"*
        *includes proceedings unrelated to the administration of justice*

As indicated above, § 1512(c)(2) has never been used to prosecute a defendant for the obstruction of an "official proceeding" unrelated to the administration of justice, i.e., a proceeding not charged with hearing evidence and making factual findings. Moreover, there is no notice, much less fair notice, in § 1512(c)(2) or in any statute in Chapter 73 that a person may

15

be held criminally liable for interference with a proceeding that does not resemble a legal tribunal. Accordingly, the government's interpretation of § 1512(c)(2) here is void-for-vagueness as applied to Harrelson.

In this case, the void-for-vagueness doctrine's function of guarding against arbitrary or discriminatory law enforcement is worth elaborating. As Justice Gorsuch explained in a *Sessions v. Dimaya* concurrence,

> Vague laws invite arbitrary power. Before the Revolution, the crime of treason in English law was so capaciously construed that the mere expression of disfavored opinions could invite transportation or death. The founders cited the crown's abuse of 'pretended' crimes . . .as one of their reasons for revolution. . . Today's vague laws may not be as invidious, but they can invite the exercise of arbitrary power all the same—by leaving the people in the dark about what the law demands and allowing prosecutors and courts to make it up.

138 S. Ct. at 1223-24.

Justice Gorsuch gave some early, original examples of statutes that failed to provide fair notice and thus led to arbitrary enforcement:

> Blackstone illustrated the point with a case involving a statute that made "stealing sheep, or other cattle" a felony. 1 Blackstone 88 (emphasis deleted). Because the term "cattle" embraced a good deal more then than it does now (including wild animals, no less), the court held the statute failed to provide adequate notice about what it did and did not cover—and so the court treated the term "cattle" as a nullity. *Ibid.* All of which, Blackstone added, had the salutary effect of inducing the legislature to reenter the field and make itself clear by passing a new law extending the statute to "bulls, cows, oxen," and more "by name." . . .
>
> This tradition of courts refusing to apply vague statutes finds parallels in early American practice as well. In *The Enterprise*, 8 F. Cas. 732, F. Cas. No. 4499 (No. 4,499) (CC NY 1810), for example, Justice Livingston found that a statute setting the circumstances in which a ship may enter a port during an embargo was too vague to be applied, concluding that "the court had better pass" the statutory terms by "as unintelligible and useless" rather than "put on them, at great uncertainty, a very harsh signification, and one which the legislature may never have designed." *Id.,* at 735. In *United States* v. *Sharp*, 27 F. Cas. 1041, F. Cas. No. 16264 (No. 16,264) (CC Pa. 1815), Justice Washington confronted a statute which prohibited seamen from making a "revolt." *Id.*, at 1043. But he was unable to determine the meaning of this provision "by any authority . . . either in

16

the common, admiralty, or civil law." *Ibid*. As a result, he declined to "recommend to the jury, to find the prisoners guilty of making, or endeavouring to make a revolt, however strong the evidence may be." *Ibid.*

Nor was the concern with vague laws confined to the most serious offenses like capital crimes. Courts refused to apply vague laws in criminal cases involving relatively modest penalties. *See*, *e.g., McJunkins* v. *State*, 10 Ind. 140, 145 (1858).

138 S. Ct. at 1226.

The concern about vagueness-enabled arbitrary enforcement is manifested here. It takes two forms, which might be called specific and general arbitrariness. At a general level, the government's enforcement of § 1512(c)(2) against Harrelson is arbitrary because, prior to January 6, it had never prosecuted a violation of that statute by alleging obstruction of a congressional proceeding that was not held pursuant to Congress's investigatory power. Accordingly, the government's election to put a new interpretation on the statute for a select group of related cases raises questions about discriminatory law enforcement. Those questions are only underlined by the patently political nature of the circumstances of the offense, as well as the criminalization of Harrelson's First Amendment rights to political speech, assembly, and to petition the government for a redress of grievances. U.S. Const. amend I; *Hoffman Estates v. Flipside*, 455 U.S. 489, 500 (1982) (stricter scrutiny of vague statutes in the context of activities protected by the First Amendment).

Perhaps more serious is the specific arbitrariness here. The government has charged more than 500 people with federal crimes related to the January 6 protests. Many, if not most, of those defendants allegedly entered the Capitol Building. Yet many, if not most, of those people have not been charged under § 1512(c)(2), even though the government alleges all the defendants had the same object: to stop the Electoral College vote count. The explanation for why the government chose to prosecute Harrelson under § 1512(c)(2), and not so many others, is

17

apparent from the Indictment. The government targeted him for political reasons, because he is a member of the Oath Keepers. *See* ECF 196 at ¶11.  Of course, Harrelson's alleged affiliation with a political group has nothing to do with § 1512(c)(2). But the government's reliance on his political associations shows the danger of arbitrariness inherent in the vague and elastic interpretation of § 1512(c)(2) it offers for this specific set of defendants alone.

