## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

                     Complainant,

     v.

KENNETH HARRELSON

*(Styled as <u>USA v. Thomas Edward Caldwell</u> incorporating cases against multiple Defendants)*

               Defendant

Criminal Case No.

**21-CR-28-APM**

## <u>DEFENDANT KENNETH HARRELSON'S  REPLY TO GOVERNMENT'S SUPPLEMENTAL BRIEF ON 18 U.S.C. § 1512(c)(2)</u>

## I.     INTRODUCTION

Defendant Kenneth Harrelson files this Reply in the supplemental briefing.

The Government, in response to the Court's request, filed a supplemental brief supporting its position that 18 U.S.C. § 1512(c)(2) applies to the alleged actions of all of the Defendants in this case *USA v. Caldwell* allegedly to obstruct the Joint Session of Congress convened on (starting on) January 6, 2021, including conspiracy under 18 U.S.C. § 371 or aiding and abetting under 18 U.S.C. § 2 with his co-Defendants on January 6, 2021.  See ECF Dkt. No. 437.  The Court ordered that the Defendants may file a reply to the Government's supplement.

In a case with approximately 19 Co-Defendants, the issue is being extensively briefed.

However, given the importance of the topic with a potential maximum penalty of 20 years for an entirely novel, improbable interpretation of 18 U.S.C. § 1512(c)(2), the Court and the Defendants deserve a thorough exploration of the topic, including to fully inform appeals.

## II.    SUBSET OF PERTINENT FACTS

As shown in video evidence (under seal because of camera position, not content),

Harrelson was shoved by a massive crowd both behind and ahead of him through the open doors

of the U.S. Capitol building.  Videos show the door was opened from the inside by a man or men

who showed no indicators of being pro-Trump demonstrators.[1]  The crowd thereafter surged

forward carrying Harrelson with it.

Almost nothing charged in this case constitutes a crime or criminal act *per se.*  The

Government speculates without clear facts or evidence and clearly without *mens rea*, as to what

the motives, intents, and purposes of the Defendants might have been.  Established law finds that

the First Amendment protects even over-the-top statements of frustration or exuberance which

may be considered hyperbole and taken with a grain of salt.   Especially while the 2020

Presidential campaign was still being disputed,[2] it is by definition political rhetoric which the

courts have found may be hyperbole, not literal.[3]

---

[1] I discovered just prior to filing that public disclosures from another case suggest a theoretical possibility that these unidentified individuals were invited in by Capitol police. Because of the impending deadline, and because this disclosure surprised me, I will provide one outside link to at least frame the reference. https://www.buzzfeednews.com/article/zoetillman/capitol-footage-police-trump-insurrection-mob

[2]      See, generally, e.g., *Bush v. Gore,* 531 U.S. 98 (2000) (2000 campaign not finally decided until December 12, 2000, when both George W. Bush and Al Gore disputed the Electoral College votes out of Florida all the way up to the U.S. Supreme Court).

[3]      As attorney Julia Haller found: The Supreme Court has repeatedly extended First Amendment protection to statements that, in context, do not reasonably state or imply defamatory falsehoods in the requisite sense. In *Greenbelt Co-Op. Publ. Assn., Inc. v. Bresler*, 398 U.S. 6, 13-15 (1970), the Court concluded that use of the word "blackmail" to describe the plaintiff's hard-nosed negotiating tactics could not reasonably be understood to mean the plaintiff had committed a criminal offense.  In context, "even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the plaintiff's] negotiating position extremely unreasonable." Id. at 14.  Consequently, "the imposition of liability . . . was constitutionally impermissible" because "as a matter of constitutional law, the word 'blackmail' . . . was not

Disagreement in the public square, including disagreements over political questions, judicial precedents, and how Congress or the Supreme Court votes on any issue, is a hallmark of America.  It is part of our past and likewise in equal or greater measure, counsel fervently hopes, a defining part of our present and our future.  This heritage is partly defined by the understanding that *mens rea* cannot be hammered down and cannot be said to objectively exist under the law strictly by the perception, artificially created by a political or otherwise biased lens, that it exists.

