**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal Case No. |
| Complainant, | |
| v. | 1:21-cr-28-8-APM |
| KELLY MEGGS | |
| and | Assigned to the Honorable |
| | Amit Mehta, District |
| KENNETH HARRELSON | Court Judge |
| *(Styled as <u>USA v. Thomas Edward Caldwell</u> incorporating cases against multiple Defendants)* Defendant | |

<u>**KELLY MEGGS AND KENNETH HARRELSON** MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO REMOVE THE SENSITIVE DESIGNATION OF CERTAIN VIDEO</u>

COMES NOW the Defendants Mr. Kelly Meggs and Mr. Kenneth Harrelson, by counsel, pursuant to Paragraph 9 of the Protective Order and hereby respectfully move the Court for an order directing the Government to remove sensitivity designations to publicly release one or more video(s) produced under a Protective Order.  The video(s) in question are described as the "West Terrace 3 Hour Block" video attached as Exhibit 13 in EXHIBIT A, attached, **Defendant Ryan Nichols' Motion For Modification Of Bail To Place Defendant On Conditional Release Pending Trial**, *USA v. Ryan Taylor Nichols*, Case No. 21-cr-00117-TFH-1, within this Court, ECF Dkt. # 55, November 1, 2021, and also EXHIBIT B, attached, Andrea Widburg, "**Did Capitol Police murder someone other than Ashli Babbitt?,**" <u>American Thinker</u>, November 22, 2021, accessible at

https://www.americanthinker.com/blog/2021/11/did_capitol_police_murder_someone_other_than_ashli_babbitt_.html (mis-identifying the motion as a motion to dismiss), and EXHIBIT C, attached Julie Kelly, "**Terror in the Capitol Tunnel**," <u>American Greatness</u>, November 18, 2021, accessible at: **https://amgreatness.com/2021/11/18/terror-in-the-capitol-tunnel/**

I.   **ARGUMENT**

      **A.  Defendants Here, Oath Keepers, are Being Improperly Accused of What Everyone Did**

Mr. Kelly Meggs, Mr. Kenneth Harrelson[1]  and the other Defendants in this group are accused of entering a different entrance on the other (East) side of the U.S. Capitol.

The Fifth Superseding Indictment is absolutely completely silent as to any alleged actions by Kelly Meggs or Kenneth Harrelson any other Defendant in this group committing, attempting to, conspiring to, or aiding and abetting any confrontation with police, any violence of any kind, any damage to any federal property, any interference with any law enforcement, or any interference with any proceedings by the U.S. Congress.

Most of the Oath Keepers are former law enforcement or former military, and that is part of the culture for all of the Oath Keepers.  Not only would interference with or violence toward police be extremely improbable, but it is certainly not alleged by the Grand Jury.

Mr. Kelly Meggs is alleged to have wandered in to the U.S. Capitol at around 2:40 PM and exited at around 2:59 PM, with his wife.  FSI ¶¶ 143-144 [2]  Mr. Harrelson is alleged to have

---

[1]      Mr. Harrelson is a disabled veteran. ECF 485, pages 4-5.

[2]      The Government seeks to hypnotize the Court and the jury pool with the word "stack" – meaning, in this case, just a line of people staying together in a large crowd by putting one hand on the back of their friend (or family member) in front of them.  Such a line is seen at large rock music concerts or Disney World to help friends stay together when it is too loud to talk to each

wandered into the US Capitol at around 2:40 PM and exited around 2:57 PM;[3]

However, the Joint Session of Congress convened for hearing and resolving disputes about Electoral College votes pursuant to 3 U.S.C. 15, had ***already recessed*** at 2:18 PM according to the Congressional Record or 2:20 PM according to FSI ¶ 8. [4]

Defendant Kelly Meggs does not, in fact, own a time machine, to the best of counsel's knowledge and awareness.