Insofar as they allege that Harrelson obstructed a type of "official proceeding" nowhere identified in §§ 1512(c)(2) and 1515, Counts One and Two must be dismissed under the Due Process Clause of the Fifth Amendment.

## 2.   *The government's interpretation of "corruptly" fails this Circuit's* **Poindexter** *test*

The Indictment contends that Kenneth Harrelson's alleged obstruction of Congress on January 6 was aimed at stopping or delaying the Electoral College vote count. The Indictment further alleges that a desire to protest in support of a political belief is "corrupt" under that statute. That construction is void-for-vagueness as § 1512(c)(2) provides no notice of that interpretation, which would also invite arbitrary and discriminatory law enforcement.

In *United States v. Poindexter*, a former national security advisor was charged under § 1505 for obstructing a congressional investigation into the Iran/Contra Affair.  951 F.2d 369, 371 (D.C. Cir. 1991). In that case, the defendant's obstruction consisted of lying to or misleading Members of the House and Senate Intelligence Committees about U.S. shipments of missiles to Iran.  *Id.* at 372.  The relevant passage of § 1505 provided "Whoever corruptly influences, obstructs, or impedes or endeavors to influence, obstruct or impede the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either House, or any committee of either House . . .shall be [punished]." The court held that Poindexter's lying to Congress, while a violation of § 1001, was not an obstruction offense under § 1505.

18

The D.C. Circuit first determined that two forms of vagueness existed in the adverb "corruptly." First, the court observed that the verb "corrupt" "may be used transitively ('A corrupts B,' i.e., 'A causes B to act corruptly') or intransitively ('A corrupts,' i.e., 'A becomes corrupt, depraved, impure, etc.')." 951 F.2d at 379.  It also found that § 1505's adverb "corruptly" could take on either a transitive or intransitive meaning. The court decided that § 1505 "favor[ed] the transitive reading." *Id.* Second, the court found that "corruptly" was also vague in the sense that "[r]eading 'corruptly' to prohibit one from influencing another to act 'immorally' or 'improperly' provides no more guidance than does reading it to prohibit one from acting 'immorally' or 'improperly' oneself." *Id.*

Accordingly, to avoid unconstitutional vagueness, the court construed § 1505 "to include only 'corrupting' another person by influencing him to violate his legal duty." *Id.* The court further found that even that definition of "corruptly" may suffer from unconstitutional vagueness where the defendant's purpose is not "to obtain an improper advantage for himself or someone else. . ." *Id.* at 385. The court gave this example of activity the adverb "corruptly" may not cover without vagueness problems:

> [S]omeone who influences another to violate his legal duty [but] to cause the enactment of legislation that would afford no particular benefit to him or anyone connected to him. Or, as the Chief Judge instanced at the oral argument of this case, there "would be some purposes that would be corrupt and some that wouldn't be . . . Suppose the [defendant acted] to protect the historical reputation of some historical figure that has been dead for 20 years and he decides that he doesn't want to mar that person's reputation."

*Poindexter*, 951 F.2d at 386.

As indicated above, following *Poindexter,* Congress amended § 1515 to clarify that "As used *in Section 1505*, the term 'corruptly' means acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding,

concealing, altering or destroying a document or other information." § 1515(b) (emphasis

added). However, Congress did not amend § 1515 to define "corruptly" as used in § 1512. In

addition, the phrase "improper purpose" was held unconstitutionally vague in *Poindexter*. 951

F.2d at 379 ("Words like 'depraved,' 'evil,' 'immoral,' 'wicked,' and 'improper' are no more

specific—indeed they may be less specific—than 'corrupt.'").

Here, the Indictment's construction of § 1512(c)'s adverb "corruptly" fails this Circuit's

*Poindexter* test. It does not allege that Harrelson obstructed the January 6 joint session "to obtain

an improper advantage for himself or someone else. . ." *Poindexter*, 951 F.2d at 386.