In the charges against Mr. Harrelson, as with most of the Defendants in the January 6, 2021, protests, the Government indulges illusory projections and sophistry—a wholly untenable conspiracy theory—wherein Harrelson is responsible not only for the independent, superseding willful criminal acts of others, but when pushed by a throng through an open door as he shuffles through compression by a large crowd that expands to fill the space as all crowds do, he likewise bears personal responsibility for breaching that open door as well or some other door somewhere in a building that someone else breached.  Oh, and the vandalism someone did as well.  Furthermore, the Government presupposes—as a preconceived assumption without evidence—that in Harrelson's mind, *mens rea* is indisputably to be found.

Also in this conspiracy theory, Harrelson is guessed to have obstructed or tried to obstruct the January 6 Joint Session of Congress.  The charge of obstructing an official proceeding under 18 U.S.C. § 1512(c)(2) remains unexplained as to how unarmed demonstrators could have intended to or could have obstructed the January 6, 2021, Joint Session of Congress for the certification of the Electoral College vote.

In other words, no facts have been alleged in the indictment sufficient to validly charge

---

slander when spoken, and not libel when reported in the Greenbelt News Review." Id. at 13.  *Farah v. Esquire Magazine*, 736 F.3d 528, 535-536, 407 U.S. App. D.C. 208, 215-216, (D.C. Cir. 2013).

Harrelson under 18 U.S.C.  § 1512(c)(2).

**ARGUMENT**

A.  **UNCONSTITUTIONALLY VAGUE**

Harrelson repeats and adopts the arguments that for a criminal prosecution, the term "corruptly" and the transitional link "or otherwise" are unconstitutionally vague as applied by the Government's interpretation in this case.

B.  **COURT MUST CONSTRUE THE STATUTE CONSISTENTLY WITH U.S. CONSTITUTION TO THE EXTENT POSSIBLE.**

Of course, it is a rule of statutory interpretation to construe any statute consistently with the U.S. Constitution rather than to provoke a confrontation with the terms of the U.S. Constitution.  *See Ohio v. Akron Ctr. for Reproductive Health*, 497 U.S. 502, 514, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990) ('Where fairly possible, courts should construe a statute to avoid a danger of unconstitutionality' (internal quotations omitted).)

The Government's version sweeps up numerous forms and expressions of First Amendment protected activity into an area wherein criminal sanctions could be triggered against a broad array of Constitutionally protected activity.  This is untenable. The Defense interpretation assumes care and surgical precision where one would expect to find it—protecting the First Amendment.

"Thus, when Congress enacts law, it is presumed to be aware of all previous statutes relating to the same subject matter." *Erlenbaugh v.  United States*,  409 U.S. 239, 243, (1972). "Ordinarily, Congress may be presumed to know the construction which has been given to prior statutory provisions, and to know their history, when it incorporates them in later legislation."

*Office of People's Counsel v. Public Service Comm'n*, 477 A.2d 1079, 1091 (D.C. 1984). Likewise, Congress is presumed to be aware of the First Amendment to the U.S. Constitution.

Self-awareness and good judgment in the practice of Constitutional law have generally, in the past, kept the Judiciary distanced from permitting the prosecution of what too many observers see as merely thought crimes.

The hearings and discussions so far have been difficult.  Harrelson, by counsel, humbly suggests that there is a reason for that:  When drafting 18 U.S.C. § 1512(c), Congress was intentionally trying to avoid sweeping up free speech by clashing with the First Amendment.

Congress selected the word "corruptly" rather than criminalizing whomsoever "unlawfully" "or otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so …."  Congress could have chosen other qualifiers which would have risked including demonstrations or free speech which might be loud or unruly, but still protected by the First Amendment.  Instead, Congress used a financially-suggestive word "corruptly," evocative of specific intent crimes, which sounds in the financial context of the Arthur Anderson trials and the Sarbanes-Oxley law from which the statute originated.  Congress could have chosen "violently" or the like, though they did not.

The Defense construction of the word "corruptly" is the one that avoids a collision with the First Amendment.  Even if this Court is not persuaded by arguments about other approaches to interpretation, the duty to avoid a conflict with a constitutional right should be independently examined alongside all other arguments.  This duty is followed whether or not any other rule of construction applies.

The Government prosecution tries to substitute its own conjectures regarding "planning" and "criminal intent" into Defendants' visit to the District of Columbia, where Harrelson listened

to speakers, planned to ferry speakers and others through crowds at the Ellipse rally, and

demonstrated at the U.S. Congress – all lawful activities.

Refusing to confront the distinction between activity protected by the First Amendment

and the different, serious allegations which apply only to a few, the Government chills free

speech in violation of the First Amendment by sweeping up the peaceful, expressive conduct into

an alleged criminal plan.