Therefore, Defendant Kelly Meggs did not at 2:40 PM cause or contribute to causing in any way the  recess of the Joint Session of Congress 20 to 22 minutes *earlier* at 2:18 to 2:20 PM…  assuming Meggs does not own a time machine, which counsel believes he does not.[5]

As alleged in FSI ¶ 160,  at 2:59 PM, Kelly Meggs and his wife Connie Meggs exited the Capitol building.

Because the Joint Session had already recessed at 2:18 PM, the 19 minutes did not and

---

other and where walking abreast is not feasible.  Of course, as with much that is in the indictment, the effect is to weave the Oath Keepers into a para-military frame ("breach," "storming") that evokes fearful visions of "military formations" and semi-automatic weapons where there never were any. People walking in a line are not a "military formation" And, until now, "military stacks" were only used in relation to actual armed military. **https://www.google.com/search?source=univ&tbm=isch&q=military+stack** last accessed: Nov 23, 2021. https://dod.defense.gov/OIR/gallery/igphoto/2001779240/; last accessed: Nov 23, 2021. https://www.defense.gov/Multimedia/Photos/igphoto/2001472174/; last accessed: Nov 23, 2021.

[3] Id., page 30, paragraph 72.
[4]    The court may take judicial notice that the House was recessed by the presiding officer at 2:18 PM, pursuant to standing Rule I, Clause 12(b) (allowing for immediate recess without a vote upon notice of a threat).  Congressional Record House Articles | Congress.gov | Library of Congress, Counting Electoral Votes--Joint Session Of The House And Senate Held Pursuant To The Provisions Of Senate Concurrent Resolution 1; Congressional Record Vol. 167, No. 4 (House of Representatives - January 06, 2021) **https://www.congress.gov/congressional-record/2021/01/06/house-section/article/H76-4**
[5]    The U.S. Capitol Police admits that the Congress recessed due to the discovery of pipe bombs.

could not obstruct any official proceeding, during which Harrelson, Kelly Meggs and his wife, Connie Meggs, prayed, admired the architecture and décor, and peacefully walked through and out.  The only remarkable fact is that during this interlude, Defendants come upon a scene whereby a police officer, Officer Dunn, who was visibly alarmed, agitated and heavily armed with an M-4 type of weapon, and actually had his weapon at the "low ready," which may itself have been a violation of proper firearms use or rules of engagement that seemed to plague the day and they diffused a dangerous situation. Defendants Harrelson and both Meggs, and other Oath Keepers, calmed Officer Dunn by engaging the group of protestors by placing their bodies in between Officer Dunn and the protestors.  They consciously positioned their ***backs to Dunn*** sending a strong message to protestors, but more importantly to Dunn, so that the reassurance would have a calming effect.

The Indictment alleges that the Joint Session reconvened at 8:00 PM.  Harrelson's visit ending at 2:56-2:57 PM and Kelly Meggs' visit ending  2:59 PM could not have and did not interfere with or delay the reconvening of the Congress at 8:00 PM.[6]

Perhaps Kelly Meggs makes an impression but the 5 hour gap between Kelly Meggs leaving and the Joint Session re-convening cannot have been caused by Kelly Meggs.

Worse, this case stands precariously on the idea that Congress cannot do its business when other people are in the building.  Suggesting that Congress people are like hermits or monks who cannot work unless the building is empty, the Fifth Superseding Indictment would have us believe that the mere presence of people in the building would disrupt the Joint Session

---

[6]     Intellectual credit for the time analysis owed to Norm Bradford, consultant, informally known in decades past as "Mr. DWI" in Loudoun County courts.

of Congress, even though Congress routinely does its work every day with hundreds or even a thousand visitors in the 751 foot long building, [7] as large as a small ocean-going cruise ship.

This of course highlights the total absence of any allegation or logic to the idea that Kelly Meggs or Kenneth Harrelson did anything capable of obstructing an official proceeding, nor intended to. The Indictment fails to allege anything done to disrupt the proceeding except to make the illogical and unsupported assumption – hoping that someone will fall for it – that Congress needs the building to be empty to meet and act.