Instead, it contends he allegedly obstructed the session in support of the sincerely held

political belief that the 2020 presidential election was not fairly decided. Such an interpretation

of § 1512(c) is unconstitutionally vague because it leaves to judges and prosecutors to decide

which sincerely held political beliefs are to be criminalized on an ad hoc basis. *See Dimaya*, 138

S. Ct. at 1223-24. Accordingly, Counts One and Two should be dismissed as they rest on an

unconstitutionally vague interpretation of "corruptly."

### C.   The rule of lenity dictates that any ambiguities in § 1512(c)(2) be resolved in Mr. Harrelson's favor

Even if § 1512(c)(2) is not unconstitutionally vague as applied to Harrelson, any

ambiguities in the statute should be resolved in his favor under the rule of lenity. Under that

principle, "where text, structure, and history fail to establish that the government's position is

unambiguously correct," courts must "apply the rule of lenity and resolve the ambiguity in [the

defendant's] favor." *United States v. Granderson*, 511 U.S. 39, 54 (1994). "When interpreting a

criminal statute, we do not play the part of a mindreader." *United States v. Santos*, 553 U.S. 507,

515 (2008) (Scalia, J.). "In our seminal rule-of-lenity decision, Chief Justice Marshall rejected

the impulse to speculate regarding a dubious congressional intent. 'Probability is not a guide

which a court, in construing a penal statute, can safely take.'" *Id.* (quoting *United States v. Wiltberger*, 18 U.S. 76 (1820)).

Here, even if the Court decides that the government's interpretation of § 1512(c)(2) is correct—i.e., that "official proceedings" of Congress include those which are not held pursuant to its investigatory power, that § 1512(c)(2) applies outside the context of document destruction, and that "corruptly" includes a disinterested but mistaken purpose — it is not unambiguously so. That is shown by the lack of any case law supporting the government's interpretations, by the legislative history which tells against those interpretations, and by the text and structure not just of § 1512(c), but of all sections of Chapter 73.

Because the government's interpretations are not unambiguously correct, the Court is required to resolve any ambiguities in Harrelson's favor by dismissing Counts One and Two. *Granderson*, 511 U.S. at 54; *Santos*, 553 U.S. at 515.

> **D.    The novel construction principle of the Due Process Clause requires rejection of the government's interpretation, which would operate as an *ex post facto* law**

Because no court has construed § 1512(c)(2) as the government does in this case, to apply that novel construction against Harrelson in this case would violate the novel construction principle of the Due Process Clause of the Fifth Amendment.

The Supreme Court has held that the novel construction principle is similar to an *ex post facto* law which has been described as one "that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action." *Bouie v. City of Columbia*, 378 U.S. 347, 353 (1964). "[A]n unforeseen judicial enlargement of a criminal statute, applied retroactively, operates precisely as an *ex post facto* law, such as Art. I, § 10, of the Constitution forbids." *Id.* If a "legislature is barred by the *Ex Post Facto* Clause from passing

such a law, it must follow that a [court] is barred by the Due Process Clause from achieving

precisely the same result by judicial construction." *Id.*

Bouie also concerned a trespass case that gave every indication of being politically

motivated. The 1964 case involved a combination drugstore and restaurant in South Carolina.

The restaurant would not serve Black Americans. Two Black college students took seats in the

restaurant. After they entered, an employee hung up a "no trespass" sign. The store manager

called the police, who asked the students to leave. When they refused, they were arrested and

charged with trespass. The students were tried and convicted, with the State Supreme Court

upholding the trespass convictions.  The Supreme Court reversed, based on the novel

construction principle of the Due Process Clause. It reasoned that the South Carolina Supreme

Court's construction of the trespass statute was effectively an *ex post facto* law. By its terms, the

state statute merely prohibited "*entry* upon the lands of another . . .after notice from the owner . .

prohibiting such entry. . ." 378 U.S. at 355 (emphasis added). However, there "was nothing in

the statute to indicate that it also prohibited the different act of remaining on the premises after

being asked to leave. Petitioners did not violate the statute as it was written; they received no

notice before entering either the drugstore or the restaurant department." *Id.* Finally, "the

interpretation given the statute by the South Carolina Supreme Court  . . . ha[d] not the slightest

support in prior South Carolina decisions."  *Id*. at 356.

So too here.  Harrelson did not "violate the statute as it was written." *Bouie*, 378 U.S. at

355. Section 1512 prohibits obstruction of "official proceedings" which all courts have construed

to mean proceedings before a tribunal that mimic a court of law. There is "nothing in the statute

to indicate that it also prohibited the different act," *Bouie*, 378 U.S. at 355, of interfering with

proceedings that do not hear evidence or find facts. "The interpretation given the statute by the

[government] . . . has not the slightest support in prior [§ 1512] decisions." *Id.*

Accordingly, the novel construction principle requires rejection of the government's

interpretation, which would operate as an *ex post facto* law in violation of the Due Process

Clause of the Fifth Amendment.