This Defense's limitation of the language seems logical and appears to carry correct

meaning.  There is a logic and symmetry to the Defense interpretation.

## C.  **STATUTE IS AMBIGUOUS**

As demonstrated by the various briefings, 18 U.S.C.  § 1512(c) – that is comparing both

(c)(1) and (c)(2) – is ambiguous.  That is not merely because there is a dispute, but from the

nature and substance of the dispute.  The Government relies extensively on this topic and others

on the rule that only the plain text of a statute may be considered unless there is a demonstrated

ambiguity . *See, e.g.*, *United States v. Wiltberger*, 5 Wheat. 76, 95-96, 5 L.Ed. 37 (1820)

(Marshall, C.J.) ("Where there is no ambiguity in the words, there is no room for construction.

The case must be a strong one indeed, which would justify a court in departing from the plain

meaning of words . . . in search of an intention which the words themselves did not suggest");

*U.S. v. Gonzales*, 520 U.S. 1, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997).

However, "Ambiguity exists if there is a plausible interpretation of the statute" [that

would not authorize money damages against the Government. *Nordic Village, supra*, at 34, 37,

112 S.Ct. 1011.] *Fed. Aviation Admin. v. Cooper*, 132 S. Ct. 1441, 182 L. Ed. 2d 497, 566 U.S.

284, 291 (2012).   Ambiguity arises where a contractual term is "fairly susceptible of different

constructions," "obscure in meaning through indefiniteness of expression," or has a double

meaning. *Duquesne Light Co. v. Westinghouse Elec. Corp.,*, 66 F.3d 604, 614 (3rd  Cir. 1995).

A contract is not, however, rendered ambiguous by the mere fact that the parties do not agree on

the proper construction.   *Duquesne Light Co*., 66 F.3d at 614.

"'Ambiguity' can exist in a written document only in those cases where language is

susceptible of more than one meaning.[18]"   *Hardy and Hardy*, Cal. App, 135 P. 2d, 615, 619,

quoted in Dr.  Sanford Schane, "Ambiguity and Misunderstanding in the Law," *Thomas*

*Jefferson Law Review*, vol. 26, No. 1. 2002.

Much of the Government's arguments at the initial hearing on this topic presupposed

that the statute was not ambiguous.  However, here 18 U.S.C.  § 1512(c) is manifestly

ambiguous at least in the novel interpretation propounded by the Government in these cases.

And when such ambiguity also reflects a Constitutional conflict, such conflict must always be

resolved on the side of the Constitution.  Therefore, the Court should consider the extensive

references by the various Defendants to the legislative history and context of the passage of 18

U.S.C.  § 1512(c)(2).

Other Defendants argue convincingly that what is an "official proceeding" is ambiguous

at best, in a statutory scheme about the destruction of documents, when there are other statutes

that would be rendered superfluous by the interpretation of "official proceeding" urged by the

Government.  The transition between  § 1512(c)(1) and (c)(2) "or otherwise" is clearly

ambiguous , at least between the Government's interpretation and the plain meaning, as the

parties' vigorous debates about alternative meanings of the transition "or otherwise" illustrate.

The Defense argues that the valid charging under the statute requires *A + B* together and

that "corruptly," while probably unconstitutionally vague, at least would limit the

"unlawfully" category to "corruptly" unlawful. The vague term invites debate, but does anyone

doubt that speeding, loitering, parading or littering would not be covered?  Vandalism seems to

be quite a stretch as well, particularly on an aiding and abetting theory, but at least the Defense

properly recognizes "official proceeding" as a term of art to describe the narrow subset of

investigative proceedings outside a panoply of Congressional functions for which 18 U.S.C.  §

1512(c) would not and could not reasonably apply.

The Government argues that the valid charging under the statute is *A or B* and that

"corruptly" is synonymous with the much broader "unlawfully" and applies to all Congressional

Activity.  This interpretation is novel, it is outside the rules of statutory construction and it

ignores the existence of the First Amendment. Where exactly is the dividing line

between "obstructing, influencing or impeding" Congressional business that garners 20 years in

prison and "obstructing, influencing or impeding" that is perfectly legal and afforded full

protection of the First Amendment?  Are we to lock up K Street?  Would Congress have ignored

this obvious conflict or, conversely, recognize it and grant the Executive almost unfettered

ability to select and cherry pick from a broad range of First Amendment protected activities

those it wished to charge criminally?  Is this a likely or even plausible scenario?