### B. Nevertheless Oath Keepers Charged With Other People's Crimes

Nevertheless, inexplicably and with a logic that counsel cannot begin to explain, the Government insists that these Oath Keeper Defendants are somehow responsible for everything that everyone did anywhere on January 6, 2021. If there were any car accidents in D.C. on January 6, 2021, it must have been the Oath Keepers' fault.

Kelly Meggs was born. Then 100 or so people battled with police on January 6, 2021. Therefore, Kelly Meggs is clearly to blame because he was born prior to January 6, 2021.

Rather than dismissing this case, the Government spreads the idea that everyone all did the exact same thing on January 6, 2021, and that these Defendants are responsible for what others did in confrontation with police. (Recall that Congress is one of the complaining victims, represented by the U.S. Attorney's office.)

Therefore, because about 100 people [8] became embroiled in a conflagration with police

---

[7]     Architect of the Capitol, **https://www.aoc.gov/explore-capitol-campus/buildings-grounds/capitol-building**
[8]     The DoJ announces that "over 165 individuals charged with assaulting, resisting, **_OR IMPEDING_** law enforcement."   **https://www.justice.gov/usao-dc/pr/affiliate-oath-keepers-**

on the West side of the building at the central arched tunnel and in a court yard, *therefore the Oath Keepers are responsible* (somehow), eventhough to this day, they had no knowledge or awareness about any of those events.

Worse, in complete disregard of Federal Rules of Criminal Procedure Rule 12, which provides for dismissing a case when the Indictment lacks specificity or fails to state an offense, the U.S. Attorney's Office for the District of Columbia insists repeatedly that they may show up at trial with previously-undisclosed evidence.

Actually, prosecutors can show up with *more* evidence but they need to actually *start out* with *some* evidence.  See Federal Rules of Criminal Procedure Rule 12(b)(3)(B)(v).

Therefore, even though the Fifth Superseding Indictment contains not a shred of any factual allegation against these Defendants, other than strong adjectives and adverbs and dramatic tellings worthy of a great novelist, and lots and lots of talking to each other, the Government refuses to drop the case and insists that it will prosecute these Defendants for talking to each other a lot.  They are dramatically portrayed as "preparing for battle" by getting dressed, reminiscent of a "Lord of the Rings" novel.  The Oath Keepers had the bad manners of talking to each other without including the FBI in their private conversations.  The Government doesn't know what the Defendants were talking about and that's just not right.

The Indictment in this case alleges against these Defendants:

---

**pleads-guilty-conspiracy-and-breaching-capitol-jan-6**   Thus ***FEWER THAN*** 165 people assaulted or resisted law enforcement, aside from those who merely "IMPEDED" – whatever that means. Some of the 165 are only guilty of "impeding."  Thus, around 100 people out of hundreds of thousands, estimated by organizers as high as 500,000 to 1 million fought with police.  These Defendants of course did no such thing.

10.   In the course of these events, over 100 members of law enforcement were assaulted.  The Capitol suffered millions of dollars in damage -- including broken windows and doors, graffiti, and residue from pepper stray, tear gas, and fire extinguishers deployed both by crowd members who stormed the Capitol and by Capitol Police officers trying to restore order.   Additionally, many media members were assaulted and had cameras and other news-gathering equipment destroyed.

Therefore, Defendants Meggs and Harrelson must respond to what other people did in other places around the cruise-ship-size 751 foot long Capitol building.

As a result, the videos in question are exculpatory evidence under *Brady v. Maryland* even as to Defendants Meggs and Harrelson, because the Government refuses to admit that the Oath Keepers in this group had nothing to do with any of the violence, impeding, or disruption taking place on the other side of the cruise-ship size building.

Therefore, Defendants Meggs and Harrelson must be prepared to respond to false allegations that they are parts of what other people did on the other side of the Capitol building.