### E.     The Indictment's application of § 1512(c)(2) is invalid under the First Amendment, as applied to Harrelson

As the Indictment itself acknowledges, Harrelson's activities on January 6 included

political expression, assembly and petitioning of the government for a redress of grievances. U.S.

Const. amend. I. Insofar as the § 1512(c)(2) charges characterize protest per se as obstruction of

congressional proceedings, they are unconstitutional applications of the statute as applied to

Harrelson.

To prevail on an as-applied challenge under the First Amendment, Harrelson must merely

show that § 1512(c)(2) is being unconstitutionally applied as to the specific protected activity for

which he is charged. *Edwards v. Dist. of Columbia*, 755 F.3d 996, 1001 (D.C. Cir. 2014). The

first question is whether Harrelson's alleged conduct was "expressive." *Texas v. Johnson*, 491

U.S. 397, 404 (1989). "[T]o bring the First Amendment into play," Harrelson must merely show

"[a]n intent to convey a particularized message was present" and "the likelihood . . . that the

message would be understood by those who viewed it." *Id.* Next, the court assesses whether the

challenged statute is related in any way to the suppression of free expression. If so, and if the law

is content-neutral, the court must subject the statute to intermediate scrutiny. *Edwards*, 755F.3d

at 1002. Under that standard, the statute is constitutionally applied only if (1) "it is within the

constitutional power of the government"; (2) "it furthers an important or substantial

governmental interest"; (3) "the governmental interest is unrelated to the suppression of free

expression"; and (4) "the incidental restriction on alleged First Amendment freedoms is no

greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377 (1968).

Here, there is no argument that the conduct charged under § 1512(c)(2) was not protected expression.  The entire thrust of the conspiracy charge and underlying § 1512(c)(2) offense is that Harrelson and others protested at the Capitol concerning the results of the 2020 presential election.  FSI, ¶¶ 27, 28.  That is the very core of the First Amendment.  *See*, *e.g.*, *Johnson*, 491 U.S. at 404 (flag burning expressive); *Tinker v. Des Moines Ind. Comm. School. Dist.*, 393 U.S. 503, 505 (1969) (students wearing black armbands to protest war is expressive); *Brown v. Louisiana*, 383 U.S. 131, 141-142 (1966) (sit-in to protest segregation expressive); *United States v. Grace*, 461 U.S. 171 (1983) (picketing is expressive).  *See also Snyder v. Phelps*, 562 U.S. 443, 444 (2011) ("A statement's arguably inappropriate or controversial character . . . is irrelevant to the question [of] whether it deals with a matter of public concern.").

Similarly, there is no argument that § 1512(c)(2)'s application here is unrelated to the suppression of expression, assembly and the petitioning of the government for a redress of grievances. Again, the thrust of the obstruction claim is that Harrelson and the other defendants intended to affect the actions of Congress: otherwise known as political demonstration and protest. Critically, the indictment's obstruction claim is not *limited* to any alleged intent to *enter* the Capitol and to affect congressional action *by force or threats*. FSI, ¶ 27. After all, the government could have attempted to charge such an offense under § 1505, prohibiting obstruction of Congress's investigatory powers by force or threats.  The FSI does not charge that offense and its obstruction theory encompasses the very act of protesting to affect congressional action itself. Accordingly, § 1512(c)(2) is here "related to the suppression of free expression." *See*, *e.g.*, *United States v. Caputo*, 201 F. Supp. 3d 65, 71 (D.D.C. 2016) (restricted area statute

"related to the suppression of free expression" where charged defendant jumped White House fence to protest executive action).