### D.  **"CORRUPTLY" DOES NOT APPLY TO THE ALLEGED FACTS**

"Black's Law Dictionary defines "corruptly" as used in criminal-law statutes as

"indicates a wrongful desire for pecuniary gain or other advantage." Black's Law Dictionary 371

(8th ed. 2004)."  *United States of America vs. Samuel Saldana*, U.S. Court of Appeals for the

Fifth Circuit, Case No. 04-50527, Opinion, August 18, 2005 , footnote 7.

*Marinello v. United States*, 138 Ct. 1101, 1114 (2018) is highly instructive:

The difference between these *mens rea* requirements is significant. While "willfully" requires proof only "that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty," *Cheek v. United States,* 498 U.S. 192, 201, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991), "corruptly" requires proof that the defendant "act[ed] with an intent to procure an unlawful benefit either for [himself] or for some other person," *United States v. Floyd,* 740 F.3d 22, 31 (C.A.1 2014) (collecting cases); see also Black's Law Dictionary 414 (rev. 4th ed. 1951) ("corruptly" "generally imports a wrongful design to acquire some pecuniary or other advantage"). In other words, "corruptly" requires proof that the defendant not only knew he was obtaining an "unlawful benefit" but that his "objective" or "purpose" was to obtain that unlawful benefit. See 21 Am.Jur.2d, Criminal Law § 114 (2016) (explaining that specific intent requires both knowledge and purpose).

An on-line version of Black's Law Dictionary defines

CORRUPTION
Illegality; a vicious and fraudulent intention to evade the prohibitions of the law. The act of an official or fiduciary person who unlawfully and wrongfully uses his station or character to procure some benefit for himself or for another person, contrary to duty and the rights of others. U. S. v. Johnson (C. C.) 20 Fed. 082; State v. Ragsdale. 59 Mo. App. 003; Wight v. Rindskopf, 43 Wis. 351; Worsham v. Murchison, 00 Ga. 719; U. S. v. Edwards (C. C.) 43 Fed. 07. [4]

However, the Fifth Superseding Indictment strikingly omits any allegation of anyone obtaining any benefit from the supposed (last minute) plan to obstruct, impede or influence the certification of the Electoral College vote.  The indictment – at best – suggests only a motivation of anger or revenge in wanting to disrupt the certification.  The indictment contains no hint as to how anyone would benefit from leaving the Presidency vacant other than perhaps House Speaker Nancy Pelosi as the next in the line of succession.

The Government has not clarified how obstructing or delaying the certification of the

---

[4] https://thelawdictionary.org/corruption/

Electoral College vote by the Joint Session of Congress would provide a benefit to the January 6th Defendants or anyone else.   January 6th Defendants are believed to have been motivated by the belief and the concern that Congress may not have been in possession of all the facts necessary to certify the election results fairly and appropriately in accordance with applicable laws.

For application of "corruptly," the Government leaves it unexplained how stopping the Joint Session of Congress from certifying any winner for President would help their presumed preferred candidate Donald Trump, rather than merely leaving the Office of President vacant.

In 1982, Congress found in the Victim and Witness Protection Act of 1982 that "*the purpose and role of government is to ensure that the Federal Government does all that is possible within the limits of available resources to assist victims and witnesses of crimes without infringing on the constitutional rights of the defendants*" (emphasis added.)  Public Law 97-291 (October 12, 1982), 96 Stat. 1248, preamble of purposes, Section (2).

The Government tries to transform the word which is a condition of 18 U.S.C.  § 1512(c)(2) "corruptly" into covering expressive conduct protected by the guarantees of the First Amendment, notwithstanding whether that expression might be frustration or extreme dissatisfaction or a petition for redress of grievances.[5]   It has long been acknowledged that the First Amendment protects speech even if it might be unfortunately rude, loud, unnecessarily

---

[5]     Humans read and understand language within its many contexts.  Humans use over-the-top language to blow off steam and express frustration in ways that other humans comprehend as not being literal assertions of fact or literal statements of intentions or plans.  Language must be understood, in full, context, in the way that real humans speak, even when imperfect.  A mother exclaiming *"**I'm going to kill that boy**!"* is understood as merely being frustration.

impolite, or even offensive. [6]

Governed by the indictment and confined within its terms, [7] the alleged facts cannot qualify as "corruptly" obstructing, influencing or impeding any official proceeding.  If 18 U.S.C. § 1512(c)(2) can be applied to this kind of an official proceeding, it is not clear where the attempted influencing of such a proceeding in the style of the January 6th Defendants can be meaningfully differentiated from innumerable other forms of free expression such as ordinary lobbying, peaceful protest, and/or other styles of demonstration than were observed on January 6th, when these are designed—as likewise the January 6th activities were merely aimed and intended—to encourage Congress to engage in more effective and longer-term deliberations.