### C.  Video Described by Ryan Nichols Should be Publicly Released

We, counsels for Kelly Meggs and Kenneth Harrelson, Jonathon Moseley and Bradford Geyer, have personally seen some of the video produced confidentially as *Brady v. Maryland* disclosure materials described in the motion of Ryan Nichols, viewed together with counsel for Ryan Nichols.

But don't take our word for it.  The video is there and it should be seen by the Court in chambers and by the public.

We do not have a copy of the video, however.  We have only watched it in a meeting.  Mr. Moseley is still trying to get renewed copies of prior discovery from previous counsel, and does not believe this video has ever been released to Kelly Meggs' counsel.  Mr. Geyer is not aware that these videos are in his discovery although he recognizes it is possible.

Not only should it be public, but we need copies for Kelly Meggs' defense and Ken Harrelson's defense.[9]

This Motion is not for anyone to believe counsels.

The Motion is for the Court to review the video in Chambers and to rule on whether the designation under the Protective Order is proper or should be removed.  Then the video can speak for itself.

Based on the motion filed by Ryan Nichols, there is sufficient reason for the Court to review the video in chambers and decide whether to release it, which it should.

### D.  Video Improperly Withheld is Not Confidential

The so-called arched tunnel is the central entrance to the U.S. Capitol on the West side (facing the Washington Monument) at the top of a long but very steep set of stairs (as opposed to the long, gently-sloping pedestrian stairs stretching across the West lawn up from the street near the statue and reflecting pool).  The arched tunnel is an entrance on the West face accessible from the lawn, as contrasted with upper level doors opening on to the upper level balconies.

We have personally seen that one or more video recordings were made from a permanently affixed security camera within the arched tunnel, looking outward so as to see the backs and heads of Washington, D.C. Metropolitan Police Department officers as they confronted a line of demonstrators.

### E.  Identity of Police Officers and Security Camera Not at Risk

The content shown in the video(s) have not been designated confidential, only the camera view of the actual video which might show where the camera is positioned.  Thus, the scenes can

be described without violating the Protective Order.

Although, the identity of the MPD officers who violently attacked a woman – as clearly seen in the video – should be made public, the video does not show the front of the MPD officers and they are wearing riot gear helmets.  The release of the video or videos would not identify any MPD police officer.

In the video(s), the MPD officers have identifying labels "MPD" or "Metropolitan Police Department" on their riot gear on the back – visible to the camera behind them and thus visible in this video – but not apparently on their front.  (That is, their organization unit is visible – ___not___ their individual names.)  Thus, their identity does not appear to be visible to the crowds outside.  Strangely, identification is on their back not their front.

The video(s) contain the markings at the top of a particular security camera by code.

The video(s) is / are designated sensitive for no reason other than the myth that the positioning of the security camera would reveal too much about the security system of the U.S. Capitol.  Already rejected by Chief Judge Beryl Howell, this objection is lacking in both candor and common sense.  See, Memorandum Order and Opinion, *United States v. Eric Chase Torrens,* Criminal  Action No. 21-204-2  (BAH), ECF Dkt. # 83, September 15, 2021.

In fact, the positioning of the camera looking through the arched tunnel is overwhelmingly obvious.  It cannot be considered confidential.  The arched tunnel is a prominent entrance to the U.S. Capitol.  The fact that there is a camera looking outward in that entrance would be obvious to any tech-minded 14 year old.  The view of the entrance is completely obvious and does not betray any security strategies or methodology.  (By that I mean, that there is no other choice available for placing a camera.  Nothing can be revealed because no one could think of any alternative position for a camera looking out through the tunnel.  That there would

9

be a camera at a major entrance is obvious.)

However, the U.S. Capitol Police could re-position cameras in the entrances later, perhaps by providing for more than one where now there appear to be only one, if it were possible by some means to confuse future wrong-doers.  The video does not suggest any way that security could be improved in that tunnel, but perhaps by adding additional cameras inside and out rather than pretending that the video camera in question is properly secret.