Accordingly, under an intermediate scrutiny test, the Court applies the *O'Brien* factors to determine the constitutionality of § 1512(c)(2)'s application here. The following two factors show that the statute's application here is patently unconstitutional: (1) the government's interest *is* related to the suppression of free expression; and (2) the incidental restriction on First Amendment freedoms *is* greater than is essential to the furtherance of that interest. *O'Brien*, 391 U.S. at 377. As explained, that the § 1512(c)(2) theory in this case is not limited to an attempt to influence Congress by threats or force can only mean that it covers acts that influence Congress through protest and demonstration. Moreover, nothing in the indictment cabins Harrelson's "obstruction" to the act of entry into the Capitol Building. If his "obstruction" encompasses protest outside the Capitol Building, the government is criminalizing not just his expression, but the expression of every group that politically demonstrates outside that building with a view to affecting, or "obstructing," legislation. Second, that restriction is far greater than is "essential" to the furtherance of the government's legitimate interest in preventing obstruction of official proceedings of Congress. For the government could adequately protect that interest merely by preventing obstruction of Congress "by threats or force"—*i.e.*, using the proper statute for the crime it is failing to allege, 18 U.S.C. § 1505—or at the very least by preventing obstruction of Congress through unlawful entry into the building. *City of Houston v. Hill*, 482 U.S. 451, 459 (1987) ("[W]e have repeatedly invalidated laws that provide the police with unfettered discretion to arrest individuals for words or conduct that annoy or offend them."). Accordingly, the § 1512(c)(2) charges against Harrelson unconstitutionally infringe on his First Amendment rights and should be dismissed.

III.     **The Section 1752 count should be dismissed**

  A.     **The Indictment fails to state an offense because only the USSS restricts areas under § 1752**

Count Four alleges contend that Harrelson violated § 1752 by entering the Capitol Building, which the it characterizes as a "restricted building and grounds," as that phrase is defined in § 1752. ECF at 31-32. However, it does not allege that the U.S. Secret Service (USSS) restricted that area under the statute.  *Id.*  The government's position is that any government entity may set a restricted area under § 1752 and that the Capitol Police restricted the area Harrelson and the other protesters entered on January 6.

The government's position finds no support in the statutory text, the legislative history, or precedent.  Penal statutes are strictly construed.  *United States v. Moore*, 613 F.2d 1029, 198 U.S. App. D.C. 296 (D.C. Cir. 1979). As shown above, all three definitions of "restricted building or grounds" in § 1752(c)(1) concern the authority and actions of the USSS and not any other federal agency. Section 3056, concerning the "powers, authorities, and duties of United States Secret Service," confirms that § 1752 is a statute directed to the USSS and not any other federal agency. 18 U.S.C. § 3056(d). The legislative history of § 1752 is saturated with references to the USSS and to no other federal agency.

Common sense accords with the statutory analysis. The government claims that any federal or state agency may unilaterally set a "restricted area" and arrest anyone found within it so long as a Secret Service protectee is also present. The implications of that argument are absurd. Accordingly, such a statutory interpretation is highly disfavored. *See United States v. Am. Trucking Ass'ns, Inc.*, 310 U.S. 534, 543, 60 S. Ct. 1059, 84 L. Ed. 1345 (1940) ("When [one possible statutory] meaning has led to absurd or futile results . . . this Court has looked beyond the words to the purpose of the act."); *see also Corley v. U.S.*, 556 U.S. 303, 317, 129

S.Ct. 1558, 173 L. Ed. 2d 443 (2009) (interpreting criminal procedure statute to avoid

"absurdities of literalism"); *Ctr. for Biological Diversity v. E.P.A.*, 722 F.3d 401, 411, 406 U.S.

App. D.C. 140 (D.C. Cir. 2013) (recognizing "'the long-standing rule that a statute should not be

construed to produce an absurd result'" (quoting *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060,

1068, 329U.S. App. D.C. 341 (D.C. Cir. 1998)).

      The government's interpretation countenances the following absurdities.  The U.S. Postal

Inspection Service (hypothetically) determines that the Secret Service is not properly protecting

the president. Because, according to the government, there is no requirement in the statute for the

government to prove that the restricted area was restricted at the direction of the Secret Service,

the Postal Service resolves, unilaterally, that the "restricted area" of the White House should

extend from the State Department to the west, and to the E. Barrett Prettyman U.S. Courthouse,

to the east. Even though the Secret Service may disagree with the Postal Service's view of the

appropriate size of the restricted area, for purposes of § 1752 liability that does not matter, and

the reader of the brief is liable, and potentially detainable pretrial, unless some federal agency

(the Postal Service? The Secret Service? Both?) gives him "lawful authority" to "knowingly"

"remain" where he is.  18 U.S.C. § 1752(a)(1).  Or, to take another absurd example, even if the

Secret Service determines that the restricted area protecting a Secret Service protectee temporarily

visiting a place is appropriately limited to one block, § 1752(c)(1)(B), a local police unit may

unilaterally determine that it should extend 20 blocks. Any person exercising his First

Amendment rights in blocks two to twenty may then be federally prosecuted—by the same

government that deemed the restricted area limited to one block.