Again, this is about whether Harrelson had the *mens rea* under the facts alleged in the indictment to knowingly and intentionally violate 18 U.S.C.  § 1512(c)(2), in terms of what Harrelson knew <u>*ahead of time and at the time*</u>, not with the benefit of hindsight.

## E.  NO FACTS ARE ALLEGED THAT HARRELSON OBSTRUCTED ANY OFFICIAL PROCEEDING

No facts have actually been alleged that Harrelson did, attempted, or planned any action that was intended to or capable of obstructing any official proceeding.  It cannot be that mere presence inside the building could obstruct the Joint Session.  The U.S. Capitol is 751 feet long. [8]

---

[6]     Justice John Marshall Harlan wrote in *Cohen v. California*, 403 U.S. 15 (1971), "one man's vulgarity is another's lyric" writing for the majority there that an individual had a First Amendment right to wear a jacket bearing the words "Fu*k the Draft."

[7]     The prosecution may be able to present evidence additional to the indictment, but cannot escape what has already been alleged, including in each version of the indictment.

[8]     Architect of the Capitol, https://www.aoc.gov/explore-capitol-campus/buildings-grounds/capitol-building

The U.S. Capitol grounds are 126 acres. [9]  On any given day when Congress is in session, the building is filled with probably more than a thousand people other than Members of Congress and their staff.  Congress does not require the building to be unoccupied to do its work.  Tourists and Washingtonians sometimes go eat at the House cafeteria or Senate cafeteria just for the experience of it with no official business with any Member of Congress.  Citizens and interest groups routinely lobby Senators and Representatives in large numbers.  Journalists in large numbers often wait outside of committee hearings.

Therefore, merely demonstrating outside of or entering the Capitol could not (in terms of any plan or *mens rea*) and did not obstruct any proceeding of Congress.

If there was an intention or plan to obstruct an official proceeding it is not found in the Fifth Superseding Indictment, which must both guide and limit us at this stage.

Other than through the sheer numbers of demonstrators, an unarmed Harrelson could not have planned to obstruct or delay the Joint Session of Congress.  But Harrelson could not have known ahead of time, before arriving in D.C., how many people would be there.  The weather was cold, very windy, with a depressing overcast layer of clouds before noon, which would lead to the reasonable expectation of a low turnout on a Wednesday, mid-week work day.

***Indeed, all law enforcement agencies insist that they had no advance intelligence** that the demonstrations would be large or out of control.[10]  **Therefore, how would Defendant Harrelson driving up from Florida and then inside a hotel room know **better** than the U.S. Capitol Police, Metropolitan Police Department, and Federal Bureau of Investigation all of***

---

[9]     "Our History," U.S. Capitol Police, https://www.uscp.gov/the-department/our-history

[10]    *See* joint hearing before the Senate Rules Committee and Senate Homeland Security and Governmental Affairs Committee, February 23, 2021, accessible on C-Span archived video at, https://www.c-span.org/video/?509061-1/senate-rules-homeland-security-committees-hearing-us-capitol-attack-day-1 , starting at time stamp 55:00 minutes.

*whom, based on public reports, had sources inside groups and organizations attending the event?[11]*

Thus sheer numbers alone cannot have formed any plan, conspiracy, or *mens rea* intention to disrupt the Joint Session of Congress.  Unarmed, Harrelson obstructing or delaying the Joint Session is a practical impossibility under the circumstances.  [12]

In another case, the prosecution actually alleges that Zachary Rehl **charged the Capitol armed only with a radio and goggles**.  That the prosecution offers this comical image without self-awareness of the implausibility illustrates what is wrong with these prosecutions.  See, Government's Motion For Revocation Of Release Order And For Pretrial Detention, *USA v. Nordean,* Case 1:21-cr-00175-TJK  at ECF Dkt. #37, pages 5 (**"The defendant himself 'stormed' the Capitol, equipped with a radio and goggles."**).  That is not remotely credible.