In February 2021, Mr. Moseley watched on television that this same scene (from the outside looking in) was played during the impeachment trial of former President Donald Trump. The same complaining victim – the U.S. Congress – waived any confidentiality of its security camera video and aired this scene and many other the scenes from security cameras all throughout the U.S. Capitol on national and international television during the impeachment trial in the U.S. Senate.

We, undersigned counsel, also watched the battles with police shown at this same arched entrance (tunnel) on television from the impeachment trial and the same video clip from the outside has been replayed probably thousands of times in the news media.  I was able to compare the national televised replay of this scene with the video designated confidential.

## F.  IN THE ALTERNATIVE DROP THE CASE

On the other hand, if the Government does not want to reveal confidential information, then their remedy is to drop the case.  See, generally, Karen H. Greve, "Graymail: The Disclose or Dismiss Dilemma in Criminal Prosecutions,"  Case Western Reserve Law Review, Vol. 31, Issue 1, 1980.

## G.  The Video Content is Exculpatory Evidence as to all Defendants

Other videos viewed from outside the arched tower looking in appear to show that the

crowd is handing up "weapons" (boards and tools left behind by the construction crews constructing the scaffolding for the inauguration).

In fact, however, the video(s) from this camera view from the inside looking out of the arched tunnel show something entirely different.  In the new view from this video, these items are actually being collected from the crowd by some, and then passed up to a man who drops down in the arch and then climbs back up again, repeatedly, and hands over these improvised "weapons" to the MPD police officers at the line between the demonstrators and the officers. Anything that could be used as a weapon (mostly from the Capitol scaffolding construction crew) is being collected from the crowd (repeatedly) and surrendered to the MPD officers.

Nevertheless, at least one MPD officer is shown beating a woman at the line between the MPD officers and the demonstrators.  When the woman's red hat falls off, a substantial amount of blood (given that it is passing through her hoodie, can be seen from her head bleeding through from her white "hoodie" on top of her head that was under her red MAGA hat.

Again, the video speaks for itself, and it needs to be publicly released.

There is no need for counsels to ask, and counsels are not asking, for anyone to believe their description.  The video itself from the Capitol security cameras can be reviewed.

As pled by counsel, Joseph McBride, for Ryan Nichols.  *[White shirt refers to an MPD police officer whose name is unknown.  Ledge officer refers to an MPD police officer in riot gear who is elevated above the other officers by standing on something, apparently a ledge, to the right the side of the tunnel.  The Ledge officer is observing the whole scene and at times leans forward toward the crowd to dispense some type of chemical spray.]*

**Here is analysis of the beating as seen from**

**Exhibits 13 and 14 (Please note that the time stamps**

pertain to the three-hour long video itself, attached as

Exhibit 13, and not the time of day on January 6, 2021),

as follows:

   **2:07:01: White-shirt hits the woman in the head with his baton five times in seven seconds;**

   **2:07:22: The woman is sprayed directly in the eyes by officer on ledge;**

   **2:07:24: White-shirt uses his baton to hit another person with a mask on;**

   **2:07:30 The woman and others are still being maced and hit by White-shirt and ledge officer;**

   **2:07:38 Blood is visibly coming out of the woman's head and can be seen on the white hoody;**

   **2:07:55 White-shirt and other officers are randomly assaulting people for no apparent reason;**

   **2:08:17 White-shirt makes his way to front of crowd again and targets woman who is attempting to escape;**

   **2:08:30 White-shirt spears and pokes the woman his baton about the head, neck, and face so as to inflict maximum pain;**

   **2:08:46 White-shirt beats the woman with his baton striking her eight times in six seconds;**

   **2:09:13 White-shirt punches the woman in the face, with his left-hand, landing five punches in five seconds, with all of his might;**

   **2:09:35 Another officer joins in and starts beating the woman in the head with his baton, landing twelve strikes in seven seconds;**