      That is why what little § 1752 precedent there is supports Harrelson, while none supports

the government's interpretation. Instructive is *United States v. Bursey*, 416 F.3d 301 (4th Cir.

2005). There, Bursey entered an area restricted by the USSS in advance of a political rally in

South Carolina held by the president. *Id.*, at 304. Reviewing the trial record, the Fourth Circuit

observed that "the Secret Service designated an area near [the rally] as a restricted area." *Id.* It

also noted that the "authorized persons" admitted into the area all "wore lapel pins issued by the

Secret Service," meaning that the USSS was the entity that granted "lawful access" to the area.

*Id.* Intending to protest the Iraq war, Bursey approached the restricted area with a megaphone.

A Secret Service Agent advised him he could not remain in that area. He was repeatedly advised

thereafter of the same by multiple law enforcement agents over a twenty to twenty-five minute

period. *Id.* Bursey was charged and convicted under § 1752(a)(1).

One sufficiency argument Bursey raised on appeal was that, as a matter of *mens rea*, "he

was never advised that the area was a federally restricted zone, *so designated by the Secret

Service.*" 416 F.3d at 308 (emphasis added). The Fourth Circuit rejected this argument. But not

on the ground that § 1752 restricted areas need not be so restricted by the USSS. Instead, trial

evidence showed that Bursey "understood the restriction to have been created by the Secret

Service (as opposed to state or local law enforcement)." *Id.* The Fourth Circuit added,

> [T]here was ample evidence that Bursey understood the area to have been
> restricted by the Secret Service, *and thus a federally restricted zone.* Specifically,
> Bursey testified that he believed that "at that event, October, when the President
> came to town, that the circumstances would be similar to his prior visits, where …
> the Secret Service comes in and preempts" local and state police. . . Bursey also
> acknowledged that, in protesting at two earlier visits to South Carolina by the
> incumbent President, he was advised in both instances that "the Secret Service
> had basically preempted the security arrangements" of local police.

*Bursey*, 416 F.3d at 309 (emphasis added).

The import of the Fourth Circuit's logic is clear. Had the Fourth Circuit even

contemplated the idea that entities other than the USSS could restrict areas under § 1752, the

above reasoning would lack sense. Likewise, the trial court also simply assumed the USSS was

the only entity that restricts areas under the statute. *United States v. Bursey*, 2004 U.S. Dist. LEXIS 29661, at \*31 (D.S.C. Sept. 13, 2004) ("Bursey's own testimony confirms that he understood the restrictions would be established by the Secret Service.").

Because Count Four is based on the government's allegation that Harrelson crossed into an area restricted not by the USSS but by the U.S. Capitol Police, it should be dismissed for failure to state an offense under § 1752.

### B.      If the government's interpretation of § 1752 is applied, it is unconstitutionally vague as to Harrelson

If the Court concludes that the indictment properly charges Harrelson with violating § 1752 by crossing a boundary set by an agency other than the USSS, the statute is unconstitutionally vague as applied to him.

Under the government's interpretation of § 1752, there is *no* notice, much less "fair notice," of the conduct proscribed *in this case*. As shown above, the text, legislative history, and common sense all point to the ordinary person's reasonable conclusion that the government agency that may restrict a person from entering an area in which there is a Secret Service protectee is—the Secret Service.  Assuming the truth of the government's allegations in this case, Harrelson saw police lined up outside the U.S. Capitol, whether they were U.S. Capitol Police or Metro Police.  But if the text, legislative history and common sense inform an "ordinary person" that he violates § 1752 by entering an area the Secret Service has restricted— as in *Bursey*, one of the handful of cases interpreting the statute—there is no similar notice in the statute that being on the wrong side of a police barricade is, independent of the Secret Service, in violation of that statute. The indictment does not allege postings on January 6 warning Harrelson that the Secret Service designated the area he entered as restricted. They do not allege any law enforcement officers notified Harrelson of that fact.

29

The concern about vagueness-enabled arbitrary enforcement is manifested here. At a general level, the government's enforcement of § 1752 against Harrelson is arbitrary because, prior to January 6, it had never prosecuted a violation of that statute with the allegation that the accused entered an area restricted by some government agency other than the USSS. Accordingly, the government's election to put a new interpretation on the statute for a select group of related cases raises questions about discriminatory law enforcement. Those questions are only underlined by the patently political nature of the circumstances of the offense, as well as the criminalization of Harrelson's First Amendment rights to political speech, assembly, and to petition the government for a redress of grievances.  U.S. Const. amend I.