What's also mysterious is the question of why defendants who allegedly had this intent brought their legally owned and licensed weapons and stored them legally outside of the District where they could not be deployed for insurrection purposes.  Would it not have been easier to engage in insurrection if they were heavily armed?  If they knew what they were doing was a crime before committing the crime, why wouldn't they have brought the essential and necessary tools of the insurrectionist trade?

Why did they carefully avoid violating D.C.'s gun laws?  Their actions show they had no

---

[11] The most prominent among a plethora of recent allegations (some clearly fanciful based on lack of confirmation in discovery returns) is based on a New York Times investigation.  Among Those Who Marched Into the Capitol on Jan. 6: An F.B.I. Informant, https://www.nytimes.com/2021/09/25/us/politics/capitol-riot-fbi-informant.html

[12]      Contrast the actual bombing inside the U.S. Capitol on March 1, 1971, by Leftist activists, which produced little reaction from the political class and apparently did not disrupt Congressional business, "This Day in History," The History Channel, https://www.history.com/this-day-in-history/bomb-explodes-in-capitol-building

intent to engage in an insurrection, but rather simply to convince Congress to deliberate fully including on disputed States election results.  Why would they attend a Constitutionally-protected demonstration without their weapons, unless they didn't intend to engage in insurrectionist activity, and always planned and intended to act lawfully?   The allegations preclude Harrelson's knowing and intentional violation of 18 U.S.C.  § 1512(c)(2).

The protestors were unarmed at the U.S. Capitol, even while some incidentally brought weapons (in case Antifa attacked them) yet left them in Virginia.  The only other significant "weapon" the Defendants could have had is numbers, but they had no way of knowing what the numbers would be until they arrived at the Capitol.

Actually, it was reports of pipe bombs at the Republican National Committee headquarters across from the Capitol South Metro (subway) station near the Cannon House Office Building and the Democrat National Committee headquarters a few blocks farther down Capitol South Street and the violence committed that were primary factors triggering the U.S. Capitol Police to advise the presiding officers of the House and Senate to recess.[13]

---

[13]     It was the discovery of pipe bombs "[t]hat resulted in the evacuation of two congressional buildings, the Cannon House Office Building, as well as one of the Library of Congress buildings. So it took extensive resources," testified the Capitol Police Chief Steven Sund serving on January 6, 2021.  *See* a joint hearing before the Senate Rules Committee and Senate Homeland Security and Governmental Affairs Committee February 23, 2021, accessible on C-Span archived video at, starting at time stamp 2:08:04 (two hours, 8 minutes, 4 seconds), https://www.c-span.org/video/?509061-1/senate-rules-homeland-security-committees-hearing-us-capitol-attack-day-1

**"So the assault on the Capitol is not what caused the evacuations of those buildings? The discovery of those pipe bombs is what caused the evacuations of those buildings**?" asked Republican Oklahoma Sen. James Lankford.

"**That is correct, sir, "** said Sund.  https://youtu.be/vtzwYAh1o30

*Tweet at 1:19 PM:*



¹⁴

Congress was already in recess. It shows that *BEFORE* the tweet at 1:19 PM, buildings were being evacuated because of reports of pipe bombs and these reports of pipe bombs ¹⁵ -- primarily -- that caused the ultimate evacuation of the U.S. Captitol at 2:18 PM as Julia Haller found in the Congressional Record (2:18 PM vs. the 2:20 PM recited in the indictment).

*Tweet at 1:17 PM:*



---

¹⁴ https://twitter.com/SecretsBedard/status/1346884057276305411?ref_src=twsrc%5Etfw

¹⁵    Kevin Johnson, "Pipe bombs placed at RNC, DNC night before Capitol riot; feds up reward to $100,000," USA TODAY, January 29, 2021, accessible at: https://www.usatoday.com/story/news/politics/2021/01/29/fbi-increases-reward-info-capitol-pipe-bombs-100-000/4309766001/  ;  *See* Twitter messages from around 1:15 PM on January 6, 2021, attached as collective Exhibit A; Kristinn Taylor, "UPDATE: ALL CLEAR: Buildings Near Capitol Being Evacuated Due to Suspected Pipe Bomb, The Gateway Pundit, January 6, 2021, accessible at:  https://www.thegatewaypundit.com/2021/01/reports-buildings-near-capitol-evacuated-due-suspected-pipe-bomb/

F.  **DOCTRINE OF LENITY**

Because 18 U.S.C.  § 1512(c) is ambiguous (at least in an ambiguity created by the

Government's attempt to stretch it to cover conduct the statute has never been used for before),

the Court then must address the interpretive rules of Lenity and Novel Construction.