   **2:10:47 If you pause the video here, you will see the welts on the woman's face along with a disturbing look of helplessness;**

   **2:10:54 Officers push the woman around the**

> tunnel.
>
> **2:10:55 The woman temporarily collapses.**
>
> **2:11:13 White-shirt follows the woman to the front of the tunnel and beats her with his baton as she's collapsing; and**
>
> **2:11:24 The woman is re-taken to the back of tunnel and is never seen again.**
>
> **Ryan has his eyes peeled on the tunnel but the woman never comes out. As he is looking for her, he sees a blonde-haired woman attempting to leave the tunnel, just as she is about to exit, she gets kicked and stomped in the head by an officer. She is screaming, and so are others.18**

**Defendant Ryan Nichols' Motion For Modification Of Bail To Place Defendant On Conditional Release Pending Trial**, *USA v. Ryan Taylor Nichols*, Case No. 21-cr-00117-TFH-1, within this Court, ECF Dkt. # 55, November 1, 2021, pages 14-15.

The video also shows that the MPD officers beating on people in the front line between the officers and the demonstrators was pointless, because the demonstrators they were beating on were physically incapable of moving, let alone retreating, being pressed from the other direction by hundreds of other demonstrators.  There was no pathway for the demonstrators to back up or retreat.

Ryan Nichols argues that this behavior provoked the crowd to respond to come to this woman's defense.  Whether the MPD understood it or not, these confrontations, Nichols argues, created the violence that followed.  He argues that there were confrontations with police because the crowd tried to come to this woman's and other people's aid.

Here, Kelly Meggs and Kenneth Harrelson argue only that we need to know.

During the impeachment trial and in massive news coverage, the jury pool was led to believe that the confrontation was with U.S. Capitol Police.  Not to detract from the service performed by USCP in defense of the Capitol by perhaps 100 people, the video that we have

seen shows that the now-infamous confrontation at the arched tunnel was actually with Washington, D.C. Metropolitan Police Department police officers.  Close-ups of that archway have been used over and over as the _only_ thing that happened on January 6, 2021.

The difference is that the U.S. Capitol Police are accustomed to the tradition that the U.S. Capitol is open to the public which would lend an explanation for why many seem to have been let into the Capitol.  The dishonesty of saying that the Capitol is "secured" is contemptible because the National Air and Space Museum is "secured" 24 hours a day, yet 4.5 million tourists visited from around the world in 2019.[10]   "Secured" means manned with guards.  It does not mean closed to the public.  The prosecution knows this, yet misleads.


The U.S. Capitol and its grounds are open to the public, contain two gift shops in the actual Capitol and in other buildings [11], and many cafeteria and coffee shops / grills in the Capitol and adjoining office buildings open to the public.  One may go and eat in the Capitol or office buildings purely for the fun of it.  [12]  The attempt to portray the public building – which contains public viewing galleries to watch Congress in session – as a top-secret missile base is merely contemptible.  While this very Federal courthouse is "secured" 24 hours a day, a member of the public may enter and observe a trial or hearing at any time, unless explicitly closed (such

---

[10]     Media Fact Sheet, National Air and Space Museum,
**https://www.si.edu/newsdesk/factsheets/national-air-and-space-museum**
[11] **https://shop.visitthecapitol.gov/**
[12]     "Eat with the staffers who run Congress (Review of **Longworth Building Cafeteria**)," TRIP ADVISOR, August 23, 2016, ("Unlike the Senate cafeterias and dining rooms where your rank and title gain admittance, anyone is welcome at the Longworth. Democracy in action!"), **https://www.tripadvisor.com/ShowUserReviews-g28970-d4168517-r409328710-Longworth_Building_Cafeteria-Washington_DC_District_of_Columbia.html** (In fact, while the Senate Dining Room may at times require a minimal invite, the House and Senate cafeterias are all open to the public.)

as due to COVID or for sealed proceedings).