Perhaps more serious is the specific arbitrariness here. Hundreds of other protestors "entered" the same "restricted area" as Harrelson.  Yet, it is undisputed that most of those people have not been charged under § 1752 like he has been. The explanation for why the government chose to prosecute Harrelson under § 1752, and not others, is because he is alleged to be an Oath Keeper. ECF 196 at ¶11.

That has nothing to do with § 1752 or the Secret Service.  But the government's reliance on that factor shows the danger of arbitrariness inherent in the vague and elastic interpretation of § 1752 it offers for this specific set of defendants alone. Insofar as it alleges that Harrelson entered and remained in a "restricted area" set by an agency nowhere identified in the statute, Count Four is unconstitutionally vague.

### C.    The rule of lenity dictates that ambiguities in § 1752 be resolved in Harrelson's favor

Even if the Court decides that the government's interpretation of § 1752 is formally correct—i.e., that any agency may set restricted areas under § 1752(c) —it is not unambiguously so.  That is shown by the lack of any references in § 1752 to agencies other than the USSS; the

statute's legislative history, which similarly focuses exclusively on the USSS; the clear role that

the USSS plays in all three definitions of "restricted buildings or grounds" in § 1752(c); the

indication in Section 3056 that the USSS enforces restricted areas in § 1752; the lack of any case

law supporting the government's position; and the common sense notion that if the USSS patrols

and guards the restricted areas in § 1752, it also sets them. Because the government's

interpretations are not unambiguously correct, the Court is required to resolve any ambiguities in

Harrelson's favor by dismissing Counts Five and Six. *Granderson*, 511 U.S. at 54; *Santos*, 553

U.S. at 515.

>    **D.      The novel construction principle dictates against the government's
>            interpretation, which would operate as an *ex post facto* law**

Because no court has ever construed Section 1752 to mean that agencies other than the

USSS may set restricted areas under the statute, such a construction would be retroactively

applied to Harrelson would constitute an *ex post facto* law in violation of the Due Process Clause

of the Fifth Amendment.  *Bouie*, 378 U.S. at 353 (1964).

Harrelson did not "violate the statute as it was written." *Bouie*, 378 U.S. at 355. Section

1752 prohibits entry into an area restricted by the USSS. There is "nothing in the statute to

indicate that it also prohibited the different act," *Bouie*, 378 U.S. at 355, of entering into an area

restricted by the U.S. Capitol Police.  "The interpretation given the statute by the [government] . .

has not the slightest support in prior [§ 1752] decisions." *Id.*

Accordingly, the novel construction principle dictates against the government's

interpretation, which would operate as an *ex post facto* law in violation of the Due Process Clause

of the Fifth Amendment.

## IV.     Count Twelve is duplicitous

In Count Twelve, Harrelson is charged with violating 18 U.S.C. § 1512(c)(1) by allegedly deleting files and communications "that showed his involvement" in the alleged offenses. ECF 196 at 36-37. Count Twelve states that these alleged actions were intended to impair their ability to be used "in an *official proceeding*, that is, the FBI investigation and the grand jury investigation into the attack on the Capitol." *Id.* (emphasis added).  Count Twelve is duplicitous and fails to state an offense and, accordingly, must be dismissed.

Count Twelve is duplicitous as it alleges that Harrelson obstructed two "proceedings": the FBI investigation *and* a subsequent grand jury investigation. An FBI investigation, however, does *not* qualify as an "official proceeding" under § 1512(c)(1). *See Yates v. United States*, 574 U.S. 528, 561 (2015) (Alito, J., concurring) (an FBI investigation counts as a matter within a federal department's jurisdiction, but falls outside the statutory definition of "official proceeding" in § 1512(c)(1) as construed by courts); *see also United States v. Ermoian*, 752 F.3d 1165 (9th Cir. 2013), As an FBI investigation is not an "official proceeding" as a matter of law, obstructing such an investigation is not a violation of § 1512(c)(1). Hence, Count Twelve effectively charges two separate and distinct *enumerated crimes* in one count and should be dismissed as duplicitous.

A jury could reach an improper guilty verdict based on the two different enumerated crimes averred. *See United States v. Starks,* 515 F.2d 112, 116 (3rd Cir. 1975) (finding reversible error where defendant's indictment alleged "extortion" and "attempted extortion" as substantive offenses in one conspiracy count). A significant "vice of duplicity is that a general verdict of guilty does not disclose whether the jury found the defendant guilty of one crime or both." *Id.* A duplicitous charging document also raises Double Jeopardy concerns, as "the verdict does not

reveal whether the jury found [the defendant] not guilty of one crime or not guilty of both." *Id.*

*See also United States v. Gordon,* 844 F.2d 1397, 1401 (9th Cir. 1988) (explaining that a

duplicitous count that charged two separate conspiracies could cause juror confusion and the

possibility of a non-unanimous verdict).