> We wrote that we "have traditionally exercised restraint in assessing
> the reach of a federal criminal statute, both out of deference to the
> prerogatives of Congress and out of concern that `a fair warning
> should be given to the world in language that the common world will
> understand, of what the law intends to do if a certain line is passed.'"
> *Aguilar, supra,* at 600, 115 S.Ct. 2357 (quoting *McBoyle v. United
> States,* 283 U.S. 25, 27, 51 S.Ct. 340, 75 S.Ct. 816 (1931); citation
> omitted). Both reasons apply here with similar strength.

*Marinello v. United States*, 138 Ct. 1101, 1106 (2018).

> It is the rule that a court may not apply a "novel  construction  of  a
> criminal  statute  to conduct that neither  the statute nor
> any  prior  judicial decision has fairly disclosed to be within its
> scope."5   Unlike  the others,  this  rule  does not speak  to  how  a
> court  should interpret criminal statutes.  Rather, it provides that once
> a court decides to interpret a statute  so as  to render the  defendant's
> conduct criminal,  it  may not apply  that  interpretation retroactively
> unless  "the statute, either standing  alone or as  construed,
> made  it  reasonably  clear  at the  relevant  time that  the  defendant's
> conduct was  criminal."6

*United  States  v.  Lanier*, 520 U.S. 259, 267 (1997).

Ambiguity in a statute defining a crime or imposing a penalty should be resolved in favor

of the defendant. See Antonin Scalia & Bryan A. Garner, Reading Law (Thomson / West 2012),

at 296.

G. **DEFENDANTS COULD NOT HAVE PLANNED TO OBSTRUCT PROCEEDING**

There were 1200 "sworn officers" of the U.S. Capitol Police on duty and on-site at the Capitol according to the Acting Chief.  See:  https://www.msn.com/en-us/news/us/capitol-police-chief-admits-that-officers-were-underequipped-for-jan-6-riot/vi-BB1d8KOS .  All 1200 had guns, tasers, clubs, and tear gas.  Of those 1200, 170 were equipped with riot gear, shields, and helmets.  *Id.*  By contrast, none of the demonstrators brought weapons, except for one or two knives and loose items found on site.  Some did violently attack police.

But in advance, rather than in hindsight, none of these Defendants could have plausibly believed that they could overwhelm even 1200 _armed_ Capitol Police, not to mention the District of Columbia's Metropolitan Police Department and the District of Columbia's own D.C. National Guard.  Even 1200 _armed_ police would likely have held back 10,000 _unarmed_ protestors, most of whom stood well back and did not participate, and many were elderly.

Of course, the demonstrators did, in fact overwhelm law enforcement. But they could not have planned that ahead of time and the refusal of Government leadership to deploy adequate resources was completely unanticipated by all.   There could not have been an advance conspiracy or plan.  The failure of leadership to call up reinforcements was completely unanticipated by all.   There could not have been an advance conspiracy or plan.

Clearly, there are no facts alleged that Defendant Harrelson obstructed or could have obstructed any official proceeding of Congress by merely being around the Capitol building.

### III.    CONCLUSION

> Regardless, to rely upon prosecutorial discretion to narrow the otherwise wide-ranging scope of a criminal statute's highly abstract general statutory language places great power in the hands of the prosecutor. Doing so risks allowing "policemen, prosecutors, and juries to pursue their personal predilections," *Smith v. Goguen,* 415 U.S. 566, 575, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974), which could result in the nonuniform execution of that power across time and geographic location. And insofar as the public fears arbitrary prosecution, it risks undermining necessary confidence in the criminal justice system. That is one reason why we have said that we "cannot construe a criminal statute on the assumption that the Government will `use it responsibly.'" *McDonnell v. United States,* 579 U.S. ___, ___, 136 S.Ct. 2355, 2372-2373, 195 L.Ed.2d 639 (2016) (quoting *United States v. Stevens,* 559 U.S. 460, 480, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010)). And it is why "[w]e have traditionally exercised restraint in assessing the reach of a federal criminal statute." *Aguilar, supra,* at 600, 115 S.Ct. 2357.