By contrast, the MPD has a different experience than the U.S. Capitol Police.  The strong contrast by events at different places around the Capitol may be explained in part by the USCP carrying out their traditional role of welcoming tourists and visitors and the MPD following their training and approach.

### H.  Legal Framework and Authorities

Federal Rule of Criminal Procedure 16(d) gives district courts the discretion to enter protective orders, "subject always to the Sixth Amendment's limitations." *United States v. Cordova*, 806 F.3d 1085 (D.C. Cir. 2015).

The Sixth Amendment guarantees a defendant the right to assist meaningfully in his own defense. *See McKaskle v. Wiggins*, 465 U.S. 168, 174 (1984) ("The [Sixth Amendment] . . . implies a right in the defendant to conduct his own defense, with assistance at what, after all, is his, not counsel's trial."). It also guarantees the right to a trial by a fair and impartial jury. U.S. Const. amend. VI. The Supreme Court has found that the right was violated where, in the months preceding a defendant's trial, "a barrage of newspaper headlines, articles, cartoons and pictures was unleashed against him," which were "delivered regularly to approximately 95% of the dwellings" in the jury pool, the collective result of which was that the "continued adverse publicity caused a sustained excitement and fostered a strong prejudice" in the jury pool. *Irvin v. Dowd*, 366 U.S. 717, 726 (1961). The defendant in *Irvin* established this with 46 negative headlines. *Id.* at 725. In assessing potential impartial-jury prejudice from negative publicity, courts consider the source of that publicity and whether it derives from government action. *See*, *e.g.*, *United States v. Bakker*, 925 F.2d 728, 733 (4th Cir. 1991).

This Court recently ordered the government to remove a Highly Sensitive designation from Capitol CCTV video, over its objection. *United States v. John Anderson*, 21-cr-215, ECF No. 37

(D.D.C. 2021).  *In United States v. Morss*, 21-cr-40-TNM-5, the government did not oppose the release of Capitol surveillance footage to the press and public.  The government has released footage from inside the Capitol for public assistance in identifying suspects. *See*, *e.g.*, U.S. Capitol Violence, FBI, http://www.fbi.gov/wanted/capitol-violence.     Capitol surveillance video has been made public multiple times in connection with the January 6 events, most notably in President Trump's second impeachment trial. *See*, *e.g.*, *See full video of how insurrection at Capitol unfolded*, CNN, http://www.cnn.com/videos/politics/2021/02/10/security-footage-capitol-riot-plaskett-timeline-impeachment-trial-two-vpx.cnn  ).

## I.   Complaining "Victim" Is Massively Abusing The Protective Order And Singing On Every Street Corner

The Office of the U.S. Attorney for the District of Columbia is the legal counsel representing the U.S. Capitol Police and the U.S. Congress.  Styled as the United States of America vs. roughly 680 Defendants, it is in fact the U.S. Congress and its agency the U.S. Capitol Police who are the complaining "witness" or complaining victim.

The U.S. Congress is massively prejudicing the jury pool in the District of Columbia, almost every day, pumping out provable lies to the prejudice of all of the Defendants.  Without a shred of evidence, the Congress is smearing these Defendants in public as racists and White supremacists.  Those lies are evidently causing detained Defendants to be beaten in prison on the perception that they are "Insurrectionists.".  Someone is more than likely to to die in custody because of the lies or misrepresentations of the complaining victims, the media, and potentially

Congress and USCP.[13]

Moreover, the complaining victims in the U.S. Congress are massively prejudicing the jury pool in the District of Columbia by pronouncement these Defendants as already guilty and as insurrectionists, etc.[14] These allegations aren't just false, they are blood lies. Defendants' Meggs and Harrelson remain loyal US citizens who did not do what ther are accused of doing and they sing the National Anthem every evening at 8:00 PM.

Judges of this Court are prominently – to massive publicity within the jury pool of Washington, D.C. – condemning the behavior not just of individual Defendants at sentencing but all of those who came to Washington, D.C. to exercise their rights protected and guaranteed under the U.S. Constitution to peaceably assemble, to protest, to the exercise of free speech, to travel, and to petition their government for redress of grievances.