### V.      The indictment should be dismissed because it does not provide adequate notice and does not ensure the grand jury made determinations required by the Fifth Amendment

The constitutional rights to presentment to a grand jury and adequate notice of the

charges are embedded in the Fifth and Sixth Amendments to the Constitution and in Rule 7(c) of

the Federal Rules of Criminal Procedure. In the January 6 cases, the government has mass

produced indictments identical in language with the exception of names of protestors. A review

of the indictment reveals that the federal depredation of property and civil disorder charges do

not plead any specific acts or circumstances but rather conclusory January 6 allegations.

"[R]eal notice of the true nature of the charge" is "the first and most universally

recognized requirement of due process." *Smith v. O'Grady*, 312 U.S. 329, 334 (1941). In holding

that the notice requirements of the Sixth Amendment apply to the States through the requirement

of due process, the Supreme Court stated: "No principle of procedural due process is more

clearly established than that notice of the specific charge [is] among the constitutional rights of

every accused in a criminal proceeding in all courts, state or federal." *Cole v. Arkansas*, 333 U.S.

196, 201 (1948); *see* Joseph Story, *Commentaries on the Constitution*, § 1779 (1833) ("[T]he

indictment must charge the time, and place, and nature, and circumstances, of the offense, with

clearness and certainty; so that the party may have full notice of the charge, and be able to make

his defense with all reasonable knowledge and ability.").

The Fifth Amendment's presentment provision also requires that the facts be elucidated

sufficiently in the indictment so that the grand jury's finding of probable cause can be ascertained and to foreclose conviction based on any offense not found by the grand jury. *See Stirone v. United States*, 361 U.S. 212, 215-162 (1960) ("[A]fter an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself."). Without specificity of charged conduct and circumstances, the court would be forced to "guess as to what was in the minds of the grand jury at the time they returned the indictment[,]" which would "deprive the defendant of a basic protection that the grand jury was designed to secure," by allowing a defendant to be convicted "on the basis of facts not found by, and perhaps not even presented to, the grand jury that indicted him." *United States v. Du Bo*, 186 F.3d 1177, 1179 (9th Cir. 1999) (quoting *United States v. Keith*, 605 F.2d 462, 464 (9th Cir. 1979) (citing *Russell v. United States*, 369 U.S. 749, 770 (1962)).

### A.    The federal property depredation charges are not elucidated sufficiently

Count Three alleges that Harrelson destroyed federal property on January 6, "causing or attempting to cause damage that that exceeded $1,000." ECF 196 at 30-31. However, the indictment does not allege what property Harrelson supposedly damaged, how he damaged it; and what the damage to each piece of property was. That basic pleading failure violates Harrelson's constitutional rights to presentment to a grand jury and adequate notice of charges. U.S. Const. amend. V, VI.

### B.    The tampering allegations are not elucidated sufficiently

Count Twelve alleges that Harrelson deleted files from his cellular telephone, in violation of 18 USC § 1512(c)(1). ECF at 36-37. However, it fails to sufficiently allege what Harrelson alleged deleted. That basic pleading failure violates his constitutional rights to presentment to a grand jury and adequate notice of charges. U.S. Const. amend. V, VI.

## Conclusion

For all the foregoing reasons, Defendant, Kenneth Harrelson, respectfully requests that the Court dismiss the Fourth Superseding Indictment with prejudice.

Respectfully submitted,

KENNETH HARRELSON
By Counsel

_____/s/_____
Nina Ginsberg, Esquire
DC Bar No. 251496
*DiMuroGinsberg, PC*
110 King Street, Suite 610
Alexandria, VA 22314
Telephone: (703) 684-4333
Facsimile: (703) 548-3181
Email Address: nginsberg@dimuro.com

_____/s/_____
Jeffrey Zimmerman, Esquire
DC Bar No. 456162
*Jeffrey Zimmerman, PLLC*
108 N. Alfred Street
Alexandria, VA 22314
Telephone: (703) 548-8911
Facsimile: (703) 548-8935
Email Address: www.zimpacer.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of July 2021, a true and accurate copy of the foregoing was electronically filed and served via the Court's CM/ECF system to all counsel of record.

_____/s/_____
NINA J. GINSBERG