*Marinello v. United States*, 138 Ct. 1101, 1109 (2018).

The Government gathered anyone it wanted to, and disingenuously imputed criminal intent unto them, for no other reason than that the event was "Stop the Steal" themed.  Next, the Government improperly conferred criminal liability based on an aiding and abetting theory, which presents the Honorable Court with an extremely tenuous connection indeed to a handful of rogue vandals.  It is rather cause for alarm to see no hesitation in charging a statute in a massively escalated way such that attending a First Amendment protected rally is suddenly an element of a 20-year statute (that was never intended to be used outside the investigative committee context).  This statute, having been improperly invoked by the Government, improperly imputes a presumption of criminal intent upon anyone too close to the Capitol or inside it on January 6th, while also vastly expanding "corruptly" into a general crimes definition.  Very convenient for charging theories based on fully extended aiding and abetting theories that encompass common crimes like vandalism.

One wonders whether when the Court considers corruption, vandalism comes to mind.  By the reasonableness standard, vandalism would not make the "corruptly" list any more than graffiti art.  The Government has falsely imputed malign intent to First Amendment protected activity, invoked 18 U.S.C.  § 1512(c)(2) and falsely interpreted it so as to dramatically and artfully expand the category of general crimes to which it could apply, including vandalism and then imputed the same *mens rea* to anyone who was strolling about Capitol grounds— including hundreds of thousands who assumed the condition in which they found the grounds was a natural state, having nothing to compare it to and the vast majority witnessing no crimes— all on an attenuated aiding and abetting theory.  The effort is strained and artful.  But does not pass Constitutional muster.

But if there is a guessing game to be played about imagining what is in people's minds based on supposition and context, perhaps we should factor in actual context that remains under seal. How many insurrectionists, after shuffling (watch the video), ahem…sorry, "storming" in through an open door would encounter a fellow Oath Keeper, a medic, who had entered Congress as he did warzones on behalf of our country, *unarmed*, as a medic.  A man who movingly fell to his knees and wept at the majesty of the Dome and the moment?  What happens to fanciful notions of insurrectionist intent when the defendant and Oath Keepers then kneel down to their Lord and Savior and join hands in prayer?  As the group of Defendants prayed, Museum crowds of all ages mulled around gazing up at the dome in awe. They gazed up in wonder much like Defendant who was enjoying his first trip to Washington DC.  And, minutes later, defendant and other Oath Keepers, upon hearing a disturbance, responded, and put themselves between a crowd and a Capitol Police Officer to protect him. Unarmed "insurrectionists" who "breach doors" by walking through them after they are opened from the

inside, who "storm" by walking and shuffling in a mingled crowd of moms, dads, and grandparents, and who move in a military  "stack" without any weapons, who wear military themed clothing, except Defendant and others who didn't, who terrorize through group prayer and who come to the aid of a police officer because that is what Oath Keepers do.

Undersigned counsel respectfully submits that dismissal as requested by the Defendants is appropriate and required under these circumstances.

Dated:  October 18, 2021                RESPECTFULLY SUBMITTED

                                        /s/ Brad Geyer
                                        Bradford L. Geyer, PHV
                                        PA 62998
                                        NJ 022751991
                                        Suite 141 Route 130 S.
                                        303
                                        Cinnaminson, NJ 08077
                                        Brad@FormerFedsGroup.Com
                                        (856) 607-5708

                                        /s/ Jonathon Alden Moseley
                                        Jonathon Alden Moseley, Esq.
                                        DC Bar No. VA005
                                        Virginia State Bar No. 41058
                                        Mailing address only:
                                        5765-F Burke Centre Parkway, PMB #337
                                        Burke, Virginia 22015
                                        Telephone:  (703) 656-1230
                                        Contact@JonMoseley.com
                                        Moseley391@gmail.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on October 18, 2021, a true and accurate copy of the forgoing was electronically filed and served through the ECF system of the U.S. District Court for the District of Columbia.

<u>/s/</u> Brad Geyer
Bradford L. Geyer, PHV
PA 62998
NJ 022751991
Suite 141 Route 130 S.
303
Cinnaminson, NJ 08077
Brad@FormerFedsGroup.Com
(856) 607-5708