We are scolded by law professors that it is normal for judges at sentencing to hold public condemnation sessions of defendant. However, here, there are still related cases. Here, in effect, we have one case brought by one set of complaining victims (agencies) split up among many judges, against roughly 680 Defendants.

This Court may not have had the occasion – as defense counsel have – to read and

---

[13] See ECF 489 generally (also Attachments 1 and 2) about how co-Defendants receive additional punishments over and above the ordinary prisoner abuse and mistreatment suffered generally by January 6th defendants.

[14] See ECF 485 generally about how allegations in the Indictment suffer from exaggeration and embellishment.

compare the boiler-plate "form letter" indictments (at least in terms of the counts) brought against roughly 680 Defendants, which are (in the Counts) mostly identical. There are a few groups which have been accused of more or less serious Counts, but the writing of Counts is identical.

This is in effect one case. And yet Judges are making commentary while sentencing some Defendants even though hundreds of other Defendants facing the same Counts for the same conduct in the same place on the same day are still awaiting trial while others have not been identified or interviewed.

**II.      CONCLUSION**

WHEREFORE, the Court should order the designation of videos from within the compilation of the Ryan Nichols' defense counsel removed and the video publicly released.

Dated: November 23, 2021          RESPECTFULLY SUBMITTED
                                  KELLY MEGGS, *By Counsel*


                                  Jonathon A. Moseley, Esq.

                       USDCDC Bar No. VA005
                       Virginia State Bar No. 41058
                       Mailing address only:
                       5765-F Burke Centre Parkway, PMB #337
                       Burke, Virginia 22015
                              Telephone: (703) 656-1230
                       **Contact@JonMoseley.com**
                       **Moseley391@gmail.com**


                              /s/ Brad Geyer
                              Bradford L. Geyer, PHV

                                  18

PA 62998
NJ 022751991
Suite 141 Route 130 S. 303
Cinnaminson, NJ 08077
**Brad@FormerFedsGroup.Com**
(856) 607-5708


## CERTIFICATE OF SERVICE

      I hereby certify that on November 23, 2021, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following CM/ECF participants.  From my review of the PACER / ECF docket records for this case that the following attorneys will receive notice through the ECF system of the U.S. District Court for the District of Columbia.

      **Jeffrey S. Nestler**
U.S. ATTORNEY'S OFFICE
555 Fourth Street NW
Washington, DC 20530
202-252-7277
**jeffrey.nestler@usdoj.gov**

      **Kathryn Leigh Rakoczy**
U.S. ATTORNEY'S OFFICE FOR THE DISTRICT OF COLUMBIA
555 Fourth Street, NW
Washington, DC 20530
(202) 252-6928
(202) 305-8537 (fax)
**kathryn.rakoczy@usdoj.gov**

      **Justin Todd Sher**
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue NW
Washington, DC 20530
202-353-3909
**justin.sher@usdoj.gov**

      **Troy A. Edwards, Jr**
U.S. ATTORNEY'S OFFICE FOR THE DISTRICT OF COLUMBIA
555 4th Street, NW
Washington, DC 20001
202-252-7081
**troy.edwards@usdoj.gov**

**Alexandra Stalimene Hughes**
DOJ-Nsd
950 Pennsylvania Ave NW
Washington DC, DC 20004
202-353-0023
**Alexandra.Hughes@usdoj.gov**

**Louis J. Manzo**
DOJ-CRM
1400 New York Ave NW
Washington, DC 20002
202-616-2706
**louis.manzo@usdoj.gov**

**Ahmed Muktadir Baset**
U.S. ATTORNEY'S OFFICE
United States Attorney's Office for the District of Col
555 Fourth Street, N.W., Room 4209
Washington, DC 20530
202-252-7097
**ahmed.baset@usdoj.gov**

Jonathon Moseley, Esq.